G.M. SHUPE, INC.

v.

**The UNITED STATES.**

No. 386–79C.

United States Claims Court.

July 31, 1984.

4. It is alleged that its claim approximates ten percent (10%) of its profits.

Patrick A. Sullivan, Spokane, Wash., for plaintiff. Winston & Cashatt, Spokane, Wash., of counsel.

Alvin A. Schall, Washington, D.C., with whom was Asst. Atty. Gen. J. Paul McGrath, Washington, D.C., for defendant.

## OPINION

LYDON, Judge:

In this construction contract case, plaintiff seeks to recover damages on behalf of itself and on behalf of Continental Drilling Company (Continental), its subcontractor, from defendant arising out of its construction of the Nambe Falls Dam in New Mexico for the Bureau of Reclamation, Department of the Interior (BOR). Plaintiff filed its petition (complaint) in this court as a direct access case under section 10(a)(1), (3) of the Contract Disputes Act of 1978, codified at 41 U.S.C. § 609 (1982). Plaintiff advances five separate theories of recovery in claiming some $4 million as damages it incurred in construction of the Nambe Falls Dam. Defendant has raised a number of defenses, legal and factual, to the various damage claims asserted by plaintiff, and, in addition, has asserted a counterclaim in its amended answer against plaintiff in which it seeks to recover $78,922.75 which defendant claims it mistakenly paid plaintiff as contract proceeds.

## I.

After trial on the merits and the compilation of a voluminous trial record, the par-

ties filed detailed and extensive proposed findings of fact and expansive briefs, which were followed by oral argument. Plaintiff has presented ten separate claims. It is clear that six of the claims represent claims by plaintiff itself. It is also clear that two of the claims represent claims by plaintiff on behalf of Continental. As to one of the remaining two claims, it seems clear that this claim represents claims by both plaintiff and Continental. As to the other remaining claim the record is most confusing as to whether the claim is that of the plaintiff alone or whether it also includes a claim by Continental. The manner in which the claims and attendant proof and defenses were presented created some confusion and difficulty for the court. For example, the parties were unable to agree on whether certain claimed damages belonged under one claim category or another. The record, as constructed, provides little help in resolving the matter. Again, Continental presented its claim for damages primarily on the total cost theory, but it did break out specifically the individual amounts it sought for two separate claims. However, neither the record nor the parties provided much help to the court in breaking out other claims Continental asserts under the total cost wrapper.

The following facts, which are specifically found by the court, are herein set forth by way of background in order to place discussion and consideration of the various claims asserted by plaintiff and Continental in proper perspective. Additional facts, specifically found by the court, will be set forth when each claim is discussed and ruled upon *infra.*

Plaintiff, incorporated in the State of Washington, was formed in 1972 by Gerald M. Shupe (G. Shupe). Plaintiff was owned and managed by G. Shupe, Michael Quinn and Larry Campbell (Campbell). Prior to the formation of plaintiff, G. Shupe and Quinn had extensive experience in the construction of dams. Both also had long experience in negotiating claims arising out of construction contracts. Continental, a California corporation, also had many years of experience in performing drilling and grouting work on dam structures. At time of trial, Richard O. Thies (Thies) was president and general manager of Continental. Thies had a degree in geology and had been with Continental since the early 1940's, working his way up the company ladder from drill helper to president. Thies was experienced in drilling and grouting work and in estimating work related thereto.

On June 11, 1974, plaintiff was awarded a contract by BOR to construct the Nambe Falls Dam. The work site was about 25 miles north of Sante Fe, New Mexico. Five bids were received by BOR relative to this work. Plaintiff's low bid, which was accepted, was $5,119,753. Of the remaining four bids, the lowest was $5,475,000 and the highest was $6,368,587. BOR's estimate for performing the contract was $4,777,507. While the relative closeness of the government's estimate and the second lowest bid suggests that plaintiff's bid should be considered reasonable without more, the fact that plaintiff's bid anticipated completing the job 6 months earlier than the required completion date set forth in the contract suggests an overly optimistic approach to the contract, especially in light of the information contained in the pre-bid information made available to bidders regarding the geology, and the rock and soil conditions of the work site.

The contract in question contained the usual General Provisions found in federal government construction contracts, *e.g.,* Specifications and Drawings (Article 2), Changes (Article 3), Differing Site Conditions (Article 4), Damages For Delay (Article 5), Disputes (Article 6), Payments to Contractor ·and release from contractor (Article 7) and Suspension of Work (Article 23). The contract also contained specific provisions related to the nature of the contract, *i.e.,* dam construction. For example, section 4.1.2 (Open-Cut Excavation, General) and section 4.1.3 (Excavation, All Classes, For Concrete Arch Dam And Thrust Block). In the contract, BOR estimated the amount of anticipated excavation under bid item 39 to be 20,000 cubic yards,

and estimated that use of 21,250 bags of grout should be anticipated in performing the pressure grouting work required under bid item 17.

■ Information concerning the geology of the dam site and the rock and soil conditions at the dam site was available to bidders. This information indicated that difficulties were to be expected in drilling in the rocks and formation of the work site, with rock breakage and cavings clearly to be anticipated. G. Shupe testified that this information provided an excellent and clear description of what was encountered by plaintiff during construction of the dam. Plaintiff does not contend that any of its claims result from differing site conditions. On the other hand, Continental does contend that it encountered a differing site condition in performing its drilling and grouting work. The record, however, will not support this contention by Continental. The court finds that the pre-bid information furnished bidders clearly described the actual conditions that were encountered at the work site.

Plaintiff was given notice to proceed with the contract work on June 13, 1974. Work on the dam commenced on June 20, 1974. BOR accepted the contract work as substantially complete on April 13, 1976, the original contract completion date.

Nambe Falls Dam, as constructed, is a composite structure consisting of a prestressed concrete thin arch dam, a concrete thrust block, and an earth embankment dam. In effect, the thrust block joins the concrete and earth dams; it forms the left abutment for the concrete thin arch dam and the right abutment for the earth dam. An uncontrolled overflow spillway occupies the top central portion of the thin arch dam. The spillway is designed to traject discharges downstream and away from the thin arch dam. A small outlet works, located in the lower portion of the thin arch dam, is designed to provide for the downstream river requirements.

The prestressed concrete thin arch dam is located in a small gorge of the Rio Nambe. The thin arch dam is about 320 feet long and has a maximum height of 150 feet. The right abutment of the thin arch dam is keyed into the foundation rock. However, on the left abutment, the topography was such that a concrete thrust block was constructed to serve as an artificial abutment. As indicated above, the thrust block, which was somewhat pyramid in shape, also functioned as an abutment for the earth embankment dam. The concrete thrust block was 280 feet long at its base and had a maximum height and width of 108 feet and 78.5 feet respectively. A 5-foot wide by 7.5-foot high gallery extends from one end of the thrust block to the other. In an area atop the thrust block where it joins the earth embankment dam an access house was located. This access house provided entry to the gallery where there were various gauges, measuring instruments and other electrical items. The earth dam embankment portion of the Nambe Falls Dam contains approximately 200,000 cubic yards of earth materials.

The concrete portion of the dam, i.e., the thin arch dam and the thrust block, was divided into nine vertical sections, or "Blocks", to facilitate construction. There was a contraction joint between each concrete Block. Looking downstream at the dam site, concrete Block 1 is at the extreme right end of the thin arch dam, and concrete Block 9 is at the extreme end of the thrust block. Each of these nine concrete Blocks was composed of a series of "lifts". A lift was a 7½-foot high mass of concrete whose width varied depending on its location in the concrete portion of the dam. In other words, the lifts were not all uniform in size and shape. The number of lifts in a Block also varied, from 4 to 20, again depending on where the Block was located in the concrete portion of the dam.

At the bottom of the right abutment, there was the small "U" shaped gorge mentioned above. The axis or center of the thin arch dam was directly in the middle of this small gorge. On the left side of the gorge, unlike the right side, there is only a short 46-foot rise in the terrain, thereafter the terrain slopes gradually upward to the

area upon which the thrust block and earth dam were built. This short rise on the left side of the gorge forms the left abutment for the bottom portion of the arch dam. The bottom portion of the thin arch dam is anchored to this short rise of terrain by the same means it was tied into the right abutment, *i.e.*, by fillets poured into an excavated portion of the rise. As a result, the use of fillets in this area only covers a short distance and the thrust block formed the left abutment for the remaining portion of the arch dam.

Following award of the contract, plaintiff, as required by the contract, submitted to BOR on June 20, 1974, a construction program work schedule, *inter alia.* This schedule was in the form of a bar graph which set forth the dates on which work on the various (87 in number) contract items and activities would be completed. The construction work schedule indicated that plaintiff contemplated completing the contract on or about October 10, 1975, 484 days after the Notice to Proceed had been issued, and 186 days earlier than the completion date of April 13, 1976, set forth in the contract.

By letter dated July 22, 1974, BOR advised plaintiff it had reviewed its submissions of June 20, 1974, *supra,* and offered comments and suggestions relative thereto. These suggestions and comments by BOR raised questions about certain aspects of plaintiff's contemplated work program which reflected some concern as to the viability of the completion dates proposed by plaintiff.

■ On July 23, 1974, plaintiff again submitted a construction program work schedule which the record suggests was identical in material respects to the one submitted on June 20, 1974, and discussed above. On August 2, 1974, BOR wrote plaintiff a letter identical to the July 22, 1974, letter discussed above. On October 4, 1974, plaintiff submitted a revised construction program work schedule which did not differ from the June 20, 1974, submission regarding the contract completion date. The record indicates that plaintiff did not concern itself with the suggestions and comments of BOR relative to its contemplated construction work schedule set forth in the BOR letters of July 22, 1974, and August 2, 1974. On December 3, 1974, BOR advised plaintiff that its revised construction program was approved. The totality of the record supports a finding that BOR's approval of the plaintiff's contemplated construction work schedule did not carry with it any agreement or acceptance or assurance that plaintiff would be able to complete the contract work by the contemplated date of October 10, 1975, some 186 days earlier than the date set forth in the contract; nor did it reflect a consensus by BOR that plaintiff's contemplated early completion date was reasonable and reasonably attainable.

As indicated previously, plaintiff substantially completed performance of the contract in issue on April 13, 1976. On July 7, 1976, plaintiff executed a Release of Claims. This Release stated in pertinent part:

* * * [A]fter completion of all work and prior to final payment, the contractor [plaintiff] will furnish the United States [BOR] with a release of all claims;

NOW, THEREFORE, in consideration of the above premises and the payment by the United States to the contractor of the amount now due under the contract, to wit, the sum of twenty-one thousand three hundred fifty-seven and no/100 -------------- dollars ($21,357.00), the contractor hereby remises, releases, and forever discharges the United States, its officers, agents, and employees of and from all manner of debts, dues, liabilities, obligations, accounts, claims and demands whatsoever, in law and equity, under or by virtue of the said contract except: * * *

The release as executed by plaintiff contained 19 noted exceptions, totaling $2,719,-009. The following claims, and the amounts thereof, at issue in this case, were excepted from the operation of this release as follows:

| Date | Description | Amount | Litigation Claim No. |
|---|---|---|---|
| December 22, 1975 | Foundation Excavation | $ 862,193 | [Claim 1] |
| November 7, 1975 | Upstream and Downstream Fillet Design Change | 553,601 | [Claim 2] |
| January 13, 1976 | Excavation Changes in the Core Trench | 141,644 | [Claim 3] |
| November 26, 1975 | Vertical Contraction Joint Treatment | 165,929 | [Claim 4] |
| January 8, 1976 | Increased Costs and Delays Resulting from Concrete After-Cooling | 55,059 | [Claim 5] |
| January 15 and February 3, 1976 | Galley Drain Holes | 92,357 | [Claim 6] |
| December 23, 1975 | Changed Work Proposal for Change Order No. 1 and Ensuing Work on Embankment Cut-off Trench Drilling and Grouting Design | 618,699 | [Claim 7A] |
| April 6, 1976 | Request for Equitable Adjustment Resulting from Minimal Foundation Grout Take | 129,963 | [Claim 7B] |
| April 22, 1975 | Request for Equitable Adjustment Resulting from Excessive Bit Cost | 99,564 | [Claim 7C] |
| | | $2,719,009 | |

Subsequent to execution of the release, plaintiff, by letters dated December 3, 1976, and April 7, 1977, requested BOR to consider settlement of all its claims based on the purported total cost for the work, in lieu of evaluating each excepted claim on its individual merit. Plaintiff's total cost claim, as submitted, was $5,565,297.38. However, the contracting officer, in his consideration of plaintiff's claims, only considered those claims excepted from the release and not yet settled. Negotiations subsequent to execution of the release between plaintiff and the contracting officer resulted in full settlement of 10 of the 19 claims noted as exceptions to the release. On July 5, 1979, the contracting officer issued his findings of fact and decision on the 9 remaining claims noted as exceptions to the release and not otherwise settled. In this decision, the contracting officer denied plaintiff's claims and further concluded that the plaintiff had been overpaid on certain of the claims and that, accordingly, the government had a proper claim against plaintiff for $78,922.75.

On August 30, 1979, plaintiff filed its petition [now complaint] with the United States Court of Claims setting forth four Causes of Action. On October 30, 1981, plaintiff filed an amended petition with the Court of Claims adding a Fifth Cause of Action [the spillway impingement claim]. On January 15, 1982, defendant filed its answer to plaintiff's amended petition and asserted five Affirmative Defenses and a counterclaim in the amount of $78,922.75. Plaintiff's reply to defendant's counterclaim was filed on August 5, 1982.

Subsequent to filing the petition mentioned above, plaintiff on December 14, 1981, submitted another claim, set forth in its amended petition, designated as "the

spillway impingement claim" with the contracting officer contending that it was not aware of the existence of this claim "prior to the last few months." The claim was certified to the contracting officer. Plaintiff advised the contracting officer that the spillway impingement claim was for $1,383,098 and was within the total cost claim of $4,697,602 previously submitted to the contracting officer but was not specifically identified because it was unknown to plaintiff at the time. On April 16, 1982, the contracting officer issued findings of fact and decision denying this claim on the grounds that the claim was barred by the release plaintiff executed on July 7, 1976, and since it was asserted after final payment was made, the General Provisions of said contract precluded allowance of any such claim (*see* Articles 3(f) and 4(c) of the General Provisions, Standard Form 23–A, Oct. 1969 Edition).

## II.

Before proceeding with the consideration and disposition of the ten claims asserted by plaintiff and its subcontractor, Continental, the court directs its attention to the affirmative defenses raised by defendant to certain of these claims, and to the five theories plaintiff and/or Continental advance in support of their efforts to recover damages.

### A. Release

Defendant asserts that plaintiff's claim for damages relating to primary excavation (which defendant construes to mean excavation work coming down the right abutment), which is part of claim No. 1, plaintiff's claim for that portion of the concrete aftercooling claim which arose prior to June 10, 1975, which is part of claim No. 5, and plaintiff's spillway impingement claim, which is claim No. 1.1, are barred by the operation of the general release plaintiff executed on July 7, 1976. Plaintiff concedes that this release, if held to be valid, effectively bars recovery on these claims. However, plaintiff argues that the release should not stand in the way of recovery by

plaintiff on these claims because the release was obtained by economic duress, or by mutual mistake, or by failure of consideration, or by unilateral mistake.

 It is well settled that execution by a contractor of a release which is complete on its face reflects the contractor's unqualified acceptance and agreement with its terms and is binding on both parties. *Inland Empire Builders, Inc. v. United States*, 191 Ct.Cl. 742, 752, 424 F.2d 1370, 1376 (1970). It is also well established that where a contractor has the right to reserve claims from the operation of a release, but fails to exercise that right, which is the situation in the case at bar with respect to the claims set forth above, it is neither improper nor unfair to preclude the contractor from maintaining a suit based on events which occurred prior to the execution of the release. *H.L.C. & Associates Constr. Co. v. United States*, 176 Ct.Cl. 285, 293, 367 F.2d 586, 590 (1966).

There are, of course, special and limited circumstances in which a claim may be prosecuted despite the execution of a general release. *See J.G. Watts Constr. Co. v. United States*, 161 Ct.Cl. 801, 806–807 (1963). Plaintiff asserts that the facts in this case fit into the mold of such special and limited circumstances sufficient to avoid the operation of the release. The record, however, does not support such assertions.

 First, plaintiff claims that economic duress vitiates the release. Case law does support the proposition that economic duress will serve to render a release inoperable. *See Winn-Senter Constr. Co. v. United States*, 110 Ct.Cl. 34, 65–66, 75 F.Supp. 255, 260 (1948). In *Winn-Senter*, the release, which was held inoperable, was executed when a claim, not listed as an exception thereon, was pending before the contracting officer for decision. In executing the release, the contractor believed the claim before the contracting officer at the time would not be affected thereby. The Court of Claims concluded in the *Winn-Senter* case that the conduct of the parties in continuing to consider a claim after exe-

cution of the release made it plain they never construed the release as barring the claim. No such facts are present in this case. None of the claims in question were pending before the contracting officer when the release was executed, nor were the claims considered after the execution of the release. Indeed, the contracting officer refused to consider any claim not listed as exceptions in the release.

■ In order to substantiate the allegations of economic duress, plaintiff must show more than a reluctance to accept the release and of financial embarrassment. Plaintiff must prove that the duress in question resulted from defendant's conduct and not by the plaintiff's necessities. *Fruhauf Southwest Garment Co. v. United States*, 126 Ct.Cl. 51, 62, 111 F.Supp. 945, 951 (1953). There were no acts of the defendant, relative to execution by plaintiff of the release in question, that could be deemed coercive or which would constitute duress. The contract, which plaintiff signed, contained a provision (Article 7, General Provisions) which provided for the execution of a release prior to receipt of final payment. Such a provision cannot be deemed to be coercive since plaintiff was free to note as many exceptions thereto as it wished. In this case, plaintiff listed 19 exceptions.[1] He did not list the three claims set forth above. Plaintiff had the alternative to note as exceptions the claims in question. Defendant has not been shown to be guilty of any coercive acts relative to plaintiff's voluntary execution of the release. Plaintiff did not protest being asked to execute the release nor was it

inhibited in any way by BOR in listing its exceptions to the release. *Compare James Shewan & Sons, Inc. v. United States*, 73 Ct.Cl. 49, 81–83 (1931). Plaintiff has failed to prove the necessary elements of duress as set forth by the Court of Claims in *Fruhauf Southwest Garment Co. v. United States, supra. See B.D. Click Co. v. United States*, 222 Ct.Cl. 290, 305, 614 F.2d 748, 756 (1980); *Johnson, Drake & Piper, Inc. v. United States*, 209 Ct.Cl. 313, 321–323, 327–331, 531 F.2d 1037, 1042–1044, 1046–1048 (1976). *See also Inland Empire Builders, Inc. v. United States, supra*, 191 Ct.Cl. at 753–754, 424 F.2d at 1376–1377.

■ Second, plaintiff claims that a mutual mistake as to material facts existed relative to execution of the release and thus plaintiff should not be bound by the release. Again, case law supports the view that where it is shown that by reason of a mutual mistake, neither party intended that the release cover a certain claim, the court will reform the release. *See J.G. Watts Constr. Co. v. United States, supra*, and cases cited therein. There are no facts in this record which would support a finding of mutual mistake. This is not a case where both parties agreed that a contractor should, in performing a contract, be paid for state taxes on contract materials as part of the contract price and that after completion of the contract and execution of a release the state changed its laws and imposed taxes on the contractor. In such circumstances, a mutual mistake exists and reformation of the release is justified since neither party could have been aware when the release was executed that such a cost

---

1. Plaintiff claims that its "alternative, when faced with a threat to withhold payments due under the contract, was bankruptcy." This is sheer hyperbole. As the release shows, the final contract payment was $21,357. The record indicates that contract retainages amounted to $64,-793.60. Thus, a total of $86,150.60 was due plaintiff. The release excepted from its operation claims totaling at least $2,719,009. These numbers do not favor plaintiff's argument that the release should be avoided. More importantly, the $86,150.60 due plaintiff was to be paid plaintiff's bonding company, not to plaintiff, under an agreement between them. Accordingly, the withholding of these amounts pending

execution of the release would not directly affect plaintiff's liquidity. Irrespective of plaintiff's dire financial predicament, no economic duress finding could be sustained on this record, especially where there is no evidence that plaintiff was restricted in the scope of exceptions it could assert and list in the release. Indeed, when BOR sent its form letter on July 2, 1976, requesting a release of claims, plaintiff was advised that any claim exceptions should be noted on the release. *See Adler Constr. Co. v. United States*, 191 Ct.Cl. 607, 611, 613–614, 423 F.2d 1362, 1364, 1365–1366 (1970), *cert. denied* 400 U.S. 933, 91 S.Ct. 461, 27 L.Ed.2d 441 (1971).

had been incurred. *See Duhame v. United States*, 133 Ct.Cl. 360, 363, 135 F.Supp. 742, 743, 744 (1955); *Harrison Eng'g and Constr. Corp. v. United States*, 107 Ct.Cl. 205, 68 F.Supp. 350 (1946). In this case, plaintiff certainly was aware, or should have been aware, of the costs and claims connected with contract performance.[2] The actions of the contracting officer after the release was executed certainly demonstrate that BOR intended that the executed release have a binding effect on all claims not listed as exceptions therein. Any mistake in this regard was, at best, a unilateral mistake on plaintiff's part, not a mutual mistake of both parties. Plaintiff's claim of a mutual mistake in the execution of the release must be rejected.

 Next, as might be expected, plaintiff claims the release should be rescinded because of plaintiff's unilateral mistake in not excepting the claims in question from the release. As a general rule, mutual mistake underscores a claim for reformation, and unilateral mistake is usually associated with a claim for rescission. Where rescission of a release is sought, unilateral mistake can sometimes be grounds for granting relief. Relief on the grounds of unilateral mistake, however, presents a thorny problem. *See* 3 A. Corbin, Corbin on Contracts §§ 608, 609 (1960). *See also Hester v. New Amsterdam Casualty Co.*, 268 F.Supp. 623 (D.S.C.1967), a case cited by plaintiff in support of its unilateral mistake—rescission contention, but which, on the facts, is inapposite.

 In essence, although not articulated as such in plaintiff's brief, plaintiff seeks to rescind the release under equitable principles. However, plaintiff has failed to make a showing of entitlement to any relief in this regard. *See Inland Empire Build-*

ers, Inc. v. United States, supra, 191 Ct.Cl. at 756, 424 F.2d at 1378. Moreover, it is not unreasonable to conclude in this case, that any unilateral mistake of plaintiff in not including an exception when executing a general release upon completing the contract and receiving payment therefor, will not avoid the binding effect of the release. Plaintiff stresses that it only signed the release because it expected BOR to settle all its claims by payment thereof. However, the subjective and unmanifested intention of plaintiff's president (G. Shupe) will not avoid the otherwise general effect of a release. *See H.L.C. & Associates Constr. Co. v. United States, supra*, 176 Ct.Cl. at 295, 367 F.2d at 591–592.

Finally, plaintiff argues that since the release was given in exchange for sums already due, the release was inoperative for failure of consideration. This argument is without merit. *United States v. William Cramp & Sons Co.*, 206 U.S. 118, 27 S.Ct. 676, 51 L.Ed. 983 (1907); *Inland Empire Builders, Inc. v. United States, supra*, 191 Ct.Cl. at 751–752, 424 F.2d at 1376.

In this case, the release is deemed operative and, therefore, serves to bar the claims, or portions thereof, described above. See plaintiff's interest claim, discussed in Part V, *infra*, which is also deemed barred by the July 7, 1976, release. Further, plaintiff is barred, in any event, from recovering on any claims asserted in this litigation which involve any amounts in excess of the amounts set forth in the release relative to the excepted claims listed therein. *See A.L. Coupe Constr. Co. v. United States*, 134 Ct.Cl. 392, 399, 139

---

**2.** Plaintiff argues that it did not have data that would indicate the full impact of the spillway impingement claim, *i.e.,* the amount of cubic yards excavated from this area at the time the release was executed, and that this should serve to avoid the release. However, the underlying facts were surely available to it prior to execution of the release and the fact this impact was not recognized or realized at that time is the fault of plaintiff, not defendant. Plaintiff excavated the materials and therefore was able, or should have been able, to determine at the time the amount of materials it excavated. Plaintiff should not be allowed to blame the government because plaintiff failed to keep excavation records. *See Johnson, Drake & Piper, Inc. v. United States*, 209 Ct.Cl. 313, 328–329, 531 F.2d 1037, 1046–1047 (1976).

F.Supp. 61, 65 (1956), and cases cited therein.[3]

### B. Theories Of Recovery

Plaintiff seeks to recover over $4 million from defendant as damages arising out of its contract with BOR to construct the Nambe Falls Dam. In its submissions, plaintiff concedes that the release sets forth $2,719,009 as the exclusion amount of the exceptions thereto. Plaintiff claims entitlement to over $4 million on the alternative recovery theories of total cost, quantum meruit, jury verdict, breach of contract and equitable adjustment.

 Under the total cost theory, a contractor seeks to recover the difference between the actual costs incurred in contract performance and its bid or estimated costs. The total cost theory of recovery was not favored by the United States Court of Claims and was tolerated only when no other mode of recovery was available, and when the reliability of the supporting evidence was fully substantiated. *WRB Corp. v. United States*, 183 Ct.Cl. 409, 426–427 (1968). The court is not persuaded that it was impossible or highly impracticable for plaintiff to determine the costs it incurred relative to each asserted claim. Plaintiff's assertion that this can be explained by the fact it lost some of its records is unconvincing.[4] Further, there is some question as to the realistic nature of plaintiff's bid. In the court's view, based on the totality of the record, it was unrealistic of plaintiff to expect to complete this contract 6 months earlier than the contract completion date in view of the geology of the work site and the instability of the rock which had to be excavated. Further, plaintiff's construction program schedule was suspect in that, given the potential construction problems and difficulties evident in the bid documents, plaintiff's early completion schedule was overly optimistic. Finally, the record indicates that plaintiff was responsible for some of the added costs it incurred. Indeed, plaintiff concedes it was responsible for some overexcavation and it seems clear plaintiff was responsible for some inefficiencies in contract performance, a fact noted by plaintiff's subcontractor. Plaintiff's efforts to take refuge in the total cost approach by claiming it took into account its own deficiencies and shortcomings is a feeble justification for acceptance of such an approach since the integrity of the approach has been tainted and this record does not persuade that it should be ignored by viewing the approach as a "modified total cost" recovery approach. *See WRB Corp. v. United States, supra*, 183 Ct.Cl. at 426–427. This record will not support a recovery in this case based on the total cost theory by either plaintiff or its subcontractor, Continental.

 Plaintiff's jury verdict approach to recovery is likewise most unpersuasive on

---

**3.** Since these claims are barred by the release, there is no need to deal with additional defenses raised by defendant relative to these claims, *i.e.*, the defenses of final payment—that plaintiff did not assert these claims until after final payment under the contract, of untimely assertion of these claims—that plaintiff did not comply with the notice provisions of Articles 3 (Changes) and 4 (Differing Site Conditions) of the contract, and of failure by plaintiff to obtain a decision from the contracting officer on these claims.

**4.** The record suggests that these "lost records" were available when plaintiff submitted its claims to the contracting officer on a total cost recovery theory in 1976 and 1977. It is true that many of the records were not available to the FBI for their audit of plaintiff's claims in the early 1980's and thus made it difficult for the FBI to audit said claims. Plaintiff advised the FBI that in various moves by the company, the records had been lost. However, since plaintiff knew it had claims it intended to assert when it had said records, it was obligated to safeguard its records relating to said claims. Plaintiff's lack of diligence in preserving and safeguarding these vital records does not justify use of the total cost approach in this case. *WRB Corp. v. United States*, 183 Ct.Cl. 409, 426 (1968). Determination of damages in this case was made exceedingly difficult for the court because plaintiff utilized the total cost approach in determining its total damages and then making what it felt were proper allocations of those costs among the claims. In this manner, plaintiff felt it could avoid the stigma of the total cost approach by presenting the court with damage amounts for individual claims, a technique plaintiff characterizes as a "modified total cost" approach to damage determination.

this record. While the United States Court of Claims has allowed jury verdict recoveries, it has done so where there was no more reliable method for computing damages and the evidence was sufficient to enable the court to make a fair and reasonable approximation. *See WRB Corp. v. United States, supra*, 183 Ct.Cl. at 425, and cases cited therein. Here, the court is of the view that a more reliable method for computing damages for these various claims was available and should have been followed by plaintiff. Plaintiff's officials had long experience in construction contracts and in negotiating claims. More importantly, the record in this case and the confusion and complexity built into the damage figures presented by plaintiff preclude the court from being able to make a fair and reasonable approximation necessary for resorting to a total award jury verdict remedy, assuming one to be justified. Plaintiff is not entitled to a total award recovery in this case on the basis of a jury verdict.

■ Next, plaintiff seeks recovery on the basis of quantum meruit. However, it is well settled that recovery in this court, as was the holding in its predecessor court, on a quantum meruit basis is an action on a contract implied-in-law, as distinguished from a suit on a contract implied-in-fact, and is therefore beyond the jurisdiction of this court. *See Fincke v. United States*, 230 Ct.Cl. 233, 246–247, 675 F.2d 289, 296–297 (1982), and cases cited therein. This fact serves to distinguish *United States v. Algernon Blair, Inc.*, 479 F.2d 638 (4th Cir.1973), cited and relied on by plaintiff, which involved a suit by a subcontractor, suing in the name of the United States, against a prime contractor and its surety in the District Court in a Miller Act case. *Algernon Blair* was not a Tucker Act case.

■ Plaintiff also seeks recovery on the theory of breach of contract. However, it seems clear that plaintiff's claims, and the claims of its subcontractor, are redressable under various provisions of the contract. Accordingly, plaintiff is limited to the relief provided by the contract, *i.e.*, equitable adjustments, and is not entitled to any further or different relief. *See L.W. Foster Sportswear Co. v. United States*, 186 Ct.Cl. 499, 502, 405 F.2d 1285, 1287 (1969). Despite its arguments in its briefs and at oral argument to the contrary, plaintiff does seem to recognize that all its claims can be resolved on the basis of equitable adjustment determination (*see* plaintiff's initial post-trial brief, p. 3, note 1).

### III.

■ Plaintiff makes much of the fact that it anticipated completing the Nambe Falls Dam contract 6 months earlier than contemplated in the contract. It did substantially complete the contract within the time period called for by the contract. It is, of course, settled that a contractor is not precluded from recovering delay (or impact) damages merely because it completed a contract within the period provided by the contract. *See Coley Properties Corp. v. United States*, 219 Ct.Cl. 227, 234–235, 593 F.2d 380, 384–385 (1979). In this case, plaintiff seeks to recover, *inter alia*, damages for over 5 months (160 calendar days) of delay in contract completion which it attributes to governmental actions. Both parties resort to a "critical path method" (CPM) of construction analysis in support of their positions regarding recovery of delay damages.[5] Each party attacks the

---

5. In *Haney v. United States*, 230 Ct.Cl. 148, 167–168, 676 F.2d 584, 595 (1982), the critical path method (CPM) of construction was described in pertinent part:
 "Essentially, the critical path method is an efficient way of organizing and scheduling a complex project which consists of numerous interrelated separate small projects. Each subproject is identified and classified as to the duration and precedence of the work. (*E.g.*, one could not carpet an area until the flooring is down and the flooring cannot be completed until the underlying electrical and telephone conduits are installed.) The data is then analyzed, usually by computer, to determine the most efficient schedule for the entire project. Many subprojects may be performed at any time within a given period without any effect on the completion of the entire project. However, some items of work are given no leeway and must be performed on schedule; otherwise, the entire project will be delayed. These latter items of

other's critical path method analysis and defends its own. In its consideration of the various damage claims asserted by plaintiff, the court must determine whether government-caused delay was responsible for said damages, and, if so, determine the amount thereof. In this discussion, the court will follow the claim numbering and description format utilized by plaintiff.

### A. *Claim 1—Foundation Excavation Changes*

Under claim 1, plaintiff seeks to recover $1,033,864.[6] Defendant maintains that plaintiff is only entitled to recover $27,937 related to thrust block foundation work.

### *Facts*

Under the contract, it was estimated that the foundation for the concrete dam would entail excavation of 20,000 cubic yards (c.y.) of material. The actual amount of material excavated was determined by BOR to be 23,350 c.y. This difference forms the basis, in part at least, for plaintiff's claim 1. However, plaintiff concedes that it is responsible for some of this so-called overexcavation and defendant maintains that plaintiff's method of performance contributed greatly to said overexcavation. Further, plaintiff contends that its overexcavation problems resulted, in the main, from the geology of the site. As indicated previously, the site geology was accurately reflected in the pre-bid documents made available to plaintiff. Plaintiff was aware of this site geology situation before it submitted its bid and presumably took these facts and potentialities into consideration, or should have, when preparing its bid. The manner in which this claim has been characterized and/or presented by

plaintiff has produced a somewhat confusing and contradictory claim which has caused no end of problems for the court.

Defendant maintains that the bulk of claim 1 embraces a claim for primary excavation. Primary excavation involved the initial removal by means of drilling, blasting and scaling, of the bulk of material necessary to achieve a competent foundation. In the vernacular of this case, primary excavation was concerned basically with going down the slope or hill. Plaintiff concedes that any claim for primary excavation is barred by the release it executed, if said release is determined to be valid—which is the case here as discussed previously. Plaintiff, however, contends that claim 1 only involves work it performed going up the slope or hill. Cleanup work, going up the hill, plaintiff argues, should not be characterized as primary excavation. It is not unfair, on the basis of the briefs and oral argument, to attribute some of the confusion in the presentation of claim 1 to plaintiff's efforts to avoid the effect of the release. Upon careful review of a conflicting and sometimes confusing record, the court concludes that the bulk of claim 1 involves primary excavation and is therefore barred by the release. As to that segment of claim 1 that involves foundation work which is properly within the ambit of claim 1, i.e., work in the thrust block, plaintiff is entitled to recover $27,937. As to that segment of claim 1, as framed by plaintiff, which involves cleanup work in the arch dam foundation area, it is concluded that this segment more properly belongs in claim 2 and thus will be dealt with when that claim is considered.

work are on the 'critical path.' A delay, or acceleration, of work along the critical path will affect the entire project. * * * "

**6.** In its briefs and proposed findings plaintiff sought recovery of $1,050,478. At oral argument, plaintiff reduced this claim amount to the figure set forth above as a result of plaintiff's acceptance of certain Federal Bureau of Investigation (FBI) audit figures. Plaintiff likewise reduced the amounts it sought on 8 of its 9 remaining claims for the same reason. Accord-

ingly, plaintiff's total claim of $4,262,122, as set forth in its written submissions, was reduced to $4,064,116 at oral argument. As indicated earlier, in the release that it executed, plaintiff sought $862,193 under claim 1 and $2,178,964 as the amount of all 10 of its claims. For reasons set forth in Part II A of this opinion, plaintiff's recovery on any claim is limited, in any event, to the amounts set forth in said release.

As indicated previously, the concrete portion of the dam consisted of a thin arch dam (arch dam) and a thrust block. Excavation work in both the thrust block and arch dam areas was conducted in two stages. The first stage involved drilling, blasting holes, and blasting with explosives to the excavation grade or lines specified by the contract.[7] After the plaintiff blasted to the design grade or line, it scaled off any loose material from the excavated surface. The blasted material was then removed from the area, as was any loose and remaining unstable rock. The foundation was cleaned with high pressure jets of air and water. This stage of excavation has been deemed the primary excavation or going down the slope or hill stage. After completion of this primary stage of excavation, BOR inspectors examined the foundation area to ensure the competency of the rock surface upon which the concrete dam was to be placed.

The second stage of excavation was the final cleanup phase. This stage took place immediately prior to pouring concrete lifts onto the rock foundation and involved removal of all loose or disintegrated material. The foundation surface was then cleaned with high pressure jets of air and water. After this final cleanup, the concrete was poured onto the rock foundation. Unlike the primary excavation stage, cleanup excavation did not proceed as one coherent operation. Rather, it was really a part of the concrete operation since the time of final cleanup for a particular foundation area depended upon the timing of the concrete pouring in that particular area. In other words, cleanup excavation was dependent upon the concrete pouring schedule because cleanup for each off-rock con-

crete lift had to be done immediately prior to the pouring of concrete. Cleanup excavation proceeded in the same sequence as the pouring of the off-rock concrete lifts.

Foundation excavation work for the concrete portion of the Nambes Falls Dam began in the thrust block area. The drilling and blasting work for primary excavation of the thrust block began on July 26, 1974, and was completed to the contract excavation grade or line as of September 7, 1974. Although not entirely clear in the record, final cleanup on the thrust block appears to have begun sometime in September or October 1974. Concrete placement in the thrust block began on October 29, 1974.

Plaintiff excavated a total of 17,273 c.y. from the thrust block area. This was 810 c.y. more than the prebid estimate of 16,563 c.y. The record does not indicate precisely how much of this overexcavation took place in the primary stage of excavation and how much took place during cleanup excavation. Given the differing nature of the two types of excavation, however, it is reasonable to conclude in the absence of any persuasive evidence to the contrary, that in all probability most of the 810 c.y. of overexcavation took place during the primary stage of excavation.

In the thrust block area, unlike the arch dam right abutment area, no clear dividing line exists between primary and cleanup excavation. The record shows that plaintiff spent a considerable amount of time involving foundation cleanup work in the thrust block area. Plaintiff claims that an additional crew worked on thrust block foundation preparation for 15 weeks between September 15, 1974, and January 16, 1975. Defendant asserts that a review of

---

**7.** Plaintiff strenuously objects to the use of the phrases "excavation grade" or "design line" to describe the point to which the contract required plaintiff to excavate. Plaintiff insists that no such design line existed because the contracting officer had the authority under the contract to order excavation beyond the excavation lines stated in the contract if the contract excavation lines did not provide a competent foundation. Plaintiff's objection, however, is based more upon semantics than substance.

For the contract did contain excavation lines which plaintiff was to use to perform its excavation work. How else was plaintiff to set its drills and place its explosives if there were no control or reference lines. The fact that the contracting officer had the authority to direct excavation beyond those lines if the foundation at these lines proved incompetent does not obviate the importance of the excavation lines in the contract.

the work records shows plaintiff spent 233 crew hours, not the 344 crew hours it claims on this work. The court determines that defendant's assertions in this area are more accurate than plaintiff's since defendant's assertions were based upon plaintiff's work records for this work period. Plaintiff's contention, on the other hand, is based upon the unpersuasive assumption that an extra crew worked throughout the September 15, 1974—January 16, 1975, period on foundation preparation only in the thrust block area. However, defendant's analysis of plaintiff's own work records showed the exact times that this extra crew worked on foundation preparation and defendant used that data in support of its assertions.

Plaintiff completed the off-rock[8] placement of concrete on the thrust block on January 16, 1975. Plaintiff notified BOR on April 2, 1975, that it was claiming additional amounts for cleanup excavation in the thrust block area. All concrete placement e.g., off-rock and all other, in the thrust block area was substantially completed by April 14, 1975. Concrete placement on the thrust block took 24 weeks instead of the 19 weeks plaintiff contemplated, but it did not delay the eventual completion of the Nambe Falls Dam project since this work was not on the critical path. In any event, the record shows that most of this delay was due to time spent on formwork and not time spent on foundation preparation.

While plaintiff was proceeding with foundation excavation work on the thrust block, it was making plans to commence foundation excavation work on the arch dam. On August 26, 1974, plaintiff submitted a work plan or work schedule to BOR for the left and right abutments of the arch dam. In its plan, plaintiff scheduled excavation on the first two sections of the right abutment to proceed simultaneously with excavation on the left abutment. On August 27, 1974, plaintiff submitted its drilling and blasting plan to BOR. This plan showed 14 separate blasting lifts on the right abutment and 2 separate blasting lifts on the left abutment.[9] Each lift was to consist of 12–foot vertical blasting holes. On August 29, 1974, BOR approved plaintiff's blasting plan subject to modification if the results proved unsatisfactory. This plan scheduled arch dam foundation excavation to be a 6-week activity.

On August 30, 1974, plaintiff began excavation of the right abutment with an excavation blast (shot) on that date. Plaintiff then discontinued work on the right abutment in order to perform primary work on the left abutment during the month of September 1974. Plaintiff made two shots on the left abutment and, as of September 20, 1974, a substantial portion of the right abutment had been drilled and shot to the contract grade or line.

During the course of its excavation work in September, plaintiff recognized that it would need to blast trim shots in the bottom of the gorge later in the fall of 1974. Because of the late dates of these planned trim blasts, plaintiff foresaw that this blasting would be performed in the same area where concrete placement for the thrust block and completed foundation grouting were planned. The contract had a provision in paragraph 1.15.13 specifically governing blasting during concrete placement which stated: "Also, except for very light controlled blasts, subject to the approval of the contracting officer, no blasting will be permitted within a distance of 100 feet of concrete placement or of completed foundation grout holes." This provision served the obvious function of preventing the concrete and foundation grout from blasting damage.

---

8. One must distinguish between "off-rock" placement of concrete, which constitutes direct placement of concrete on the foundation rock, and all other types of concrete placement, e.g., placement of concrete on concrete as in the construction of the lifts.

9. A blasting lift consists of an area designed to be affected by a blasting operation. Each separate blasting operation could consist of one or more blast hole efforts.

In order to secure permission for blasting in the gorge during the late fall, plaintiff requested BOR's approval for blasts of not more than 50 pounds (lbs.) within 100 feet of concrete placement and completed foundation grouting. Plaintiff's president, G.M. Shupe, testified that light blasting is blasting in the range of 10–20 lbs. per detonation. Therefore, even by plaintiff's president's own definition, plaintiff's request for 50 lbs. per detonation was beyond the scope of the contract since the contract only allowed the contracting officer to approve "very light controlled blasting." Thus, the contracting officer reasonably denied plaintiff permission to blast with up to 50 lbs. per detonation in the area in question.

In October 1974, plaintiff again began to excavate the right abutment of the arch dam. Prior to October, plaintiff sought and received permission to use 40-foot long slope holes for blasting on the right abutment. As indicated earlier, plaintiff had planned to use 12-foot slope holes for this blasting. Plaintiff also advised BOR that it intended to drill its blasting holes behind the contract excavation line. Plaintiff's reason for wanting this setback was to avoid leaving protrusions (also called "tights") which otherwise would have to be removed in the latter phase of the primary excavation process. By setting its drills behind the contract excavation line, plaintiff hoped to ensure that no protrusions would remain. Although plaintiff requested only a 1-foot setback, the testimony of the witnesses, including one of plaintiff's, established conclusively that the drill setup required a setback of greater than 1 foot to adequately ensure a 1-foot setback all the way down the slope. Although plaintiff maintains that its setback was only 1 foot, the court concludes, based upon all the relevant evidence, that plaintiff's setback its drills an average of 1½ feet. Plaintiff agreed to bear the expense of any overexcavation which resulted from the 40-foot slope blast holes and the setback of the drills behind the contract excavation line.

Plaintiff excavated the right abutment during October, November, and December 1974. This primary excavation of the arch dam was completed on January 9, 1975. Plaintiff had planned to complete this excavation by November 1, 1974, 69 days earlier than it was actually completed. On January 9, 1974, BOR accepted the arch dam foundation as suitable for concrete. As of that date, primary excavation on the right and left abutments had been completed. Plaintiff excavated a total of 3,527 c.y. from the right abutment. The pre-bid estimate of material to be removed from the right abutment was 2,278 c.y.; thus, plaintiff had a overexcavation in the amount of 1,249 c.y. In the left abutment, plaintiff had an overexcavation in the amount of 1,394 c.y. since it removed 2,553 c.y. of material and the pre-bid estimate was 1,159 c.y.

On the right abutment, most of the overexcavation took place during the primary excavation phase, that is before January 9, 1975. Defendant contends that the overexcavation on the right abutment was the result of two factors: plaintiff's setback of its drills on the right abutment and plaintiff's blasting techniques. Plaintiff concedes an amount of overexcavation for the setback of its drills; however, it asserts that its blasting techniques on the right abutment were reasonable for the condition of the rock to be excavated. Specifically, defendant contends that plaintiff in excavating the right abutment should have: (1) used presplitting blasting as it had in the thrust block area; (2) kept its original plan to use 12-foot blasting lifts instead of substituting 40-foot lifts, and (3) used timed delays inside each blast pattern.[10] Defendant presented expert testimony asserting that plaintiff should have used these techniques; while plaintiff presented expert testimony that the blasting techniques used

---

10. Presplitting is the use of small charges on the perimeter of the material to be excavated which are detonated just prior to the main blast. This technique creates cracks and fissures that can channel the pressure from the main blast to ensure that the power of the explosion is exerted against the material intended to be removed.

were reasonable and that the techniques suggested by defendant were unsuitable for the type of excavation involved in the right abutment area.

After a review of the expert testimony presented on the matter by the parties, and the record as a whole, the court finds that the blasting techniques used by plaintiff on the right abutment were utilized in an attempt to speed up the excavation process, not in an attempt to control the amount of overexcavation. The court, on this record, cannot determine which of the three factors mentioned by defendant was primarily responsible for the overexcavation. Rather, the court concludes that the three factors taken together demonstrate that plaintiff's emphasis in its blasting program was on speeding up excavating, not on controlling overexcavation. The record suggests rather persuasively that plaintiff was intent on making up for time previously lost by adoption of blasting and drilling methods that put more emphasis on quick performance than on concern for overexcavation. The record shows that reasonable and competent experts differed on the appropriateness of using the three methods suggested by defendant. However, the court determines, based on a preponderance of the evidence in the record, that given the fracturing characteristics of the foundation rock and plaintiff's awareness of these characteristics, plaintiff should have adopted a more cautious approach to blasting on the right abutment.

The record supports also the probability that had the blasting efforts of plaintiff been more deliberate and cautious, e.g., use of 12-foot lifts, presplitting and predetonation, much less overexcavation would have taken place. It is not without some significance that plaintiff used presplitting in its thrust block foundation work and there is no evidence it was unsuccessful. On this record, one cannot determine whether presplitting on the right abutment would have posed a safety problem or not. There is ample evidence in the record that use of the 40-foot drill holes increased the tendency of the drill bits to wander away from their intended course and thus resulted in

greater excavation than would have been the case with 12-foot holes. In short, one had greater control over the drilling effort with 12-foot holes than one did with 40-foot holes. On the other hand, the use of 12-foot holes was more time consuming than was the use of 40-foot holes. Given the known characteristics of the rock foundation, plaintiff should have at least tried the three methods advocated by defendant and waited to see the results before proceeding with more accelerated blasting techniques. Thus, plaintiff's blasting and drilling techniques were the direct and the most significant cause of the overexcavation on the right abutment.

On December 21, 1974, during the excavation of the right abutment, BOR directed plaintiff to remove an area of unstable rock downstream from the right abutment. Plaintiff performed this additional excavation work on December 21, 1974. This December 21, 1974, directive was the only BOR directive which authorized plaintiff to perform primary excavation on the right abutment in addition to that required by the contract. The record shows that the excavation performed pursuant to the December 21, 1974, directive was minor and caused no delay in completion of the project. Moreover, plaintiff received adequate reimbursement for the work since BOR paid it at the unit price for all work done pursuant to the directive.

On January 9, 1975, when the arch dam foundation was accepted for concrete placement by BOR, plaintiff was 69 days behind on its schedule for the construction of the arch dam. This delay was primarily caused by two factors: plaintiff's inability to excavate the left and right abutments concurrently, as plaintiff had planned in its original work schedule, and the overexcavation and removal of material in the concrete dam foundation areas. As discussed earlier, defendant was not responsible for causing the failure to proceed concurrently with excavation on the left and right abutment nor was defendant responsible for causing the overexcavation.

The final cleanup and concrete phase of construction began on the arch dam after the acceptance of the arch dam foundation on January 9, 1975. The first concrete pouring for the arch dam took place on January 23, 1975. This final cleanup was required by the contract. The relevant contract provision provided: "Just prior to placing concrete, a final cleanup of the rock surface shall be made by barring, wedging, picking, or other approved methods. All loose, shattered, or disintegrated material shall be removed, and the final surface cleaned with jets of air and water under high pressure."

There is dispute between the parties on the reason why it took 14 days after BOR accepted the arch dam foundation to begin the concrete pouring. Plaintiff had originally scheduled this interim period as 3 days; thus, the concrete pouring was delayed 11 days from plaintiff's original schedule. Plaintiff maintains that this delay was caused by excessive BOR inspectors' directives relative to cleanup excavation; defendant contends that this period involved only the performance of contract work as indicated by the inspectors. While the evidence on the matter is conflicting, the court determines that plaintiff was only performing work required by the contract during the January 9 to January 23, 1975, period. This work included drilling and grouting in the arch dam foundation area, placement of crack detection tape in the foundation, and cleanup preparation. The foundation cleanup excavation performed during this period was not in excess of that required by the contract, but was work required by the terms of the contract. In fact, from the evidence presented it is clear that plaintiff did not complain to BOR during this period before the first arch dam concrete pour about excessive cleanup excavation work being required.

As of January 9, 1975, plaintiff had completed all primary excavation on the arch dam and had entered into the concrete pouring phase of the project.

## DISCUSSION

Plaintiff bases its foundation excavation claim on paragraph 4.1.3 of the contract. Paragraph 4.1.3 provides, in pertinent part:

When the excavation has been completed to the approximate grade established by the contracting officer, the surface shall be cleaned off with an air and water jet under high pressure for purposes of inspection. If the foundation is found to be unsatisfactory, as determined by the contracting officer, additional excavation shall be made as directed, and the surface again cleaned for inspection: Provided, That any increase in cost due to redimensioning or resloping will be paid to the contractor in accordance with Paragraph 4.1.2. This procedure shall be repeated until a satisfactory foundation is obtained.

Plaintiff contends that it was required to reslope and redimension both the arch dam and thrust block foundations because of BOR directives. The record does not support this contention. Implicit in plaintiff's contention is the assertion that these directives were responsible for most of the overexcavation of material during performance of the foundation excavation work. As a result, plaintiff maintains that it is entitled to an equitable adjustment pursuant to paragraph 4.1.2 of the contract.

It is difficult, however, to discern precisely what extra work plaintiff is claiming in this Foundation Excavation Changes Claim. Plaintiff presents its claim in broad and ambiguous terms. Furthermore, there is often no logical relationship between plaintiff's individual itemized damages and the general nature of the claim asserted. For example, in the Foundation Excavation Changes Claim, Claim 1, plaintiff seeks $566,685 as additional concrete costs, without explaining why concrete costs should be included in an excavation claim. The court concludes that the inclusion of said concrete costs appears to result from the total cost nature of plaintiff's claim. Apparently, plaintiff has simply allocated its additional job costs to various asserted claims without regard to whether a rational

relationship exists between the costs allocated and the substantive nature of the claim to which they were allocated.[11]

Plaintiff's counsel maintained at oral argument that claim 1 involved only a claim for extra cleanup excavation work (*i.e.*, going up the hill) beyond the scope of the contract and that primary excavation (coming down the hill) was not part of the claim. It is evident from plaintiff's submissions, however, that plaintiff's claim 1 does, indeed, involve primary as well as cleanup excavation work. The conflict between plaintiff's counsel's characterization of the claim and the substance of the claim is indicative of the confusion and ambiguity which permeates plaintiff's claim.[12] This confusing and ambiguous presentation of the claims made it extremely difficult for the court to discern the essence of plaintiff's claim. In a case with as complex and voluminous a record as the one at bar, the court's task, at best, is time consuming and difficult; but it is much more so in the present case due to the manner in which plaintiff's claim 1 has been presented.

While made more difficult because of plaintiff's ambiguous presentation of claim 1, the court has determined that claim 1 is (1) a claim for both primary and cleanup excavation in the thrust block, and (2) a claim for only primary excavation in the arch dam. The reason for this determination is that cleanup excavation was an integral part of another of plaintiff's claim, *i.e.*, "Claim 2—Fillet Design Changes." Cleanup excavation in the arch dam area was a part of the concrete pouring operation of the fillets for the arch dam. This cleanup excavation took place immediately

prior to the placement of each off-rock concrete pour. Thus, cleanup excavation was directly affected by the fillet design change, which is the basis of plaintiff's claim 2, since the fillet design change had a direct effect upon the amount of foundation area which had to undergo cleanup excavation. Claim 1 as presented by plaintiff, appears to contain some overlapping with claim 2 in relation to the damages claimed by plaintiff, *i.e.*, duplication of costs. The court's determination of the scope and reach of claims 1 and 2 avoids this problem of possible duplication of damages and presents, hopefully, the true essence of claim 1.

■■■ As determined earlier, plaintiff's claim for primary excavation is barred by the July 7, 1976, release. Even if plaintiff's claim is deemed not barred by this release, plaintiff still would not be entitled to an equitable adjustment on its foundation excavation changes claim except as indicated below. There are two reasons for this: First, plaintiff did not comply with the contract's requirement that it receive written directives in order to obtain an equitable adjustment under the contract clause it bases its claim on. Second, plaintiff's blasting techniques, and drill setback, not BOR directives, were primarily responsible for plaintiff's excavation problems.

Paragraph 4.1.2 of the contract, which was referenced in paragraph 4.1.3—the source of plaintiff's claim, provides in pertinent part:

> Any and all excess excavation for the convenience of the contractor or overexcavation performed by the contractor for

---

11. For example, in an introductory note in its Requested Findings of Fact for claim 1, plaintiff states: "We request the Court to find the Government responsible for 6.5 work days (eight calendar days) for additional directed excavation 'coming down' the right abutment." This would indicate plaintiff's claim is for primary excavation, a claim barred by the release. However, at oral argument plaintiff's counsel adamantly advised the court that "Foundation claim number one is basically going back up the hill, Your Honor." (Tr. p. 14.) Plaintiff has numerous requested findings dealing with primary excavation including one which puts the

amount of overexcavation during the primary excavation stage at 1,211 c.y. Small wonder that the court has had problems in trying to flesh out plaintiff's claim.

12. The contracting officer in his July 5, 1979, decision also noted the difficulty with the manner in which plaintiff presented its claims: "The presentation contained in this letter purportedly substantiating the amount claimed is a development of hypothetical costs by broad, general categories which does not separately identify the alleged costs with specific [BPR] directives."

any purpose or reason, *except as may be ordered in writing by the contracting officer,* and whether or not due to the fault of the contractor, shall be at the expense of the contractor. * * * [Emphasis supplied.]

Plaintiff did not comply with this provision of the contract since it received no written directive to perform foundation excavation (other than the December 21, 1974, directive discussed earlier). Plaintiff's contention that it was entitled to rely on the directives of government inspectors relative to removal of non-contract excavation must be rejected in view of the specific provision of paragraph 4.1.2 that any such directive must be ordered in writing by the contracting officer. No such requirement, except where otherwise indicated herein, was met by plaintiff relative to the excavation claim it advances in claim 1. *See Woodcraft Corp. v. United States,* 146 Ct.Cl. 101, 103, 173 F.Supp. 613, 614 (1959). If plaintiff felt that BOR was requiring excavation beyond that required by the contract, it certainly could have, and should have, requested BOR to issue a formal written directive, as it did for the December 21, 1974, BOR oral directive. *See Turnbull, Inc. v. United States,* 180 Ct.Cl. 1010, 1020, 389 F.2d 1007, 1012 (1967). As will be discussed in claim 2, plaintiff requested written directives on other occasions when ordered to do work for which plaintiff felt additional compensation was due, *e.g.,* removal of clay seam on left abutment on March 7, 1975, and removal of loosened rock and installation of rock bolts on right abutment on April 8 and 9, 1975. Moreover, plaintiff's failure to request such a written directive, when it had demonstrated through its request relating to the December 21, 1974, oral BOR directive that it recognized the need for such a directive, strongly suggests that plaintiff did not believe it was entitled to an equitable adjustment for such overexcavation. Plaintiff's failure to request or receive a written directive for excavation work (with the exception of work performed pursuant to the December 21, 1974, directive) precludes plaintiff from receiving an equitable adjustment for any extra excavation work. *See Plumley v. United States,* 226 U.S. 545, 33 S.Ct. 139, 57 L.Ed. 342 (1913); *General Bronze Corp. v. United States,* 168 Ct.Cl. 176, 186–188, 338 F.2d 117, 123–124 (1964). *See also Woodcraft Corp. v. United States, supra,* 146 Ct.Cl. at 1031, 173 F.Supp. at 614. It is not unreasonable to assume, under these circumstances, that the excavation work performed by plaintiff was at the time either work required by the contract or the result of plaintiff's construction methods which plaintiff recognized at the time it was performing the work as being its responsibility. The totality of this record supports this finding.

▮ As discussed earlier, the court has found that plaintiff's blasting techniques and drill operations (the 1½-foot setback), not BOR directives, caused overexcavation during foundation excavation work. On this additional ground, plaintiff is not entitled to an equitable adjustment for overexcavation. Plaintiff, not defendant, had the responsibility to ensure that its blasting and drilling did not cause excessive excavation beyond the contract design line, and absent a written directive from the contracting officer, plaintiff was responsible for all overexcavation.

The only item plaintiff can recover for in claim 1 is certain excavation in the thrust block area. There is no clear line of demarcation between primary excavation and cleanup operations in the thrust block area. Defendant concedes liability for additional foundation work in the thrust block area but allows plaintiff only $27,937 in damages for this work while plaintiff seeks $40,526. Accordingly, the issue here is which damage computation is correct. Both parties calculate their damages based upon the same period of thrust block foundation work, September 15, 1974, to January 16, 1975. Plaintiff bases its damage calculations on the fact that an extra crew was working during this period. Plaintiff's calculations further assume that this extra crew was always involved in foundation work. Defendant, on the other hand, used plaintiff's own work records and BOR in-

spector's reports to determine how much time this crew actually spent on this foundation work. Given the fact that defendant's damage calculations are supported by work records and inspector's reports, while plaintiff's are not, defendant's damage figures are deemed more reliable and persuasive relative to the extra excavation foundation costs which plaintiff incurred in the thrust block area.

Plaintiff has raised a number of other arguments and positions relative to why it believes it is entitled to recover over $1 million on claim 1. The court has considered these various contentions and has found them to be unpersuasive.

■■■ On the basis of the above discussion, the court finds that plaintiff is entitled to recover $27,937 as an equitable adjustment for extra work performed on the foundation in the thrust block area. In all other respects, plaintiff's claim 1 for foundation excavation changes is denied.[13]

B. *Claim 1.1—Spillway Impingement*

Under claim 1.1, plaintiff seeks to recover $1,420,596. This claim, as indicated earlier, is barred by the release since it was not set forth therein as an exception thereto. Plaintiff contends that the BOR directed the excavation of some 2,620 c.y. of material in an area of the work site which plaintiff has designed the "spillway impingement" area. The area was downstream of the left abutment and the thrust block area. Plaintiff maintains that during September and October 1974, it removed 2,620 c.y. of material from the spillway impingement area. It is to be noted that this 2,620 c.y. of material is not included in the BOR's recorded excavated removal figure of 23,500 c.y. Indeed, there is no reliable evidence in the record that BOR directed the removal of this amount of material in the area under consideration and the BOR has no record of the removal of any such quantity of material from said area. Further, plaintiff never notified the contracting officer relative to removal of this large amount of material from this area within the time period required by the contract, or before final payment. Indeed, plaintiff never presented this claim to the contracting officer until after suit was filed in this court, some 6 years later.

FACTS

The origin of this claim, as presented by plaintiff, is to be found in settled events which occurred during contract performance.

Under the terms of the contract, plaintiff was required to excavate a notch in rock running from the downstream toe of the thrust block in the vicinity of block 4 for the placement of a 12-inch drain pipe. The purpose of the pipe was to drain water from the thrust block gallery into the Nambe Falls River which flowed through an outlet works located in the arch dam into the gorge below the dam. This excavation, as originally planned, would have left standing adjacent to the drainpipe a knob or nose of rock on the arch dam side of the drainpipe.

On August 24, 1976, plaintiff exploded a blasting shot for thrust block excavation. This August 24th shot loosened the knob of rock adjacent to the 12-inch drainpipe. Plaintiff's personnel discussed the matter with BOR personnel and expressed their concern about this loosened knob of rock. On September 3, 1974, BOR orally directed

---

13. Plaintiff, in keeping with the confusing manner of presenting its claims, also included itemized damages in claim 1 for additional concrete costs and additional expenses incurred in the earth dam area. None of these items properly belong in this claim, however. In the court's view, claim 1 only involves foundation excavation claims in the thrust block and arch dam areas. It should not embrace claims for concrete placement or earth dam costs. Plaintiff must show a causal link between the damages claimed and the nature of the claim under which they are asserted. *See Roberts v. United States*, 174 Ct.Cl. 940, 956, 357 F.2d 938, 949 (1966); *Wunderlich Contracting Co. v. United States*, 173 Ct.Cl. 180, 199, 351 F.2d 956, 968 (1965). *See also Fawick Corp. v. United States*, 149 Ct.Cl. 623, 635 (1960). Plaintiff has failed to show such a causal link between claim 1 and the damages mentioned above. Therefore, plaintiff is not entitled to any recovery for these claims under claim 1.

that the knob of rock be removed. Plaintiff executed blasts on September 18, and September 24, 1974, to remove the knob of rock adjacent to the drainpipe. The September 24, 1974, shot also was for excavation of the drainpipe area. The removal of the material excavated by these two shots took 5 days and was accomplished by pushing the material into the gorge with a backhoe. The excavation work for the knob and the drainpipe involved removal of a total of 355 c.y. of material. This 355 c.y. figure was included in the BOR total cubic yardage figure of 23,500, mentione . earlier. Of this 355 c.y., 178 c.y. were removed during excavation of the knob of rock and 177 c.y. were removed during excavation for the drainpipe. Thus, only 178 c.y. was noncontract work for which BOR paid plaintiff additional compensation at unit prices set forth in the contract. Removal of the remaining 177 c.y. was contract work covered by the contract price.

Plaintiff maintains that additional excavation took place beyond that required for the drainpipe and the unstable knob of rock and that this was the spillway impingement excavation for which it now seeks compensation. However, plaintiff presents no written directives relative to removal of excavation from this spillway impingement area. The oral directives which plaintiff contends were for spillway work, were clearly directives to remove the above-mentioned unstable knob of rock and were not directives to perform spillway impingement work as asserted by plaintiff. Moreover, of the four blasts plaintiff contends were for spillway impingement work, i.e., the blasts of August 24, 1974; September 18, 1974; September 24, 1974; and November 14, 1974, all were made to perform excavation for which plaintiff has already been compensated. The August 24th shot was for thrust block excavation; the September 18th shot was for removal of the unstable

knob of rock adjacent to the drainpipe. The September 24th shot was for excavation of the notch for the drainpipe and the November 14th shot was for excavation of the left abutment.

Plaintiff's claim for 2,620 c.y. of material removed from the spillway impingement area is most unpersuasive for several reasons. First, testimony by plaintiff has been inconsistent as to the amount of excavation this spillway impingement area involved. Initially, plaintiff claimed it excavated 1,500 c.y. of material. This figure later changed several times to 2,500 c.y., then 2,800 c.y. and now 2,620 c.y. BOR which surveyed and recorded excavated material removed from the project site has no record of removal of said material which is the subject of this claim.[14] Second, it is difficult for the court to accept the fact that plaintiff could have excavated from one area some 2,600 c.y. of material, excavation only slightly less than the total overexcavation on the left and right abutments combined, without realizing that it had done so until more than 6 years after the excavation had been performed, especially in light of the fact that on other occasions when BOR directed noncontract excavation, plaintiff promptly asserted claims therefor. These facts make one skeptical about the bona fides of the claim. Finally, while BOR had survey records relative to excavation in the thrust block arch dam and the knob and drainpipe areas, it had no survey records at all of any such excavation as plaintiff now claims. This fact casts serious doubts as to the validity of this claim.

Given the above considerations, the court finds that plaintiff excavated only 178 c.y. of noncontract material in the area it labeled the spillway impingement area. Any other noncontract excavation in the spill-

---

14. While not exactly clear from the record, it would appear that plaintiff constructed a model of the project from various records. This model then served as a basis for assumptions and calculations as to what the ground conditions were before and what those conditions were after the project was completed. It was on such calcula-

tions and analysis by plaintiff's personnel that the spillway impingement claim came into being. These assumptions and calculations drawn from the model created by plaintiff are not deemed persuasive by the court as a acceptable foundation for the claim asserted.

way impingement area, if in fact there was any, was not done at the direction of BOR, and thus defendant is not responsible for any such overexcavation under paragraph 4.1.2 of the contract.

### Discussion

■ Plaintiff's spillway impingement claim requires little discussion. This claim is clearly barred by the release.[15] *See* Part II A, *supra.* Even if the release were deemed to be inoperative, the court is not persuaded that plaintiff excavated 2,620 c.y. of noncontract material from the area it designated as the spillway impingement area. Any such excavation, if done, was clearly not done at the directive, oral or written, of the BOR. If any such excavation was done, it was performed by plaintiff for its convenience or for some other purpose or reason and as provided by paragraph 4.1.2 of the contract such excavation * * * shall be at the expense of the contractor. * * * *See Woodcraft Corp. v. United States, supra,* 146 Ct.Cl. at 103, 173 F.Supp. at 614.

Mention should be made of plaintiff's damage computations for this claim. They present the same problems dealt with under claim 1, *i.e.,* ambiguity, confusion and lack of logical relationship between itemized damages claimed and the nature of the claim to which they were allocated. For example, at oral argument, plaintiff's counsel advised the claim 1.1 was "primarily a delay claim." However, examination of the damage items sought under claim 1.1 show that over 70 percent of the amount claimed is for concrete costs incurred by plaintiff. This is so even though no concrete was involved in the spillway impingement area and the claim itself was strictly an excavation claim. Only some $342,760 of the $1.420,596 claimed is for delay damages. The only explanation perceived for inclusion of concrete costs in this purely excava-

tion claim is the use by plaintiff of the total cost approach to damages and the subsequent allocation of various costs to some of the individual claims. To add to the confusion, many of plaintiff's Requested Findings of Fact under claim 1.1 relate to primary excavation activities on the right abutment. These facts are more properly germane to claim 1 and not claim 1.1. It may well be, although the court is unsure of this, that there is duplication in the claims for excavation and removal under claim 1 and claim 1.1 in this regard. In either event, there is no basis on this record to allow plaintiff any recovery for excavation of 2,620 c.y. of material.

Plaintiff is not entitled to any recovery on claim 1.1.

### C. *Claim 2—Fillet Design Changes*

■ Under claim 2, plaintiff seeks to recover $1,055,946. In the release that plaintiff executed, it excepted this claim from said release in the amount of $553,-601. As a result, plaintiff, in any event, cannot recover more than $553,601 on this claim. *See* Part A, *supra.* The bulk of plaintiff's claim emanates from a design change in the arch dam fillet work. Smaller elements of the claim (removal of clay seam and removal of rock on right abutment) relative to BOR directives involving work that took place during the fillet placement period were also deemed part of this claim. Defendant concedes liability for these claims. However, the parties dispute the quantum due plaintiff relative to these claims. Defendant maintains that damages in this regard should not exceed $262,834 for the fillet design change claim and the other claims.

### Facts

Plaintiff made its first concrete pour in the arch dam area on January 23, 1975. This first pour was made directly onto the

---

15. If the release is not deemed a bar to recovery herein, defendant has indicated that plaintiff probably would be entitled to recover $31,345 on the ground that while plaintiff was paid at contract unit prices for removing 178 c.y. of noncontract material relative to removal of the

knob of rock adjacent to the drainpipe, plaintiff was not paid for the 5 calendar days of delay which defendant indicates was reasonably associated with said work. Defendant calculated this delay damages to be $31,345, a calculation that is felt to be reasonable.

rock foundation at the bottom of the gorge. During the early stages of its concrete pouring operation, plaintiff realized that a problem existed with the design of the concrete fillets as staked out for the fillet forms by BOR personnel. While an oversimplification, a fillet was described by G.M. Shupe as a "fill in piece of concrete between the dam structure and the foundation." As originally designed, the concrete fillets were to be poured onto the excavated portions of the arch dam abutments. The excavated portion of the abutments was called a keyway. The tops of the concrete fillets were planned to be 4 feet higher than the excavation line on the abutments. Under the original design, the tops of the fillets were not to extend beyond the sides of the right abutment keyways. Consequently, the tops of the fillets were planned to intersect the keyway sides at a 90-degree angle. However, as a result of the overexcavation in the right abutment, especially on the keyway sides, the tops of the fillets, if built with their tops 4 feet from the original design grade, would have stuck out beyond the keyway sides. As a result, the fillets could not intersect the keyway sides at a 90-degree angle as planned.

On September 10, 1974, long before plaintiff began work on the fillets, plaintiff received drawings which revised the design of the fillets originally set forth in the contract. These drawings did not constitute a major change in fillet design. These drawings did, however, contain a note which addressed potential problems in fillet height due to overexcavation. Specifically, these September 10, 1974, drawings contained a note stating: "Final excavation may differ from lines shown and may result in revision of the fillets as determined by the 'Contracting Officer'." In addition, the Denver office of BOR had a document entitled: "Design Considerations for Construction of Nambe Falls Dam, April, 1974." In the section pertaining to fillets, this document specifically stated: "In general, the fillets were designed for a height of 4.0 feet, plus or minus, normal to the excavation * * *." Some adjustments to these

elevations may be required because of modifications to the foundation excavation. Clearly, BOR intended the fillets to be adjusted for any overexcavation.

BOR personnel at the construction site, however, failed to make any adjustment in the fillet design to account for the overexcavation which took place on the right abutment. BOR personnel at the project site had the responsibility for setting the stake lines for the fillet forms. These stake lines set the shape, size, and height of the concrete fillets and plaintiff set its forms to these stake lines. BOR personnel set these stake lines, so that the height of the fillets was the same as it was in the September 10, 1974, contract drawings, that is BOR personnel set fillet height at 4 feet from the original line of excavation.

In fact, as defendant concedes, BOR personnel erred in setting the height of the fillets 4 feet from the contract excavation line. As mentioned above, the overexcavation which took place on the right abutment meant that when the fillet tops were set at their original height, the tops extended beyond the sides of the right keyway. This extension beyond the right keyway meant that the tops could not intersect the keyway sides at the 90-degree angle originally planned. The error of BOR personnel came in failing to adjust the height of the fillets so that the tops were 4 feet from the actual line of excavation, rather than 4 feet from the contract excavation line. Defendant concedes that BOR personnel should have made this adjustment to the actual line of excavation if they had correctly followed the fillet design plans.

After BOR staked the first fillet to be poured, plaintiff discussed the design problem with BOR. Subsequent to these discussions, BOR directed a change in the design of the fillets. Although the problem with the fillet height arose in the context of overexcavation on the right abutment, the record indicates that this BOR directed change was for fillets on both the left and right abutment. The fillet change directed by BOR involved a change of the angle at which the fillets intersected with

the arch dam abutments. Basically, BOR did not change the actual height of the fillets, but instead had the fillets intersect the abutments at a 45-degree angle instead of the 90-degree angle called for by the September 10, 1974, plans. This particular solution to the problem seems to have been prompted by the fact that the September 10, 1974, plans showed fillet tops protruding from the keyway. In the drawing of this protruding section, the top of the fillet intersected the abutment at a 45-degree angle. This drawing of the protruding fillet in the September 10, 1974, plans appears to have been the basis for BOR's design change for all the fillets in the arch dam area.

This fillet design change to a 45-degree angle of intersection with the arch dam abutments resulted in both increased cleanup excavation and increased concrete formwork. The increased cleanup excavation was caused by the fact that the higher fillet with a 45-degree angle of intersection created a much larger area of rock foundation to have concrete poured on it. As discussed in claim 1, excavation proceeded in two phases: primary and cleanup. Cleanup excavation took place just prior to the placement of an off-rock concrete lift. During the cleanup phase, BOR personnel inspected the rock foundation area and instructed plaintiff to remove any loose or incompetent material from the foundation area. The record clearly supports the conclusion that during this fillet cleanup excavation phase in the arch dam area, plaintiff performed cleanup excavation in excess of that required by the contract because of the larger foundation area created by the fillet design change.

Defendant concedes that the fillet design change resulted in a greater foundation area for cleanup work and, therefore, required more cleanup excavation. It should be emphasized that the fillet design change did not entail additional primary excavation. It only involved additional cleanup excavation. There is no dispute about this fact as plaintiff's claim herein is only for additional cleanup foundation work. It should be noted here that plaintiff has included foundation preparation cleanup excavation both in this claim and in claim 1. As indicated in the discussion of claim 1, the court has concluded that all cleanup excavation in the arch dam area properly belongs in this claim both in order to avoid duplication of damages and because of the causative relationship which existed between the fillet design changes and the increased foundation cleanup work.

A subsidiary factor causing the extra cleanup excavation was the fractured and joined nature of the foundation rock. In certain spots on the right abutment, the condition of the rock was such that plaintiff had to remove larger quantities of loose or shattered rock than was anticipated. Although it is difficult on this record to determine the exact quantity of material removed from the right abutment during cleanup excavation, defendant submitted a model exhibit which visually depicted the amount of excavation removed both during cleanup and primary excavation. This model was based on BOR survey data and records. Plaintiff contends that this exhibit only partially shows the amount of overexcavation produced by cleanup excavation work. Plaintiff, however, did not present the court with any specific data demonstrating greater amounts of excavation during this cleanup phase.[16] In fact, plaintiff seems to rely on defendant's model exhibit in support of one of its Request-

16. Plaintiff presented a figure of an additional 7,450 square feet of surface area requiring cleanup excavation work to be performed on it. Plaintiff, however, provided no persuasive record support for this figure. This figure presumably resulted from measurement computations taken by plaintiff from the model it constructed. There was no independent and separate verification of this footage figure. However, the court is not persuaded that area meas-

urements taken from this model, given this record, have that degree of reliability which would justify a finding of 7,450 feet. The court is not persuaded that this figure reasonably represents the additional surface area involved in foundation cleanup. Neither party points to any portion of the record which would persuasively indicate or suggest just what the footage was of the foundation area enlarged by the fillet design change.

ed Findings of Fact in part at least. The court finds that defendant's model exhibit presents an acceptable and reasonable approximation by way of a visual depiction of the cleanup excavation which took place on the right abutment during the fillet period of construction. The model indicates that cleanup work was much, much less than espoused by plaintiff and supports defendant's contentions and conclusions relative thereto.

One of plaintiff's main contentions on overexcavation is that BOR directed plaintiff to excavate large quantities of material during the cleanup phase of excavation. The record, however, fails to support plaintiff's contention. Although plaintiff had to excavate increased quantities of material from the right abutment, the court is not persuaded that this quantity was of the magnitude asserted by plaintiff. Plaintiff also stresses that the jointed and fractured nature of the rock was the primary cause of the overexcavation during the cleanup phase. The record discloses that the jointed and fractured condition of the foundation rock was known by plaintiff prior to bid and during foundation work preceding the cleanup work. The increased area to be cleaned up, rather than the condition of the rock, was the main reason for the extra work during the cleanup phase of the fillet phase of the construction work.

The change in the fillet design also caused plaintiff to perform additional work while constructing the fillet forms for pouring concrete. As a result of the change in design, the size of the fillets greatly increased. In addition, the design change required plaintiff to use a hanging form which was built-in place. A hanging built-in-place form needed to be anchored to the rock by rods, and a hanging form also required a great amount of tailoring to shape the form to the rock foundation. The original design for the fillets would have allowed use of a flat panel which would not have required all the additional form work mentioned.

In addition to excess cleanup excavation and additional form work, plaintiff also had to perform other noncontract cleanup work in the arch dam foundation area during its fillet concrete placement operation. On March 5 and 6, 1975, BOR verbally advised plaintiff that certain loose material in the area of Blocks 1 and 2 on the right abutment would have to be removed. As directed, plaintiff removed this material. On March 12, 1975, plaintiff, by letter, requested BOR to issue a written change order so that it could receive an equitable adjustment for this work. On March 18, 1975, BOR denied plaintiff's request for an equitable adjustment for this work.

On March 7, 1975, BOR discovered a clay seam in the right abutment and BOR directed plaintiff to excavate the seam. Plaintiff removed the clay seam and filled the resulting cavity with concrete during the period March 8 to March 10, 1975. To accomplish this work, plaintiff worked two shifts on March 8 and three shifts on March 9, 1975. At the end of the second (or swing) shift on March 10, 1975, plaintiff had completed the work and poured the concrete lift which had been scheduled for March 7, 1975. On March 8, 1975, one day after receiving BOR's directive, plaintiff sent BOR a letter requesting a written change order and an equitable adjustment for the clay seam work.

By a letter dated April 2, 1975, plaintiff again informed BOR of its claims stemming from BOR directives of December 21, 1974 (see claim 1 discussion); March 6, 1975; and March 7, 1975. Plaintiff also alleged in this letter that BOR was directing cleanup excavation work in excess of that required by the contract.

On April 8 and 9, 1975, BOR verbally directed plaintiff to remove loose rock on the downstream side of the right abutment and to install rock bolts to secure the remaining rocks in this area. The excavation and rock bolting was completed in 5 calendar days, April 9 to April 13, 1975, and delayed the completion of that project for 5 calendar days. On April 11, 1975, plaintiff wrote a letter to BOR requesting a written change order and an equitable adjustment for this work of April 8 and 9, 1975.

**692**

In the latter part of April 1975, BOR began to respond to plaintiff's letters requesting equitable adjustments. By letter dated April 25, 1975, BOR addressed plaintiff's March 8, 1975, letter and acknowledged that plaintiff was entitled to an equitable adjustment for work performed pursuant to the March 7, 1975, directives (clay seam work). Subsequent to this letter, the parties attempted to negotiate an equitable adjustment but were unable to reach agreement.

BOR also responded to plaintiff's letters of April 2, 1975, and April 11, 1975. On April 29, 1975, BOR sent plaintiff a letter answering plaintiff's April 2, 1975, letter. In this letter, BOR stated that the December 21, 1974, directive (removal of loose rock on the right abutment) and the March 6, 1975, directive (removal of loose material in the area of Blocks 1 and 2) involved contract required excavation work. BOR, therefore, refused plaintiff an equitable adjustment for this work. However, BOR acknowledged again that the March 7, 1975, directive (clay seam work) entitled plaintiff to an equitable adjustment. BOR subsequently issued a unilateral change order for work performed pursuant to the March 7, 1975, directive because the parties were unable to agree on an equitable adjustment. This change order (No. 5) awarded plaintiff $10,850 as an equitable adjustment for the clay seam removal work. This change order made no award for delay damages.

On June 26, 1975, BOR responded by letter to plaintiff's claim that the work performed on April 8 and 9, 1975, pursuant to BOR directives (rock bolting, etc. on right abutment) entitled it to an equitable adjustment. This claim was covered by change order No. 5, and, since the parties could not agree on price, was issued unilaterally. This change order awarded plaintiff $13,000 for the rock bolting and related work. No award was made for delay damages relative to this rock bolting claim.

Plaintiff's concrete pouring operation also encountered problems and delays in areas other than those involving cleanup

excavation and offrock concrete placement. One such operation which was delayed was plaintiff's construction of the diversion works, the system of culverts, pipes and conduits which diverted the flow of the Rio Nambe during construction of the arch dam. Plaintiff had planned a 7-day period between the pouring of the concrete lift (block 2, lift 3) containing the permanent diversion hold for the diversion pipe and the pouring of the concrete lift (block 3, lift 2) which had the temporary diversion pipe running through it. In fact, plaintiff poured the lift with the permanent diversion hold on February 11, 1975, and was not ready until March 7, 1975, to pour the lift which contained the temporary diversion pipe. This was a period of 24 calendar days, 17 days longer than planned for by plaintiff.

The court finds that a substantial portion of this 17-day delay was due to the construction of the diversion works itself, a contract mandated operation. Further during this 17-day period plaintiff poured a concrete lift which it had not originally planned to pour until after the completion of the diversion works. Plaintiff contends that this 17-day delay period was due to fillet extra cleanup excavation ordered by BOR. Plaintiff, however, has failed to present persuasive evidence that such extra cleanup excavation caused the 17-day delay. The record persuades that this 17-day period was consumed for the most part in performing the contract required diversion work.

Another delay encountered by plaintiff during the concrete placement operation took place during plaintiff's construction of the outlet works, a small concrete structure housing pipes and valves which was located almost in the middle of the arch dam (block 2, lifts 9 and 10). Plaintiff had scheduled the forming and pouring of the outlet works to take 7 days. In fact, the work took 20 days. A total of 20 shifts were used to form the outlet works between March 31, 1975, and April 23, 1975. BOR was not responsible for the delay in the construction of the outlet works as

plaintiff was performing work required by the contract.

On June 13, 1975, during the concrete placement operation, plaintiff encountered another delay when the carpenters employed by plaintiff went on strike and walked off the job. The strike lasted until June 25, 1975, at which time the carpenters started work again. BOR was in no way responsible for this 11-day delay period.

Still another delay in the concrete placement period, during off-rock pour, occurred while construction of the cantilevered spillway, located in the top middle of the arch dam, was taking place. Plaintiff had planned to take 7 weeks to form and pour the concrete lifts which made up the cantilevered spillway. In fact, this forming and pouring work took 11 weeks. The record suggests that plaintiff suffered no extraordinary delays in this period. Rather, it appears that plaintiff simply underestimated the amount of work if would take to form the cantilevered structure. Since this work was not on the critical path, the delay in this work did not delay the eventual completion of the project. However, this work, the delays involved, and the reasons for those delays do indicate that plaintiff encountered delays on this project due to its own underestimation of the work involved, rather than because of noncontract work ordered by BOR.

Plaintiff completed concrete placement in the arch dam area on September 12, 1975. During this concrete placement operation, plaintiff made a total of 26 off-rock concrete pours. Thus, only 26 concrete pours involved foundation cleanup excavation prior to the placement of concrete. During the periods when plaintiff was performing the off-rock pours, it was generally on a 3-shift basis. These 3 shifts operated on a 6- and 7-day work week schedule during off-rock concrete placement work in the arch dam.

Plaintiff gave BOR timely notice of its fillet claim when it provided BOR written notification of this claim on April 2, 1975. This April 2nd letter also informed BOR that plaintiff believed that BOR was directing additional hand excavation and cleanup work beyond that required by the contract. On November 7, 1975, plaintiff transmitted its written cost proposal for increased costs in the fillet area of $553,601 and a time extension of 49 calendar days.

The contracting officer authorized BOR personnel to negotiate an equitable adjustment with plaintiff in an internal memorandum dated July 22, 1975. This memo stated, in pertinent part: "Since this is a change we directed primarily to improve the fillet design, we should give consideration to the Contractor's request for an equitable adjustment." BOR, however, rejected plaintiff's claim on May 7, 1976.

As mentioned earlier, the court has found that the fillet design change caused plaintiff added expense and delay both in its foundation cleanup excavation and in its construction of the fillet forms. Defendant concedes liability for these two items. However, the parties disagree on the amount of damages which plaintiff is entitled to recover.

Plaintiff seeks a total amount of $1,055,946 as damages on claim 2. Of this amount, plaintiff seeks $7,464 (before add-ons) for foundation preparation outside of the design prism, $34,484 (before add-ons) for foundation cleanup costs; and $220,569 (before add-ons) for extra fillet form costs. Plaintiff also seeks delay damages for 63 calendar days (55.5 work days) or $500,610. These claim costs (before add-ons) total $763,127. Add-ons include job overhead (8 percent), home office overhead (8.5 percent), profit (10 percent), tax (4 percent), and bond (0.5 percent). Add-ons total approximately $292,819. Plaintiff included as a cost item in claim 2 the cost of certain earth dam embankment work of $99,744, plus add-ons of $22,442.[17] This claim is

17. Plaintiff, as it did in claim 1.1, included this damage item in claim 2 even though it is clearly unrelated to the substantive nature of claim 2. This cost, even if valid, more properly belongs in claim 3, which deals with earth dam claims, not in claim 2 which solely involved fillet work and concrete work in the arch dam area.

ostensibly based on a total cost approach, *i.e.*, it represents part of the excess costs over the bid costs plaintiff incurred on the earth dam embankment work. It is merely a line item in plaintiff's damage schedule for claim 2. There is little explanation of this claim item in the record and the court concludes, as a result, that said claim lacks merit in any event.

Defendant, on the other hand, maintains that plaintiff is only entitled to an equitable adjustment of $262,834 on claim 2. This amount includes $3,732 (before add-ons) for foundation preparation, $4,812 (before add-ons) for foundation cleanup, and $142,352 (before add-ons) for increased costs of fillet forms. These cost figures total $150,896. Add-ons total approximately $65,106. Defendant did not allow for any delay damages on the fillet changes claim. Defendant does allow 8 calendar days (6 work days) of delay for excavation work on the clay seam, and removal of loose rock and installation of rock bolts in the right abutment. Defendant allows $40,902 (before add-ons) for the 6 work days of delay; add-ons total approximately $5,930. Plaintiff was paid for the costs it incurred in performing this extra work, but has not been paid for any delay damage.

In computing both its direct costs and its delay costs for the fillet design change, it appears that plaintiff did not make use of actual time and labor work records for the project. Instead, plaintiff extrapolates an additional work time figure from its estimate of the increased surface area which the fillet change caused. This estimate was derived, it would appear, from the model which plaintiff constructed of the project. In other words, plaintiff uses its estimate of the percentage increase in work surface area to derive the increased labor time it spent on a particular phase of fillet construction work. Plaintiff did not use actual labor time data recorded in contract documents. For example, plaintiff estimates an increased fillet form area of

220.1 percent (4,814 square feet (s.f.)) as built versus 1,504 s.f. as bid). By applying this 220.1 percentage figure to the average labor time for formwork on each fillet (24 hours), plaintiff arrives at an estimate of 53 hours as the increase in labor time for each fillet caused by the design change. Thus by multiplying this average increase figure of 53 hours by the number of off-rock concrete pours (26), plaintiff derives an estimate of 1,378 hours as the added labor time spent by the fillet forming crew as a result of the fillet design change and claims $220,569 as a result thereof.

Defendant, on the other hand, relies on the actual work records for its computation of the fillet form costs plaintiff should receive. Based upon the information contained in the daily reports of BOR inspectors for the dam project, defendant determined that plaintiff spent 175 additional shifts on form work. Based upon this information and resultant computation, defendant argues the plaintiff is entitled to recover $142,352 because of additional formwork caused by the fillet design changes. This $142,352 amount includes the cost of labor, construction equipment,[18] and form hardware.

For the additional cleanup excavation costs, defendant relies on an exhibit prepared by one of its expert witnesses which was based on contract work records. This exhibit charts the construction progress of the project. The exhibit shows, *inter alia*, only 8 additional work shifts for cleanup excavation work in the arch dam foundation area. On the basis of this analysis, defendant argues that plaintiff is entitled to only $4,812 (before add-ons) for these 8 extra work shifts for cleanup work. Plaintiff seeks $34,484. In addition, defendant also awards plaintiff $3,732 for foundation preparation outside of design prism whereas plaintiff claims $7,464. With respect to the latter claim item, defendant has merely reduced by one-half the amount sought by

---

**18.** Defendant and plaintiff do not agree on the amount which should be allowed for equipment costs. Section IV, *infra,* of this opinion contains a discussion of the position of the parties' relative to this damage item and the court's determination thereon.

plaintiff for this item without explaining the basis of the cost, *i.e.*, what it entailed.[19]

In order to come to a conclusion on the damage issue on claim 2, the court has found it necessary to consider each of the three damage items separately: fillet form costs, cleanup excavation costs (which includes what has been denoted as foundation preparation costs), and delay costs.

As to fillet form cost, the court finds that defendant's presentation on damages is more persuasive than plaintiff's. Plaintiff based its figures on the increase in the size of the fillet form area. Plaintiff did not persuasively demonstrate that there existed a direct relationship between increase in fillet form size area and the number of manhours needed to construct the fillets. Thus, plaintiff failed to convince the court that its method of calculating fillet form costs truly reflected the additional costs incurred by plaintiff for this work.

Defendant's damage calculations, on the other hand, bore a closer relationship to direct cost incurred by plaintiff because of its additional fillet form construction work. The use of actual work records showing time spent by plaintiff forming the oversized fillets allowed defendant to calculate with a reasonable degree of accuracy the cost of the additional work in fillet form construction. Therefore, the court accepts defendant's figure of $142,352 as the amount to which plaintiff is entitled because of additional fillet form construction work.

The calculation of damages for additional cleanup excavation resulting from the fillet design change is more difficult than calculation of fillet form costs. Plaintiff has included this item in both claim 1 and claim 2 and thus made it difficult to assess precisely how much plaintiff seeks for this item. Defendant's calculations are not as persuasive as its fillet form calculations were since it is unclear precisely how defendant reaches the amount it set forth for this claim item. Defendant's calculations, in part at least, are based upon the actual work records of the project. Thus, although less than ideal, the court determines that defendant's damage calculations are more persuasive than plaintiff's on this claim item. The court, therefore, accepts defendant's figure of $4,812 for cleanup cost.

The court, however, does not accept defendant's figure of $3,732 for foundation preparation costs. Defendant simply accepted plaintiff's figure of $7,464 and reduced it by one-half because of defendant's contention that plaintiff agreed to and benefited from the fillet design change. The court does not accept defendant's argument that plaintiff must share the costs resulting from the fillet design change. The court finds that defendant was responsible for the fillet design change and, accordingly, should bear appropriate costs associated with that change. Since defendant does not oppose award of these costs on substantive grounds, it is reasonable that defendant should bear the full cost of $7,464, not 50 percent of said cost.

In summary, plaintiff is entitled to recover $142,352 for extra form work, $4,812 for extra cleanup work and $7,464 for foundation preparation work, a total of $154,628 representing direct costs of fillet design change and related extra concrete work. Appropriate add-ons to this figure total $66,570. Thus, plaintiff's total direct cost recovery is $221,198.

In addition to its claim for direct costs, plaintiff also seeks a total of $567,986 (including add-ons) for "delay" costs

19. The precise nature of this claim item is difficult to discern from the record although it would appear to be related to or part of the cleanup operation prior to pouring concrete. Defendant, without explanation accepts this cost item as a valid recoverable item, but suggests it should be halved since both parties benefited by the change. Defendant's acceptance of this cost item carries with it the implication that in the context of concrete pouring on the fillet claim, foundation preparation and cleanup work are separate and distinct types of cleanup work. The court so treats these two claim items in the absence of any other explanation by the parties or the record. Recovery herein for cleanup costs encompasses any cleanup costs plaintiff improperly included in claim 1.

resulting from the fillet design change. While the parties are wont to refer to this aspect of the claim as "delay damages," the claim is really one for compensation for extended performance due to a change issued under the Changes clause of the contract. For the sake of convenience, and because the parties use the phrase, the court will utilize the phrase "delay damages" as shorthand for "compensation for extended performance due to a change under the changes clause of the contract." *See Merritt-Chapman & Scott Corp. v. United States,* 192 Ct.Cl. 848, 851–853, 873–874, 429 F.2d 431, 432, 444, 445 (1970); *Paul Hardeman, Inc. v. United States,* 186 Ct.Cl. 743, 749–752, 406 F.2d 1357, 1361–1363 (1969). Basically, plaintiff contends that the fillet design change delayed completion of the project by 55.5 work days (63 calendar days).[20] Defendant concedes liability for $47,026 which is the amount of delay damages (including add-ons) for 6 work days (8 calendar days). The 8 calendar days of delay conceded by defendant occurred as a result of the removal of the clay seam (3 calendar days) and rock bolting and related work on the right abutment (5 calendar days). Defendant makes no award for delay damages as a result of the fillet design change. Defendant does not assert that legal reasons preclude plaintiff from being awarded delay damages for the fillet design change. Instead, its position presumably is that plaintiff should not get delay damages for fillet design changes because said work was not on that critical path and/or that there were concurrent delays which preclude the award of said damages under the circumstances of this case. These are factual assertions. However, defendant does address the issue of delay damages in case the court finds, as it does, that plaintiff is entitled to delay damages for the fillet design change.

The primary difference between the parties regarding the proper number of delay days to be accorded plaintiff turns on which party's critical path analysis is accepted by the court. *See* note 5, *supra.* For plaintiff, the concrete placement operation in the arch dam was on the critical path from January 23, 1975, to September 12, 1975. Defendant, on the other hand, contends that the arch dam concrete placement operation was on the critical path from January 23, 1975, to June 24, 1975. Thus, for defendant all work occurring in the arch dam on or after June 24, 1975, had no impact on the completion of the project, and, according to defendant, plaintiff is entitled to no delay damages for work in the arch dam area which occurred after June 24, 1975.

The court adopts defendant's interpretation of the critical path for the reasons discussed in section IV, *infra,* of the opinion. This determination, however, does not fully resolve the delay damage differences between the two parties. An examination of both the additional fillet form work and the additional cleanup excavation work in the arch dam area reveals that some of this work took place while the arch dam concrete placement operation was on the critical path. Of the 125 additional shifts which defendant concedes plaintiff spent on fillet form work, 74 involved work on lifts which were poured prior to June 24, 1975. Thus, the work of these 74 additional shifts took place while the arch dam concrete placement operation was on the critical path. It is reasonable on this record to conclude that this extra form work delayed the eventual completion of the project. Given the fact that this fillet form work was an integral part of the arch dam concrete placement operation and the fact that the concrete placement operation itself was on the critical path until June 24, 1975, it is certainly reasonable to conclude

---

**20.** The parties differ on the damages which plaintiff should be paid for each day of delay. Plaintiff contends its expenses were $9,020 per work day for each day the completion of the project was delayed. As a result of concessions made in response to FBI corrections to its calcu-

lations, plaintiff lowered this figure at oral argument to $8,903 per work day. Defendant maintains plaintiff's cost of delay was $6,817 per work day. The court has accepted defendant's $6,817 amount for the reasons discussed in section IV, *infra,* of this opinion.

that this extra work delayed the completion of the project.

Defendant fails to explain how it can award plaintiff direct costs for this fillet form work without also awarding delay costs for some of the fillet work which occurred before June 24, 1975, and is conceded to be work on the critical path. Defendant's failure to allow any delay costs for this work is inconsistent with its contention regarding critical path work and its acceptance of liability for the direct cost of fillet form work. In the court's view, defendant also has some liability for delay costs as a result of the fillet design change.

The principal difficulty for the court lies in determining how many of the 125 additional shifts spent on concrete fillet form work and how many the additional shifts spent on cleanup excavation actually caused a compensable delay in the completion of the project. As mentioned above, defendant has not directly addressed the issue of delay damages for this additional fillet form work and additional cleanup excavation work. Plaintiff also has provided little help since it chose not to respond to defendant's damage calculations in its objections to defendant's Requested Findings of Fact. Instead of responding to defendant's damage calculations, plaintiff chose to rely on its damage presentation in its Requested Findings of Facts. The court does determine that plaintiff's method of calculating delay damages for the fillet design change was unpersuasive and improperly attributed a great deal more delay to BOR and this particular claim than was warranted by the evidence in the record. Indeed, plaintiff seeks 63 calendar days delay for fillet design change when the plaintiff itself attributes only 56 calendar days of delay to the period of construction involving the concrete fillets. Plaintiff, inexplicably, includes 15 calendar days of delay in its fillet work delay consideration which occurred during the primary phase of excavation on the arch dam, i.e., before January 9, 1975.

As a result of the complexity of the record and the parties' failure to address precisely how much delay is attributable to the additional fillet form work and cleanup excavation work, the court was forced to calculate, as best it could, the delay caused by the additional fillet form work and additional cleanup excavation work. Based on its review of the record, the court determines that the 125 additional shifts spent on form work and the 8 additional shifts spent on cleanup excavation resulted in a total delay to the project of 15 days.

In order to translate the above-discussed additional shifts into days of delay, the court deemed it necessary to determine, first, how many shifts involved the period when arch dam work was on the defendant's critical path, and second how many shifts involved a time period when other concurrent work delayed the project. The record shows that 74 forming shifts and 4 excavation cleanup shifts took place while the arch dam work was on the critical path, for a total of 78 shifts involving work on the critical path. Of these 78 shifts, the record indicates 29 shifts were concurrent with the construction of the diversion works on the excavation of the clay seam which work was also on the critical path. One shift involved cleanup excavation during the placement of the crack detection tape. Although it is difficult on this record to determine the precise number of shifts involved, the record appears that 4 shifts were concurrent with the delay in the outlet works, the construction of which took place while the arch dam concrete operation was on the critical path. Accordingly, removing concurrent delay shifts (33 shifts) from the 78 shifts on the critical path leaves 45 shifts as a basis for delay damage consideration.

The court concludes that a total of 45 extra shifts were involved in the additional fillet form work and cleanup excavation caused by the fillet design change. Since plaintiff was working 3 shifts a day during this period, the 45 extra shifts involved a total of 15 work days of additional work (45 divided by 3). Since these 15 days of work took place while the fillet design change work was on the critical path, the

court concludes that plaintiff is entitled to delay damages for these 15 work days. The court concedes that it is possible that this determination is less than precise or exact. Because of the complexity of the record and the failure of the parties to adequately address the delay implications of the additional shifts for arch dam clean-up and fillet form work, the court had a difficult time arriving at a precise number to reflect the delay days caused by the fillet design change. The court believes that, under the circumstances of this case, 15 delay days is a fair and reasonable figure for the additional work caused by the fillet design change. It certainly fits within the mold of an "equitable adjustment."

Plaintiff's compensable delay period is determined to be 21 workdays; this includes the 15 workdays attributable to additional form work and cleanup excavation as well as the 6 workdays conceded by defendant for clay seam and rock bolting work. This determination produces a delay damage figure of $143,157 (21 × $6,817), plus an additional $21,433 in add-ons for profit, taxes, and bonding expenses, for a total delay damage figure of $164,590.

## Discussion

The Nambe Falls Dam contract contained the standard "Changes" provision (Oct. 1969 Edition) often included in government contracts. This provision provided, in pertinent part:

CHANGES

(a) The Contracting Officer may, at any time, without notice to the sureties, by written order designated or indicated to be change order, make any change in the work within the general scope of the contract, including but not limited to changes:

(i) In the specifications (including drawings and designs);

(ii) In the method or manner of performance of the work;

\* \* \* \* \* \*

(d) If any change under this clause causes an increase or decrease in the Contractor's cost of, or the time required for, the performance of any part of the work under this contract, whether or not changed by any order, an equitable adjustment shall be made and the contract modified in writing accordingly. \* \* \*

The contract also contained a "Suspension of Work" clause.

Although plaintiff in its presentation of claim 2 does not seem to rely on the Changes provision, it is clear that it is this provision which provides the basis for its claim. Defendant has conceded liability for the fillet design change, a concession which is clearly warranted by the facts and circumstances of this case. BOR personnel had the responsibility under the September 10, 1974, design drawings, of adjusting the height of the fillets to compensate for any overexcavation. When plaintiff, for reasons discussed in claim 1, excavated beyond the contract design line, BOR personnel at the construction site failed to adjust the height of the fillets. It was this failure by BOR to adequately follow the fillet design instructions that created the necessity of a change in the fillet design. Consequently, the fillet design change was accomplished within the scope of the contract Changes provision, and plaintiff is entitled to an equitable adjustment under said provision for an increase in the cost of the performance of the work due to said change, whether or not changed by the change order itself.

The statement of facts, *supra*, for claim 2 provided the court's factual conclusions and related reasoning on the damage issue. There is no reason to repeat those determinations again. However, several matters require further discussion relative to claim 2.

For reasons discussed earlier, plaintiff's claim for cleanup excavation in the arch dam has been included in claim 2. Plaintiff contends that cleanup excavation, in fact, involved extensive resloping and redimensioning work beyond the scope of the contract required cleanup excavation work. Paragraph 4.1.3 of the contract required plaintiff to perform "a final cleanup of the

rock surface * * * by barring, wedging, picking, or other approved methods." The record show that the vast majority of the cleanup excavation in the arch dam was contract work required under paragraph 4.1.3 of the contract. To the extent that BOR required cleanup excavation beyond the scope of contract required work, such work is either included in the 8 shifts for which plaintiff receives compensation under this opinion as part of the 15 workdays of delay computed above, or such work was within the scope of the rock bolting work and clay seam work for which plaintiff received a written change order and compensation.

Plaintiff's claim for delay damages for fillet design work also deserves additional comment. Plaintiff did not use the project's work records to determine when and how much additional time it spent on cleanup excavation and fillet form work as a result of the BOR's fillet design change. Instead, plaintiff determined the additional time required for cleanup excavation in the arch dam by reference to plaintiff's own estimate of the percentage increase in rock foundation surface area. Similarly, for fillet form work, plaintiff derives its work time figures from the percentage increase in the fillet form area sizes.

After using the time figures for cleanup excavation in the arch dam and fillet form work arrived at by the method just described, plaintiff compares the total time it calculated for fillet form work and arch dam cleanup excavation with the amount of time it originally bid. The resulting percentage increase as determined by plaintiff (86.3 percent) is then used by plaintiff to calculate how much of the 56 calendar day (c.d.) delay in arch dam construction is attributable to fillet form work and extra cleanup as a result of the fillet design change. Plaintiff arrives at a figure of 49 c.d. (44 work days (w.d.)) to which it then inexplicably adds 15 c.d. (11.5 w.d.) delay which occurred during primary excavation in the arch dam.

As mentioned earlier, the court found plaintiff's method of calculating delay damages both unreliable and unreasonable. Its method disproportionately inflates the amount of delay time attributable to the fillet design change. Plaintiff's method also fails to account adequately for the fact that the arch dam concrete placement operation incurred delays which were not the result of additional BOR ordered work.

Defendant's calculation of the additional work by reference to the time and labor records from the project is more accurate than plaintiff's method of calculation, since it reflects work actually performed, not hypothetical labor time projections. Damage estimates based upon actual cost are preferred over estimates based hypothetical costs. *Lilley-Ames Co. v. United States*, 154 Ct.Cl. 544, 549, 550, 293 F.2d 630 (1961). Similarly, work time estimates based upon actual work records are preferred over estimates based upon hypotheticals. Thus, the court accepts defendant's estimate of the amount of additional work which the fillet design change required. However, since defendant failed to calculate the delay caused by this additional work, it was necessary for the court to make such delay calculations based upon the evidence of record.

Plaintiff is entitled to recover delay damages for the delay caused by the additional work described above which resulted from the fillet design changes. As mentioned previously, the basis for plaintiff's claim must be the Changes clause in the contract. Under the Changes clause, plaintiff can recover delay damages as compensation for extended performance due to the change. *Pathman Constr. Co. v. United States*, 227 Ct.Cl. 670, 673 (1981); *Merritt-Chapman & Scott Corp. v. United States*, *supra*, 192 Ct.Cl. at 851, 429 F.2d at 432; *Paul Hardeman, Inc. v. United States*, *supra*, 186 Ct.Cl. at 749–752, 406 F.2d at 1361–1363. Defendant implicitly acknowledged this legal principle when it conceded delay damages for the clay seam work and the rock bolting work, which occurred during the arch dam concrete placement operation. Defendant, as indicated earlier, failed to allow delay damages for the additional

fillet form work and the additional arch dam cleanup excavation work. The court now allows plaintiff to recover such damages as part of an equitable adjustment award.

The court has determined that plaintiff is entitled to 15 w.d. of delay for the additional fillet form work and cleanup excavation work, all of which plaintiff performed during the arch dam concrete placement operation. It is clear that plaintiff cannot recover for all the additional fillet form work and arch dam cleanup excavation work it performed. Some of this work occurred after June 24, 1975, the date the arch dam concrete placement operation left the critical path. However, as to the additional work which took place while the arch dam concrete placement operation was on the critical path, not all such work delayed the eventual completion of the project. Some of this additional work occurred during plaintiff's construction of the diversion work and still other of the above-mentioned additional work took place during the construction of the outlet works.

 Both the construction of the outlet works and the diversion works, which were work items involved in the concrete placement operation while the concrete placement operation was on the critical path, created project delays which were attributable to plaintiff, not BOR. It is well established the plaintiff cannot recover for delay caused by the government when that delay is concurrent with other delay not caused by the government. *Broome v. United States*, 203 Ct.Cl. 521, 528, 492 F.2d 829, 833 (1974); *Commerce Int'l Co. v. United States*, 167 Ct.Cl. 529, 543, 338 F.2d 81, 90 (1964) and cases cited therein. From the court's review of the record, it is evident that some of the extra arch dam cleanup excavation work and fillet form work was concurrent with work on the diversion works and the outlet works. Therefore, defendant is not liable for any of this concurrent delay. Other above-mentioned additional work took place while plaintiff performed the clay seam work and rock bolting work for which plaintiff has

been separately awarded delay damages. Based upon the court's review of a difficult and complex record, defendant is responsible for 15 w.d. of delay for additional arch dam cleanup excavation and additional fillet form work. When combined with the 6 w.d. conceded by defendant for clay seam and rock bolting work, plaintiff is entitled to recover delay damages for a total of 21 w.d. Defendant's per day delay figure of $6,817, which the court accepts, for 21 days, plus add-ons, produces an award for delay damage to plaintiff of $164,590.

Plaintiff, therefore, is entitled to recover $221,198 as direct costs incurred as a result of the fillet design change and related concrete placement work and $164,590 for 21 days of delay which also resulted from said fillet design change and related concrete placement work, for a total recovery of $385,788.

Based on the above discussion, the court concludes that plaintiff is entitled to recover $441,687 under claim 2. In reaching the conclusion, the court observes that it did so recognizing that the complexity of the issues, the somewhat unclear presentations of the parties, and the sheer volume of the record might well have produced a difference result to another trier of fact.

### D. *Claim 3—Core Trench Changes*

Plaintiff seeks to recover $15,318 for two work items in the core trench area of the earth dam. Plaintiff excepted three core trench work items from the July 7, 1976, release. In its post-trial submission, plaintiff withdrew one of these work items, dewatering of a spring, as a claim item in this case. Defendant admits in its submissions, that plaintiff is entitled to recover $54,057 on the remaining two work items. As is evident, defendant proposes an award greater than that sought by plaintiff. This fact is explained by the different critical path analyses of the parties which produce differing delay damage conclusions.

### *Facts*

Claim 3 consists of two claim items. Under the first claim item plaintiff seeks increased costs resulting from removal of a

gravel lens (or seam) and resloping of the sides of the cutoff trench in the earth embankment area. Under the second claim item, plaintiff seeks increased costs for fill work (zone 1) in the earth embankment area and the increased cost of compacting this special fill.

### a. *Gravel lens claim*

In September 1974, BOR observed an area of pervious gravel material in the cutoff trench. The cutoff trench was an excavated area beneath the earth dam, which was designed to be filled with impervious material to prevent water seepage. Therefore, it was necessary to remove this previous gravel area to ensure against water seepage.

In September 1974, BOR directed plaintiff to remove the gravel lens. Plaintiff requested that it be allowed to postpone the removal of the gravel lens until a later time because it was using the core trench area as an access road. BOR agreed to plaintiff's request.

In July 1975, plaintiff removed the gravel lens. The removal of this material required plaintiff to reslope the sides of the cutoff trench. BOR paid plaintiff at the unit price for this work but allowed no delay damages. In fact, as defendant concedes, the gravel lens and resloping work delayed the project for 6 work days (w.d.) or 8 calendar days (c.d.)

 Defendant claims plaintiff is entitled to recover direct costs of $2,140, which includes add-ons for home office overhead, job overhead, profit, taxes, and bonding expenses, as compensation for the removal of the gravel lens and resloping the side slopes of the core trench. In addition, defendant also states that plaintiff is entitled to recover $47,026 as compensation for the 6 w.d. of delay caused by the gravel lens and resloping work. This amount of $47,076 also includes add-ons for profit, taxes, and bonding expenses. Thus, defendant finds plaintiff entitled to recover a total of $49,166 for the gravel lens and resloping work due to a valid change order.

After a review of the record, the court concludes that defendant's quantum determinations provide fair and reasonable compensation for plaintiff's removal of the gravel lens and the resloping of the core trench sides and are therefore adopted by the court herein.

### b. *Zone compaction*

 As mentioned above, the cutoff trench was designed to be filled with previous material. In order to assure proper compaction, the contract specified in certain areas that the zone 1 fill was to be put down in layers not exceeding 6 inches. Specifically, the contract provided that: "The material shall be placed in the earth fill in continuous, approximately horizontal layers not more than 6 inches in thickness after being compacted." The contract also provided: "The contractor shall be permitted to construct separate portions of the embankment below original ground surface, subject to the approval of the contracting officer."

Plaintiff contends that it sought permission from the contracting officer to construct certain zone 1 portions of the earth dam, which were below the ground surface and next to the thrust block, in separate lifts larger than those specified in the contract. Plaintiff further contends that the method of placing the zone 1 fill which it proposed to the contracting officer reflected general industry practice. Plaintiff maintains that it should have been allowed to construct the earth dam as it requested and that the contracting officer improperly refused its request to construct the portion of the earth dam next to the thrust block in separate large fill lifts. The contracting officer, in fact, allowed plaintiff some variation from the contract provision of 6-inch fill lifts. He allowed plaintiff to build this portion of the dam area in 3½ foot lift differentials.

While the liability question is clouded on this claim, defendant's concession that plaintiff is entitled to some recovery on this claim is treated as an admission of liability by defendant. Defendant calculates that plaintiff is entitled to recover $4,901 for

this claim item. Plaintiff originally sought $12,109 for this item. Plaintiff, however, does not take issue with defendant's computation in its submissions or at oral argument. Upon review of the record and the contract documents, there is support for a liability determination against defendant on this issue. Further, based on its review of the record, the court determines that defendant's cost figure of $4,901 is more persuasive than plaintiff's cost figure relative to the additional work plaintiff performed on this work item, and is deemed, on this record, to be an appropriate equitable adjustment for this claim item. Plaintiff sought no delay damages for this claim item and defendant did not find plaintiff entitled to any delay damages on this claim item. The court, on its review of the record, concludes that plaintiff is not entitled to delay damages on this claim item.

### Discussion

Defendant has consented to recovery on claim 3 in an amount which exceeds the amount plaintiff seeks. The reason for this consent by defendant is that defendant's critical path of the project included the cutoff trench excavation and resloping work in the earth embankment area, while plaintiff's did not.[21] Consequently, defendant includes delay damages for the 6 w.d. of delay caused by this work in its computations, while plaintiff seeks no delay damges for the gravel lens claim item. Since the court has accepted defendant's critical path for the reasons discussed in the damages section of this opinion, section IV, defendant's damage computation for the gravel lens is controlling here.

Accordingly, the court concludes that plaintiff is entitled to recover $54,057 under claim 3.

21. In its Requested Findings, plaintiff claims that the gravel lens change caused 9 c.d. or 7 w.d. of delay in the earth embankment area. Plaintiff, however, does not claim delay damages here because earth embankment work at the time was not on plaintiff's critical path. In much the same manner, plaintiff in its Requested Findings claims 10½ c.d. or 7½ w.d. of delay in the earth embankment work for the zone work. However, as indicated above, since the earth embankment work was not on plaintiff's critical path, plaintiff did not seek delay damages.

### E. *Claim 4—Vertical Contraction Joint Treatment*

Plaintiff seeks $38,880 for work involving sandblasting concrete curing compound from the contraction joints in the concrete dam. Plaintiff excepted this item from the release in the amount of $165,929. Plaintiff contends that this was extra work required by BOR, and thus it is entitled to an equitable adjustment for performing the same. Defendant contends that the sandblasting work was required by the contract, and therefore plaintiff is not entitled to additional compensation.

### Facts

The concrete dam (consisting of both the arch dam and the thrust block) was composed of a series of vertical concrete section called blocks. The concrete dam contained a total of 9 such blocks. Between each block was a joint called a contraction joint. The contraction joints were made of concrete. Like all portions of the concrete dam, these contraction joints had to undergo a curing process. The purpose of the curing process was to prevent the freshly poured concrete from losing moisture rapidly through evaporation. Such rapid moisture evaporation could produce deficiencies in the concrete, such as cracking.

Paragraph 5.1.20, of the contract dealt with curing of the concrete in general. The description and specifications for the membrane curing method were contained in subparagraph 5.1.20(c) which stated: "Wax-base compound curing—Curing by this method shall be by application of a wax-base curing compound on concrete surfaces to form a water-retaining film on the surfaces."

The contract provision dealing with the curing of contraction joints which were to be grouted gave the contractor the option of using either water curing or membrane

curing. This option for method of concrete curing existed only for contraction joints which were to be grouted; all other contraction joints had to be cured by the membrane curing method.

In the fall of 1974, when plaintiff began its concrete placement operation, it used a water method to cure the grouted concrete contraction joints. However in late fall 1974, the freezing temperatures made the water method difficult to use. Consequently, plaintiff switched to a membrane method of curing the contraction joints in November 1974. BOR personnel, then, directed plaintiff to remove the membrane compound by light sandblasting. This removal of the compound was necessary to ensure that the grout to be applied to these joints could establish a proper bond. The membrane compound hindered proper adherence of the grout to the concrete surface unless the membrane compound was removed by light sandblasting prior to application of the grout.

The contract contained a provision which specifically directed such sandblasting. Paragraph 5.3.4(b) stated, in pertinent part: "That where contraction joints to be grouted are coated with sealing compound at the option of the contractor, they shall be lightly sandblasted to effectively remove the curing compound * * *."

An internal memorandum from plaintiff's vice-president, who was also project manager of the Nambe Falls dam project during all times relevant to this claim, to G.M. Shupe indicated plaintiff's awareness of the need to sandblast the curing compound. On or about November 15, 1974, which was during the period when plaintiff switched from the water method of curing to the membrane method, the project manager wrote: "Since we have the curing compound on hand and don't have the extra insulation, we are planning to use curing compound on the vertical surfaces until we encounter difficulty in the light blasting required." This memorandum indicates rather clearly that plaintiff understood the pertinent contract provisions as requiring light sandblasting of contraction joints to

which curing compound had been applied at the time it made a decision to switch to membrane curing.

When BOR directed the sandblasting, plaintiff protested that such work was outside the contract requirements. Specifically, plaintiff pointed to the fact that the contract used two terms, "curing compound" and "sealing compound," to describe the membrane compound method of curing. Plaintiff asserted that the use of the two terms was ambiguous because a contractor could not discern whether the two terms referred to the same compound or to two different compounds. As a result, plaintiff contended that it was unclear which compound had to be sandblasted.

The contract provision (Par. 5.3.4(b)) involving the sandblasting requirement, does use the terms "sealing compound" and "curing compound" interchangeably. In pertinent part, this provision stated:

> Except for contraction joints to be grouted, the surface of the concrete first placed at a contraction joint shall be coated with sealing compound before the concrete on the other side of the joint is placed. * * *
>
> Contraction joints to be grouted do not require sealing compound. * * * Provided, That where contraction joints to be grouted are coated with sealing compound at the option of the contractor, they shall be lightly sandblasted to effectively remove the curing compound without exposing appreciable areas of aggregate before the placing of adjacent concrete.

In the spring of 1975, when freezing temperatures no longer hindered a water method of concrete curing, plaintiff did not switch back to the water method. Instead, plaintiff continued to use the membrane method of curing the concrete pouring operation. Moreover, despite plaintiff's assertions to the contrary, plaintiff's concrete pouring operation was not delayed into the winter methods as a result of additional excavation in the thrust block resulting from BOR directives. A review of the record discloses that plaintiff had sched-

**704**

uled the vast majority of the concrete placement in the thrust block, where plaintiff's concrete placement operation began, for the months of November 1974, December 1974, and January 1975. Furthermore, plaintiff's batch plant which mixed the concrete for the project was not operating until late October 1974. Clearly then, it was plaintiff's construction schedule and equipment batch plant problems which were responsible for the pouring of concrete in freezing temperatures and the resultant need to use membrane concrete curing.

Finally, it should be noted that although the contract referred to both "sealing compound" and "curing compound" in its provisions dealing with concrete curing, the specifications for both "sealing compound" and "curing compound" were precisely the same. The contract specifically stated in which publications the specifications for "curing compound" and "sealing compound" could be found. The record shows no attempt by plaintiff to determine whether "curing compound" was, in fact, a different membrane compound than "sealing compound." In fact, the record shows that plaintiff did not even notify the contracting officer of the ambiguity it perceived before submitting its bid.

*Discussion*

■ Plaintiff's basic argument is that the use of the two terms, "curing compound" and "sealing compound," to describe the membrane method of curing created an ambiguity in regards to plaintiff's sandblasting responsibilities under the contract. Specifically, plaintiff maintains that it interpreted the contract as requiring sandblasting of "sealing compound," but not "curing compound." Thus, plaintiff maintains that when it submitted its bid it intended to use "curing compound" as a membrane curing method and did not believe that sandblasting would be required. Plaintiff argues that the use of two terms to describe one membrane curing process was responsible for his misinterpreting the contract. Since BOR drafted the contract,

plaintiff contends that BOR is responsible for plaintiff's misinterpretation of the sandblasting requirements.

Plaintiff's argument suffers from a number of flaws. The most obvious is the fact that the contract was not even arguably ambiguous about the necessity of sandblasting curing compound. The relevant contract provision (Par. 5.3.4(b)) specifically stated: "[T]hey [contraction joints] shall be lightly sandblasted to effectively remove the curing compound * * *." Thus, although the contract, at times, used "curing compound" and "sealing compound" interchangeably, the contract specifically used the term "curing compound" when referring to what material had to be sandblasted from the contraction joints. Plaintiff's contention that it planned to use "curing compound" and thus did not realize the sandblasting requirement has little appeal in view of the specific direction in the contract referring to "curing compound."

■ Moreover, a reasonable reading of the contract as a whole demonstrates no ambiguity because of the interchangeable use of "sealing compound" and "curing compound." The context within which both terms were used in the contract demonstrate they were both referring to the same membrane curing compounds. In fact, the two terms themselves indicated that they were referring to the identical method of concrete curing. Membrane compound works as a curing agent because it forms a seal on the concrete surface which inhibits the evaporation of moisture. Thus, it is only logical that a membrane "sealing" compound is also a membrane "curing" compound. Contracts must be construed with business sense as they would naturally be understood by intelligent and experienced contractors such as plaintiff. *See Hol-Gar Mfg. Corp. v. United States,* 169 Ct.Cl. 384, 388, 351 F.2d 972, 975 (1965); *Deloro Smelting And Refining Co. v. United States,* 161 Ct.Cl. 489, 495, 497, 317 F.2d 382, 386, 387 (1963). An experienced contractor, such as plaintiff, well-versed in concrete construction should certainly have understood that "curing

compound" and "sealing compound" were two different terms for an identical material.

In fact, plaintiff's memorandum of November 15, 1974, demonstrates that at the time plaintiff adopted the membrane curing method it was aware of the necessity for sandblasting. Furthermore, despite plaintiff's assertions of extra expense as a result of the sandblasting, plaintiff continued to use the membrane compound method even when warmer weather would have allowed it to switch back to the water method. The above facts suggest rather clearly that plaintiff understood the contract to require sandblasting.

Even if the court were to accept plaintiff's contention that the contract provisions involving concrete curing and sandblasting were ambiguous, plaintiff would still be unable to recover on this claim. The ambiguity, as now perceived by plaintiff, in the sandblasting provision should have been patent to a knowledgeable and experienced contractor such as plaintiff. The contract provision involved here contained the two terms in question within the same sentence. Thus, the sentence in question read "where contraction joints to be grouted are coated with sealing compound * * * they shall be lightly sandblasted to effectively remove the curing compound." (Par. 5.3.4(b).) If one did not interpret "curing compound" and "sealing compound" to mean the same compound, the sentence makes no sense. Unless the terms indicated the same compound, there would be no curing compound on the contraction joints to be sandblasted off. Therefore, plaintiff's purported reading of this contract provision demonstrates a patent ambiguity.

It is well established that when faced with a patent ambiguity in a government contract, a contractor has a duty and a responsibility to have the ambiguity resolved before bidding on that contract. *S.O.G. of Arkansas v. United States*, 212 Ct.Cl. 125, 128, 546 F.2d 367, 369 (1976) and cases cited therein. Therefore, plaintiff, at the very least, should have notified the contracting officer of the purported ambiguity before submitting its bid on this contract. Plaintiff's failure to do so bars it, in any event, from recovering any damages which resulted from its interpretation of the alleged ambiguous contract provision.

For reasons discussed above, plaintiff is not entitled to recover on claim 4.

### F. Claim 5—Additional Concrete Cooling

Under claim 5, plaintiff seeks $48,008 for costs which it alleges resulted from its having to cool the concrete longer than the period specified in the contract. On audit by the FBI, corrections and adjustments reduced plaintiff's claim figure to $35,872. These corrections and adjustments are adopted by the court. Plaintiff maintains that it exceeded the maximum number of cooling days set forth in the contract, and thus should receive an equitable adjustment for this longer period. Plaintiff excepted this concrete cooling claim from the release and both parties agree that the claim excepted from the release covers the period June 10, 1975, through November 25, 1975. Plaintiff so conceded this limitation on its cooling claim in a Stipulation of Facts which it executed and filed with the court, in its briefs, and at oral argument. Defendant accepts no liability for the claim and argues that plaintiff did not exceed the contract required cooling period when the days plaintiff failed to meet the contract specifications for cooling are taken into account.

### Facts

The contraction joints in the concrete dam, as indicated in the discussion of claim 4, were the joints between the concrete blocks which comprised the concrete dam. In order to ensure that the concrete dam would adjust for any volumetric shrinkage and act as a monolithic structure, it was necessary to grout these joints. These joints were rather large. To properly grout these joints, it was necessary to cool the concrete to open up the joints. This opening up of the joints allowed the grout to be properly applied.

Under the contract, plaintiff was responsible for supplying the concrete cooling equipment. The contract specifications required plaintiff to provide a refrigeration plant having a capacity of at least 110 tons of refrigeration per day and capable of furnishing 300 gallons per minute (gpm) of refrigerated water at a minimum temperature of 35 degrees Fahrenheit (F). The contract required plaintiff to furnish, install, and operate this equipment.

Paragraph 5.3.1 of the contract provided details of plaintiff's responsibilities for cooling the concrete. This paragraph provided in pertinent part: "[W]ater shall be circulated through these [temperature control] coils to reduce the peak temperature of the concrete, to obtain desirable temperature gradients within the concrete, and obtain the desired temperature of 40° F in the concrete at the time the contraction joints are grouted * * * the amount of water circulated through each temperature control coil shall be not less than 4 gpm."

As mentioned earlier, the concrete was divided into blocks, *i.e.*, vertical sections of the dam which ran from the bottom to the top of the dam. There were a total of 9 blocks, vertical sections, in all of the concrete dam. For the purposes of grouting, the concrete dam was also divided into three horizontal sections called grouting lifts. The first grouting lift consisted of approximately the bottom ⅓ of the concrete dam; the second grouting lift consisted of approximately the middle ⅓ of the concrete dam; the third grouting lift consisted of approximately the top ⅓ of the concrete dam. Plaintiff's concrete cooling claim for additional cooling costs involves only cooling in the top ⅓ of the concrete dam, the third grouting lift. This third grouting lift involved a total of 8 blocks.

Under the contract, plaintiff was required to provide final cooling of the concrete blocks for a maximum of 30 days. The contract in paragraph 5.3.1 provided for additional compensation for this cooling process under the following conditions: "Upon completion of all final cooling in the

dam, the average number of days required for the final cooling period for each block lift undergoing final cooling will be determined. If this average final cooling period per grouting lift exceeds 30 days, an equitable adjustment will be made for any necessary increases in cost in accordance with Clause No. 3 [the "Changes" provision of the contract] of the General Provisions."

In its cooling operation for the third grouting lift, plaintiff spent a total of 317 days operating the cooling equipment. Since there were 8 blocks in this third lift and the contract required 30 days average per block, under the contract plaintiff had to operate the cooling equipment for 240 days without additional compensation (8 blocks × 30 days). Thus, the maximum number of days in dispute is 77 (317 days—240 days). However, during this period the water was being circulated (flow through the coils) at less than 4 gpm for 46 days. In addition for 126 days during this period, plaintiff circulated water at 40° F. or greater. During the cooling of the third grouting lift plaintiff met both the contract requirements for temperature and flow for only 153 days of the total of 317 days involved. There were some days when plaintiff failed to meet both requirements on the same day.

Plaintiff does not dispute the fact that it met the contract requirements for only 153 days during cooling of the third grouting lift. Instead, plaintiff argues that BOR had control over the cooling operation. As a result of this control, plaintiff argues that BOR caused the deficiencies in the flow and temperature of the cooling water because of the manner in which it directed the cooling hoses to be placed on the concrete blocks. These cooling hoses connected the embedded temperature coils with the refrigeration plant. Thus, plaintiff blames the cooling inefficiencies on BOR's running of the concrete cooling operation.

The court determines that BOR did, to some extent, control the concrete cooling operation including the placement of hoses

on the concrete blocks.[22] The court, however, determines that there were other factors which contributed more significantly to the inability of the cooling operation to meet the temperature and flow specifications in the contract during final cooling in the third grouting lift. First, plaintiff requested permission from BOR to allow it to place concrete at a temperature 5° F. higher than that required by the contract, 55° F. rather than 50° F. In return for BOR's permission for this 55° F. temperature, plaintiff agreed that BOR would incur no added expense for this higher concrete temperature. Second, concrete cooling for the third grouting lift took place during the months of May through September, a period which included the hottest months of the year. Plaintiff's cooling hoses were not insulated and this fact caused the water in the hoses to heat up during circulation, so that it was difficult for the refrigeration equipment to reduce the temperature of the circulating water to lower than 40° F. as was needed to ensure compliance with the contract specifications. The record is clear that the temperature of the water in the hoses had to be lower than 40° F. in order to meet the contract requirement of cooling the concrete to 40° F.

The record is conflicting and unclear how and to what extent defendant's direction of the placement of the cooling hoses contributed to the inability of the refrigeration equipment to cool properly the water circulating through the embedded temperature coils. Based upon a review of the total record, the court is persuaded that plaintiff's placement of the concrete at a temperature 5° F. higher than the original contract requirement was the primary reason that the concrete cooling operation failed to meet contract specifications and thus exceeded the maximum average of cooling days allowed by the contract. In addition, plaintiff's use of uninsulated hoses to circulate the refrigerated water up to and through the temperature

control coils in the concrete blocks was also a factor in plaintiff's failure to achieve the flow and temperature requirements of the contract during portions of the concrete cooling period for the third grouting lift. Any effect of the manner of BOR's placement of the cooling hoses on the temperature and flow requirements of the contract were outweighed by plaintiff's failure to insulate the cooling hoses and by plaintiff's pouring the concrete at 55° F. rather than 50° F.

The court determines that, after taking into consideration the days for which plaintiff is responsible for the failure to meet the temperature and flow requirements of the contract, the average number of cooling days per concrete block did not exceed an average of 30 days per block during the period June 10, 1975, through November 25, 1975.

*Discussion*

Plaintiff's arguments in support of claim 5 are primarily factual in nature and thus the court's factual findings, *supra*, effectively dispose of most of plaintiff's contentions. There is one aspect of plaintiff's claim, however, which bears discussion. Plaintiff's basic position on claim 5 is grounded on the proposition that it supplied refrigeration equipment in accordance with the contract specifications, and therefore it had no further responsibility for the cooling process. It's contention is that any extension in the final concrete cooling period must necessarily be BOR's responsibility as a result of BOR's right to control the cooling operation. Plaintiff's argument rests on the assumption that, under the contract, it only had to provide cooling equipment in compliance with the contract and it had no other cooling responsibilities.

Plaintiff's argument is premised upon a faulty interpretation of the contract. While it is true the contract provided specifications concerning refrigeration plant tonnage, capacity, and rate of flow, the

---

22. Paragraph 5.3.1 of the contract stated: "The times when water is to be circulated, the order in which water is to be circulated in the various portions of the dam, and the temperature of the water circulated * * * shall be as directed by the contracting officer."

contract also specifically provided in paragraph 5.3.1 how this refrigeration capacity was to be utilized during final cooling: "Temperature control coils shall be imbedded in the mass concrete of the concrete dam * * *. As provided herein, water shall be circulated through these coils * * to obtain the desired temperature of 40° F. in the concrete at the time the contraction joints are grouted."

The contract did not specifically provide that the hoses from the refrigeration plant to the embedded temperature control coils were to be insulated. The contract, however, did specifically provide that the water in the temperature control coils had to have the capacity of bringing the concrete temperature to 40° degrees F. which could be done only if the water circulating through the coils was somewhat less than 40° F. Thus, the contract specifically stated the purpose for which the refrigeration plant was to be used. The contract must be given the meaning which a reasonably intelligent person would derive from the contract language. *Hol-Gar Mfg. Corp. v. United States, supra,* 169 Ct.Cl. at 388, *Deloro Smelting and Refining Co. v. United States, supra,* 161 Ct.Cl. at 495, 317 F.2d at 386, 387. Any reasonably intelligent and experienced contractor such as plaintiff would have understood that it had to provide not only refrigeration equipment in accordance with the contract specifications, but also provide a method of circulating the refrigerated water to ensure that it could cool the concrete to 40° F. Plaintiff, therefore, had a contractual obligation to ensure that its cooling equipment, including the hoses from the refrigeration plant to the embedded temperature coils, could accomplish the purpose stated in the contract. Moreover, plaintiff had the responsibility to ensure that this purpose could be accomplished in light of all reasonably foreseeable circumstances which might have an impact on the process.

Plaintiff failed to meet this contract responsibility when it did not insulate the hoses running from the refrigeration plant to the temperature control coils. Certainly, summer heat and its impact on the water circulating in uninsulated hoses was a foreseeable circumstance which plaintiff had a contractual obligation to provide for. The contract by not providing specifications for insulated hoses left to plaintiff the decision concerning how to ensure that the water was kept properly cool during circulation despite intense summer heat. Plaintiff did not take precautions against the impact of the summer heat on the cooling hoses by insulating the hoses and thus took the chance that the heat would have no great impact on the water circulating in these hoses. Plaintiff, not defendant, must bear the responsibility for this decision.

██ In summation, the court has concluded that the primary factors resulting in the extended cooling period for the third grouting lift in respective orders of importance were: (1) plaintiff's placement of the concrete at 55° F. rather than 50° F. specified in the contract, (2) plaintiff's failure to properly account for the effect of the summer heat on the circulating water by insulating the hoses which circulated the refrigerated water to the embedded temperature control coils. The court cannot in any definitive way determine whether BOR's control and direction of the cooling operation may have contributed to the inefficiency of the cooling operation. While plaintiff dwells on BOR's right to exercise some degree of control over the cooling operation, and complains, in generalities, about BOR's control and direction over the cooling operation, it did not present sufficient specifics as to how and when such control and direction occurred and how it caused inefficiency in the process.

The court was not able, on this record, to assign a specific number of days to each of the three above mentioned factors: temperature variance, uninsulated hoses, and BOR's degree of control of the cooling operation. However, the court is persuaded that the temperature variance factor, and to a lesser extent, the uninsulated hose factor were chiefly responsible for the inability of the cooling operation to per-

form up to contract specification. The court concludes, from the record as a whole, that if plaintiff had poured concrete at 50° F. instead of 55° F. and if it had insulated the cooling hoses, the average cooling time per block in the third grouting lift most probably would not have exceeded 30 days per block. Plaintiff, therefore, is responsible for any and all days by which the final cooling period for the third grouting lift exceeded the 30-day per block average specified in the contract.

Accordingly, plaintiff is not entitled to any recovery under claim 5.

### G. Claim 6—Changes In Gallery Drainholes

Under claim 6, plaintiff seeks $78,836 as an equitable adjustment under the Changes clause of the contract for additional drainage holes drilling and grouting work in the concrete dam gallery area. The matter as presented in the Requested Findings of the parties was such as to suggest that the subcontractor, Continental, was also making a claim under claim 6. However, it is concluded this is not so. Claim 6 is on behalf of plaintiff only. While the events of claim 6 involved Continental, it is clear Continental incurred no additional costs or delay relative thereto, a fact conceded by Continental's attorney at oral argument. Plaintiff provided support services (compressed air, water, electricity, and labor) to Continental for the gallery drilling and grouting operation. On the basis of providing these services, plaintiff seeks to recover costs and delay damages as a result of the gallery drainhole changes.

Plaintiff excepted claim 6, from the July 7, 1976, release in the amount of $92,357. Defendant contends plaintiff is only entitled to $2,139 as an equitable adjustment for changes in the gallery drainholes.

### Facts

On October 9, 1975, plaintiff's drilling and grouting subcontractor Continental encountered a water loss while drilling a drainage hole in the concrete dam gallery. Continental then moved its drilling rig 100 feet away from this hole, and attempted to drill another drainage hole. Continental again suffered a loss of water while drilling this other hole. Such a drill water loss should not have occurred during the drilling of the drainage holes because this gallery area had previously had a grout curtain pumped into it. Such a grout curtain should have ensured the impermeability of the foundation in the gallery areas by filling the voids in the foundation. The fact that Continental suffered a water loss while drilling these two drainholes demonstrated that the previously installed grout curtain had not adequately filled the voids in the foundation in these two locations. Therefore, on October 14, 1975, BOR ordered Continental to discontinue the drilling drainage holes until the two holes which had suffered drill water loss had been grouted.[23]

In fact, BOR's October 14, 1975, directive effectively precluded any further drainage hole drilling in the thrust block gallery area. Paragraph 3.3.2 of the contract specifically prohibited drilling within 100 feet of a grouting operation. Thus until the completion of the grouting of the two drainage holes which had lost water, no further drainage holes could be drilled in this concrete dam gallery area since this area was within 100 feet of the two drainage holes which had to be grouted.

Continental chose not to grout immediately the two drainage holes in question in the thrust block gallery area because its grouting equipment was being used for contract required work on the right abut-

---

**23.** The change order of October 14, 1975, which halted any drainage hole drilling until the two drilled holes were grouted provided $710 in compensation for this change. It is not entirely clear from the record precisely what work this $710 was designated to compensate for, *i.e.,* Continental's drilling and grouting costs or

plaintiff's support costs or both. In any event, defendant apparently has not deducted this amount from the sum it concedes as reimbursement on this claim. Therefore, the court also treats plaintiff's claim as a claim for expenses in addition to this $710.

ment.[24] Continental did not want to move its equipment into the gallery area until the work on the right abutment was completed. Continental continued performing the right abutment grouting work required by the contract until October 21, 1975. Continental spent from October 21 to October 24, 1975, preparing to grout the two gallery area drainage holes. On October 24, 1975, Continental grouted the first of the two gallery area drainage holes. On October 31, 1975, Continental completed grouting the second drainage hole in the thrust block gallery area.

It is unclear from the record how much of the October 24 through October 31, 1975, period was spent performing grouting work on the second drainhole. In its presentation, defendant is not consistent on the period for which plaintiff should be reimbursed. In its Objections to Plaintiff's Requested Findings, defendant maintains that plaintiff should be compensated only for its support service work during the period October 24–31, 1975. Yet, in its Requested Findings on damages, defendant allows plaintiff damages for the period October 21–October 24, 1975, but without explanation allows no labor and supply costs only equipment costs. Despite the confusion in the presentation and in the record, the court determines that plaintiff provided support services from October 21 through October 31, 1975, for additional drainage hole grouting work as a result of the October 14, 1975, BOR change directive. Thus, plaintiff spent a total of 9 work days (w.d.) (11 calendar days (c.d.)) providing support services for the additional drainage hole grouting work and incurred additional costs relative thereto.

Again, although the record is not entirely clear on the matter, the court concludes that all additional drilling work which resulted from the October 14, 1975, change directive was completed on or by October 31, 1975. All drainage hole work performed after October 31, 1975, involved work required by the contract. While plaintiff argues that it had to provide additional support services after October 31, 1975, because Continental had to drill through the grout placed in the two drainage holes when it redrilled these holes, the court finds, however, that plaintiff has been adequately compensated for this work.[25] The reason plaintiff has been adequately compensated is because any such additional services provided after October 31, 1975, were counterbalanced by contract required services which were provided during the period from October 21 through October 31, 1975, for which plaintiff has received additional compensation in this opinion. Since the court was not able to separate out the contract services provided during the October 21–October 31, 1975, period, the inclusion of this whole 11 c.d. (9 w.d.) period more than adequately allows for any small post-October 31, 1975, non-contract drilling services which may have been provided to Continental by plaintiff.

On October 20, 1975, plaintiff advised BOR by letter of its intention to make a claim for both direct and delay costs resulting from the October 14, 1975, BOR directive on the gallery drainage holes. On January 15, 1976, BOR responded to plaintiff's letter and stated that plaintiff was entitled to "an equitable adjustment to your contract to compensate for these changes in your work schedule." Defendant concedes that plaintiff is entitled to recovery for providing support services to Continental for 4 w.d., October 21 to October 25, 1975. Thus, defendant concedes plaintiff is entitled to recover $2,139, for equipment costs and add-ons for job overhead, home office overhead, profit, taxes, and bond expenses. Defendant, without explanation, allows no amount for labor

---

**24.** Continental had a second grouting plant but this one was packed up and ready for shipment off the jobsite.

**25.** BOR did not require Continental to drill two new holes for the two which suffered water loss. Instead, Continental had to drill through the grout in the old holes to the depth required. Thus, it is logical to conclude that the only additional drilling required was that which involved drilling through the depth of the old drainage holes which contained the grout.

and supply expenses. Defendant allows no amount for delay damages since it maintains the drainage hole work was not on the critical path.

■ The court determines that plaintiff is entitled to 9 w.d. of service support costs since it spent from October 21 through October 31, 1975, on the drainage hole grouting work relating to the October 14, 1975, BOR directive. The court has adopted the FBI audit figures for plaintiff's claim 6 costs for air and water plant costs as well as labor and supply costs. The court determines that the FBI audit figures for plaintiff's support costs are more reliable and reasonable than the figures used by plaintiff for the reasons generally discussed in Part IV, *infra*. As a result, plaintiff is entitled to recover $11,-549 for expenses resulting from the BOR's October 14, 1975, directive. Plaintiff, however, is not entitled to delay damages as a result of the October 14, 1975, change directive.

The finding that plaintiff is entitled to no delay damages is supported by the court's critical path analysis and a statement by plaintiff's own representative on the jobsite. First, the court for reasons discussed in the damages section of this opinion, Part IV, *infra*, concludes that the gallery drainage hole work was not on the critical path during October 1975. Thus, delays caused by the BOR October 14, 1975, drainage hole directive had no impact on the completion of the project. Second, this finding is also supported by a contemporaneous statement of plaintiff's project superintendent at the time in question. The superintendent specifically advised BOR that he did not believe that the drainage hole grouting work would cause any applicable delay in the project's completion. The record supports a finding that such work did not delay the completion of the project.

### Discussion

It is conceded that BOR directed Continental on October 14, 1975, to stop drilling drainage holes until the two holes which had suffered a water loss were grouted.

The two parties differ substantially, however, on the amount of time that Continental spent on this grouting work, and consequently, on how many hours plaintiff provided air, water, labor, and electrical support services for these additional days.

Plaintiff argues that it is entitled to 22 w.d. of support costs. It does not, however, provide persuasive support in the record for such a determination. Instead, it appears to include the whole period from when Continental first drilled the leaking drainage hole until the date the record indicates these two drainage holes were finally drilled. This method does not attempt to differentiate between noncontract and contract work performed during this period, in fact, plaintiff's method compensates plaintiff for work required under the contract.

Defendant, on the other hand, does not adequately compensate plaintiff for the grouting work in the drainage holes undertaken pursuant to the October 14, 1975, directive. Defendant only compensates plaintiff from October 21 to October 25, 1975. The record, however, clearly shows that the second drainage hole was not grouted until October 31, 1975. Thus, plaintiff clearly provided support costs for the drainage hole grouting work for a period longer than defendant allows for in its damage calculations.

The court has awarded plaintiff support costs from October 21–October 31, 1975 (9 w.d.). The court was unable, on this record, to separate out the contract work for which plaintiff supplied support costs during this October 21–October 31, 1975, period. Although the record is not entirely clear on the matter, the court concludes that the record preponderates in favor of a finding that plaintiff provided noncontract support services during the October 21 through October 31, 1975, period. In addition, by compensating plaintiff for all its support costs for this whole October 21–October 31, 1975, period, the court believes that any drilling support costs plaintiff incurred after October 31, 1975, when Continental redrilled the grouted sections of the 2 drainage holes, are adequately accounted

for by compensating plaintiff for the October 21–October 31, 1975, period.

Plaintiff, however, is not entitled to recover delay damages for this additional drilling and grouting work since as discussed earlier this work did not delay the eventual completion of the project.

Therefore, under claim 6, in addition to the amount plaintiff has already received from the October 14, 1975, change order, plaintiff is entitled to recover $11,549, including add-ons, for additional support costs it incurred as a result of the grouting and redrilling of the gallery area drainage holes pursuant to a valid change order.

### H. Claim 7—Subcontractor Claims And Related Claims By Plaintiff

Claim 7 basically involves claims generated by Continental, plaintiff's subcontractor. Plaintiff also submits claims for additional compensation related to each of the claims put forward by Continental. Claim 7 consists of three individually designated claims, hereinafter designated "Claim 7A", "Claim 7B", and "Claim 7C". These three claims were excepted from the operation of the July 7, 1976, release in stated amounts.

### Claim 7A—Drilling and Grouting Changes

Under claim 7A, plaintiff seeks to recover $117,821 as an equitable adjustment under the Changes clause. Continental seeks to recover an undetermined amount, as part of a total cost recovery, under claim 7A. The $117,821 amount sought by plaintiff represents costs (both direct costs and add-ons) for providing support services to Continental during Continental's drilling and grouting work in the earth dam foundation area.[26] Continental, which performed the actual drilling and grouting work, seeks reimbursement under this claim for additional drilling and grouting work in both the earth dam and concrete dam areas. Continental did not submit or

seek itemized damages specific to this claim. Instead, Continental included its claim in this regard within its total cost claim of $291,888. Continental's total cost claim also encompassed claim 7B and claim 7C, which claims Continental did itemize and segregate. Plaintiff excepted this Drilling and Grouting Changes claim from the July 7, 1976, release in the amount of $618,699.

Defendant concedes liability on plaintiff's claim but maintains that plaintiff is entitled to recover only $56,705. Defendant asserts that the costs incurred by plaintiff on claim 7A were not as great as alleged by plaintiff. Defendant further contends that plaintiff's inefficiencies in providing Continental with support services should serve to decrease, in any event, its claim for support service costs. Defendant concedes no liability on Continental's claim 7A action because it is based solely on a total cost approach to damages. Defendant claims such a damage approach is inappropriate under the circumstances of this case since Continental could have, and should have, segregated and itemized the damages associated with claim 7A as Continental did with its claims 7B and 7C.

#### Facts

The design of the Nambe Falls Dam required that a grout curtain be pumped into the foundation material under both the earth dam and the concrete dam. The purpose of this grout curtain was to consolidate the foundation material and fill any voids which might be present in the foundation. This grout curtain was to create a kind of impervious waterproof curtain to prevent water seepage through the foundation material under the dam. Originally, this grout curtain was to be created by drilling and grouting two sets of grout holes, primary grout holes and secondary grout holes. However, because the foun-

---

**26.** While not specifically conceded by plaintiff, it seems that plaintiff seeks only damages for earth dam drilling and grouting work and not concrete dam drilling and grouting work. This seems clear from the accounting portion of plaintiff's brief in which it listed the damages sought as related to "Core Trench Drill and Grouting Changes." Defendant also acted, in its submissions, on the assumption the damages sought by plaintiff under claim 7A were for earth dam (i.e., core trench) work only.

dation proved less porous than originally believed, BOR cancelled the drilling and grouting of secondary grout holes. Grout was a mixture of sand, cement and water and was to be injected into the foundation by first drilling holes and using these holes to introduce grout into the foundation. Grout is a finer mixture than concrete because of the aggregate used and thus is able effectively to fill cracks and fissures. A piece of equipment called a grout packer was used to place the grout into the drilled holes; the packer confined the grout to a specific area until the grout had time to consolidate.

The contract specified two grouting methods to be used on the project: stage up grouting and stage down grouting. Stage up grouting was specified as the method to be used unless difficult and unstable ground conditions were encountered. Under stage up grouting, the hole was drilled to its full depth prior to beginning the grouting operation. After the hole was drilled, the grout was introduced into the foundation in stages proceeding up from the bottom of the hole.

Stage down grouting was specified in paragraph 3.2.4 of the contract for use "[w]here necessary because of rock jointing and/or type of material encountered during the drilling * * *." This method consisted of drilling the hole until unstable ground conditions were encountered which made further drilling impracticable. At the point when drilling became impracticable, under the grout down method the contractor introduced grout into the hole to stabilize and consolidate the ground material. Drilling then proceeded through the consolidated ground area with the sequence of grouting and drilling being repeated each time caving due to unstable ground material was encountered until the driller obtained the final desired depth.

These two methods, stage up and stage down grouting, were the only methods specified in the contract. As the description above indicates, neither method involved the use of casing to control caving of the drill hole. Instead, the stage down method, which the contract specified for use in the event of unstable ground conditions, depended upon the use of grout to control caving.

*a) Earth dam work*

In the earth dam, only a portion of the foundation was designed to be grouted. The design drawings for the earth dam show that although the earth dam was 673 feet long, only about 200 feet of this foundation length was designed to be grouted. This grouted foundation area began at the thrust block and ran for 200 feet toward the other end of the earth dam. BOR conducted precontract test drillings in this area of the earth dam which was to be grouted. These test drillings showed caving area and showed that the material drilled through consisted of silty sand and gravel material which was more akin to soil than rock. Furthermore, while test drilling in this area, BOR used casing to control caving. The results of the test drilling and the fact that BOR used casing were set forth in contract documents which were available to bidders prior to bidding. In addition, BOR also made available to bidders a preconstruction geology report which showed that this earth dam section was to be situated on breccia limestone, breccia granite and a tesuque formation, an extremely soft and pliable geological formation that is unable to support itself. This material, listed in the preconstruction geology report as the foundation material of the earth dam, was recognizable as being extremely difficult material to drill and grout. Continental's personnel did not review this preconstruction geology report before bidding on the Nambe Falls Dam contract; however, Continental's personnel did review the drill logs before submitting Continental's bid. Continental's personnel assumed that the stage down grouting method provided for in the contract would take care of any caving encountered during drilling and grouting operations. On this record, this is deemed a reasonable assumption since BOR in the specifications did not provide for use of casing to control caving.

The first major stage of construction in the earth dam area was excavation of the core trench to provide a foundation for the earth dam. The tesuque formation was not removed during this excavation. Thus, as the prebid information indicated, the earth dam was to be situated on top of the tesuque formation. The earth dam had a concrete grout cap poured on top of this tesuque formation and this concrete grout cap had 2-inch pipes set into it. These pipes passed through the grout cap to enable Continental to place its drills through them to the foundation underneath the grout cap. Continental planned to use 1½-inch drills, the minimum size allowed by the contract, to drill the grout holes. There was no contract prohibition against the use of a larger size drill.

On October 1, 1974, Continental put its drilling and grouting equipment onto the job in order to begin its drilling and grouting subcontract work. Among this equipment was a CP 55 drill. Although defendant contends that this drill was inadequate to drill into the tesuque formation under the grout cap, the court concludes that Continental could reasonably have expected the drill to perform adequately the drilling required on the project given its expectation that it would use the stage down grouting method to control caving. Continental, however, should have been aware when it began its drilling and grouting program in the earth dam that the stage down grouting method might not work. Although there was no specification requirement for drill casing for caving control, the prebid materials available to Continental indicated that caving occurred during BOR's test drillings in the earth dam area and that BOR had used drill casing to control that caving. Furthermore, the prebid documents indicated that the drilling would be through the tesuque formation indicating possible caving problems and the need for a larger drill. In any event, the court determines that Continental was rea-

sonable in beginning the job with a CP 55 drill because of its plan to use the stage down method to control caving.[27]

Between October 11 and October 18, 1974, Continental began its drilling and grouting operation in the earth dam area. While drilling, Continental encountered a great deal of caving in the drill holes. The stage down method of controlling the caving provided for in the contract did not alleviate the problem because the tesuque formation under the grout cap did not accept the grout and thus the silt, sand, and gravel material which comprised the tesuque formation could not be solidified and consolidated. In short, the stage down method proved unable to control caving and allow for drilling in the tesuque formation.

On October 18, 1974, BOR suspended drilling and grouting work in the earth dam area because of the caving problems. BOR confirmed this work suspension order in a letter dated October 29, 1974. On October 23, 1974, Continental and BOR discussed the use of perforated casing to control the caving problem in the earth dam area. Neither BOR nor Continental had any previous experience in using perforated casing. At this October 23, 1974, meeting, Continental's district manager advised BOR that Continental did not consider perforated casing to be a satisfactory solution to the drilling and grouting problems in the earth dam area.

On December 3, 1974, BOR issued a change order. This order provided that Continental was to use perforated casing to control the caving problem in the tesuque formation of the earth dam area. This change to perforated casing involved a completely new method of drilling and grouting. Five-inch diameter pipes were used for surface casing instead of the original 2-inch pipes. Continental had to use a larger drill to drill holes large enough to allow the installation of the perforated cas-

27. Defendant also objected to Continental's use of leather packers contending that pneumatic packers should have been used on the job. The court determines that this contention by defend-

ant is irrelevant to the issues in this claim since the use of leather packers was not a significant contributing factor to the caving problem in the earth dam.

ing and the introduction of grout around the perforated casing. In addition, Continental had to furnish the perforated casing, i.e., a 1½-inch pipe with ⅜-inch holes drilled into it. BOR under the December 3, 1974, change order paid Continental for all the above-described changes on a cost-plus fixed fee basis. In addition, the contract provided that the grouting of voids and the drilling of grouting holes below the perforated casing was to be paid at the contract unit prices.[28]

On December 18, 1974, plaintiff wrote to BOR and objected to the portion of the December 3, 1974, change order which paid for the grouting work at contract prices. In this letter, plaintiff stated that it "reserve[d] our right to recover any and all increased costs resulting directly from the performance of the changed [grouting] work."

From December 1974 through February 1975, Continental used the perforated casing method in performing drilling and grouting work in the earth dam. During this period plaintiff continued to supply Continental with support services such as air, water, electricity and labor. The perforated casing method, however, did not successfully solve the caving problem because loose material was able to fall through perforations in the casings. Once this loose material had made its way into the casing, it would jam the drill bit and thus make drilling extremely difficult.

In February 1975, because of the lack of success with the perforated casing method, Continental suspended drilling and grouting operations. On March 4, 1975, Continental, plaintiff, and BOR met to discuss drilling and grouting procedures. As a result of this meeting, BOR agreed to allow Continental to switch to a solid casing method of drilling in the earth dam area. Thus on March 20, 1975, the December 3, 1974, directive was revised to reflect the change to solid casing. It is not entirely clear from the record when Continental, in

fact, switched to the use of solid casing. The record discloses, however, that Continental for some period after that March 4, 1975, meeting continued to try to use the perforated casing method, but this method continued to be unsuccessful.

On April 25, 28, and 29, 1975, BOR orally directed Continental to use solid casings on the additional grout holes. On May 8, 1975, BOR sent a written conformation of the above-mentioned oral directives. A total of 9 holes were cased through the tesuque formation with solid casing. The casing depths ranged from 25 feet to 75 feet. Continental completed the drilling and grouting in the earth dam foundation area on July 30, 1975. Additional compensation was also paid to plaintiff and Continental for this change order work.

Under the original work schedule, drilling and grouting work under the earth dam was to begin on October 1974 and end in January 1975. In fact, Continental began drilling and grouting in October 1974, and, as mentioned, finished on July 30, 1975. While it is true that the original contract work schedule for drilling and grouting contained flaws because it had some work scheduled to begin before the contract allowed that work to begin, it is nonetheless true that Continental suffered some delay and extra cost in the earth dam drilling and grouting work because of the caving in the tesuque formation. In addition, plaintiff, because of the extra support services it had to supply Continental during the extended drilling and grouting work, also suffered some extra expenses as a result of this caving problem.

■ Although defendant argued that problems in the earth dam area were caused in the main by inefficiency on the part of Continental's work force and equipment, the court finds this argument unpersuasive. There is no reliable support for defendant's arguments in this record. Consequently, the court finds that Continental had no significant inefficiencies in its drill-

**28.** The tesuque formation underneath the grout cap varied in depth, but was at most points not as deep as the grout holes drilled. Since a granite formation was below the tesuque formation, no casing was necessary after the drill passed the tesuque formation.

ing and grouting operation in the earth dam, and thus Continental's inefficiencies did not contribute in any significant manner to the additional expenses incurred in this drilling and grouting work.

■ On the other hand, the court does find that plaintiff did have inefficiencies in the support services it provided Continental in the earth dam drilling and grouting operations. These inefficiencies are amply demonstrated by the fact that plaintiff and Continental entered into a settlement agreement under which plaintiff agreed to pay Continental approximately $28,500 for the extra expenses its support service inefficiencies caused Continental. The court determines that it is reasonable to conclude on this record that these support service inefficiencies also affected Continental's drilling and grouting operation in the earth dam area to some undetermined degree and thereby increased its expenses, over and above the settlement figure arrived at by Continental and plaintiff, in the earth dam area.

*b) Concrete dam work*

As in the earth dam, the contract provided for a grout curtain beneath the concrete dam in both the thrust block and arch dam areas. This concrete dam grouting operation involved the drilling and grouting of two types of drill holes: "A" and "C" holes. The "A" type grout holes were drilled in the thrust block gallery area and the "C" type grout holes were drilled in the remaining portion of the thrust block area and all of the arch dam area. Both the "A" and "C" type grout holes, unlike the grout holes in the earth dam, were drilled and grouted after construction work on this portion of the dam had commenced. Continental began drilling and grouting the "A" and "C" holes in October 1974, and completed work in September 1975. Plaintiff also provided support services for this work.

Continental contends that it encountered caving in its drilling and grouting of the "A" and "C" holes, because, as in the earth dam area, the contract specified stage down grouting method was inadequate to control caving. The primary basis for Continental's contention in this regard is the testimony of Continental's president and general manager, who, in turn, relied upon data Continental culled from the project's drilling reports. Defendant disputes the fact that significant caving existed in the concrete dam area. First, defendant relies on the fact that the packer settings listed in BOR's postconstruction report on the Nambe Falls Dam project showed the packer settings at uniformly even depths for the "A" and "C" grout holes. Defendant contends, based upon expert testimony, that such uniformity in packer settings indicates no caving significant enough to hamper the grouting process. Further, defendant's expert testified that the drilling reports relied on by Continental were not an accurate indication of significant cavings because they did not differentiate between insignificant caving in the drill holes and those which severely hampered drilling.

After a review of the record, the court determines that Continental did not encounter serious caving problems while drilling and grouting the "A" and "C" holes in the concrete dam foundation area. One factor weighing heavily in the court's determination is the fact that BOR's post-construction report showed uniform packer settings for the "A" and "C" holes. In the court's view, these packer settings persuasively show that whatever caving did occur in the "A" and "C" holes it was not significant enough to hamper the grouting process. Moreover, the pre-construction geology report showed that the "A" and "C" grouting holes were to be drilled in rock, a totally different ground condition than that which the report showed existed in the earth dam area and a ground condition which indicated there would be no caving problem. The court concludes that the preconstruction geology report was accurate in the earth dam foundation area, and plaintiff so concedes. The court also concludes, that the geology report was accurate concerning the concrete dam foundation area, and

that the ground conditions which the pre-construction geology report showed as present in the concrete dam, *i.e.*, stable grantic conditions, in fact, were the ground conditions encountered by plaintiff. Finally, contributing to the court's finding in this regard are the facts that, unlike the earth dam area, there was no suspension of work nor any change in the method of drilling the "A" and "C" grouting holes.

In plaintiff's claim presentation there was a discussion relating to caving problems during Continental's drilling of the drainage holes in the concrete dam area. Despite the fact that plaintiff included a discussion of this work in its submission on claim 7A, a review of the itemized damages listed by plaintiff for claim 7A indicates that plaintiff seeks no specific compensation for service support work in this area. In fact, in the section of its brief on damages plaintiff lists the amount it seeks under claim 7A as expenses for "Core Trench Drill and Grout Changes." An examination of the accounting data for plaintiff's claim 7A supports a finding that plaintiff has properly characterized its claim as one for drilling and grouting work in the earth dam core trench area and that claim 7A does not involve work in the concrete dam area. Moreover, defendant, as well, considered plaintiff's claim 7A to only involve earth dam drilling and grouting work and so audited said claim. Furthermore, defendant's objection to the damages sought by plaintiff under claim 7A are based upon an accounting dispute over mobilization costs for construction equipment. If plaintiff had indeed included expenses incurred in the concrete dam area in this claim, it is only logical that defendant would have disputed those expenses since defendant conceded no liability for the drilling and grouting work in the concrete dam area.

With respect to Continental's claim for drainhole drilling in the concrete dam area, it is important to bear in mind that this drainhole drilling took place in the same rock formation as the concrete dam grouting drilling. Since the court has found, *supra*, no caving problem relative to

drilling the "A" and "C" holes in the concrete dam area, it is not unreasonable that a similar finding is appropriate and supported by the record relative to drainhole drilling in the same area. Since the "A" and "C" holes in the concrete dam were drilled in a granitic formation with little or no significant caving to hamper the drilling operation, the court finds that Continental, in drilling the drainage holes in the concrete dam, encountered little or no significant caving which hampered its drilling operation in the same area. To the extent that Continental encountered difficulty in drilling the drainage holes in the concrete dam, this difficulty was due to reasons other than caving and was not otherwise due to any action by BOR. Therefore, to the extent that claim 7A contains a claim by Continental for drainhole drilling in the concrete dam, Continental is entitled to no recovery.

The parties disagree on the amount of damages which the court should award to plaintiff and Continental under claim 7A. Continental does not present an individual amount for claim 7A, but includes it as part of a total cost theory of recovery. While Continental stresses that its total cost theory of recovery is really a "modified" total cost theory which eliminated all cost factors not due to the fault of BOR, *e.g.*, plaintiff's inefficient support services to Continental, etc., the court is not persuaded that this is so. Indeed, the court, for example, has found above that Continental's claim for drainage hole drilling in the concrete area is without merit. Yet those costs are bound up in the total costs that plaintiff seeks to recover. As a result of Continental's sole reliance or the total cost approach to claim 7A damages, the court, even though the record supports some recovery by Continental as a result of the earth dam change work, was unable, on this record, to determine what specific damages Continental should be awarded on the earth dam change work. Continental could have, and should have, separated out its damages relative to claim 7A. Its failure to do so justifies denial of any recovery to Continental on claim 7A.

Plaintiff seeks a total of $117,821 in service support costs under claim 7A. These cost figures, however, include costs for certain undocumented equipment mobilization which the FBI during its audit was unable to verify. For reasons discussed later in this claim, the court finds that these costs must be rejected.

Defendant concedes liability for plaintiff's additional support costs for the drilling and grouting operation in the earth dam area. Defendant, however, asserts plaintiff is entitled to only $56,705 because of disallowance of the above-mentioned equipment costs. Defendant further reduces plaintiff's claim figure by one-third (⅓) to reflect plaintiff's inefficiencies in supplying support services to Continental on which the entire claim of plaintiff is premised. For reasons set forth, *infra*, the court finds that plaintiff is entitled to recover $74,860 under claim 7A.

*Discussion*

The drilling and grouting work in claim 7A really consists of two separate claims, *i.e.*, plaintiff's service support claim in combination with Continental's drilling and grouting claim for problems in the earth dam area and Continental's claim for drilling and grouting problems with the "A" and "C" holes in the concrete dam. Since the court arrived at different factual determinations on these two aspects of claim 7A and defendant concedes liability on the earth dam work, but not on the concrete dam work, the two work areas must be discussed separately.

As the above factual discussion demonstrates, significant caving problems existed in the earth dam area. Defendant concedes liability for the caving problems in the earth dam area and this concession is supported by the court's view of the record. BOR's method of handling the caving problem exacerbated the delays and costs caused by the caving problem. When BOR directed the use of perforated casing to solve the caving problem, it dictated a method with which both it and the Continental were unfamiliar. Moreover, BOR directed the use of this method despite Continental's admonishment that this method would not work. The subsequent problems and eventual switch to solid casing showed the correctness of Continental's position.

Defendant should bear the expense caused by its change to the unsuccessful perforated casing method. While it may be true that BOR should have included a specification for solid casing in its original specifications, the prebid information available to Continental indicated that caving was a problem in the earth dam area and that BOR used casing in its test drilling in this area to control caving. Neither Continental nor plaintiff, however, should be held responsible for BOR's change to the perforated casing method and the costs this unsuccessful method inflicted on plaintiff and Continental. In fact, defendant concedes this since it admits plaintiff is entitled to some damages for additional support costs in the earth dam area. Defendant, however, only admits that plaintiff is entitled to $56,705 in damages, not the $117,821 requested by plaintiff.

There are two principal reasons for the difference between plaintiff's and defendant's damage figures. The first is an accounting difference between the two parties. Plaintiff seeks $59,832 for "Plant Operations and Maintenance," while defendant concedes $31,302 for this item. The reason for this difference is that the FBI audit of this item disallowed certain equipment mobilization costs because plaintiff lacked adequate documentation. The court accepts defendant's figure of $31,302 for equipment mobilization in view of plaintiff's failure to document equipment mobilization expenses adequately. After analysis of the damage submissions of both parties, the court accepts defendant's direct cost computations for plaintiff's claim 7A. These direct costs total $59,467 as compared to direct costs of $87,469 sought by plaintiff. Add-ons, profit, overhead, etc., serve to increase plaintiff's damage claim to $117,829.

The second reason for the difference in the parties' damage figures is that defendant reduced its damage figure, *i.e.*, $59,467, by approximately 33 percent to reflect plaintiff's inefficiencies on the job. Since the court has determined that plaintiff, in fact, was inefficient in supplying support services to Continental, some reduction is deemed appropriate. The fact that Continental and plaintiff entered into a damage settlement on this inefficiency matter is immaterial as far as defendant is concerned because defendant was not a party in any way to this settlement. However, plaintiff herein seeks to recover costs from defendant based on this inefficient support service. Under such circumstances, defendant is entitled to some reduction in plaintiff's claim premised on said inefficient support services. However, the amount by which defendant reduces its damage figure is deemed excessive. Moreover, defendant supplied no basis for using a ⅓ deduction rate but simply arbitrarily selected that rate. There is no support in the record for such a percentage figure.

The court believes that the amount of reduction should be 12 percent. This is based upon the fact that plaintiff paid Shupe $28,500 to reimburse it for inefficiencies on Continental's subcontract revenues of $247,109. Thus, plaintiff paid Continental an amount which was about 12 percent of the revenues received by Continental under its subcontract for work on the Nambe Falls Dam project. The court believes that a 12 percent factor is a reasonable measure of plaintiff's support service inefficiencies. Therefore, the court shall utilize this percentage figure in reducing the damages to be awarded plaintiff on claim 7A. Accordingly, plaintiff is entitled to $52,331 (12% of $59,467) in direct costs plus $22,529 in add-ons, for a total of $74,860.[29]

Continental, however, because of the manner in which it presented its damage request for claim 7A is not entitled to any recovery. As mentioned previously, Continental included no itemized amount for this claim. Instead, it elected to include this claim in a total cost figure and did not provide the court with material which would enable the court to separate out the costs allocable to the claim. As the court stated at the outset of this opinion, the total cost theory of recovery is not favored and should be allowed only when no other method of recovery is available and the reliability of the supporting data is fully substantiated. *WRB Corp. v. United States, supra,* 183 Ct.Cl. at 426–427. Such is not the case here.

 Furthermore, any attempt by the court, on this record, to try to approximate Continental's compensable, additional costs would be sheer speculation. The court is aware of the legal proposition where the fact of damage has been clearly established, the lack of certainty and preciseness as to the amount of damage will not preclude some recovery. However, in such circumstances, any such recovery must rest on a reasonable basis of computation. *See Dale Construction Co. v. United States,* 161 Ct.Cl. 825, 829 (1963); *Willems Indus., Inc. v. United States,* 155 Ct.Cl. 360, 376, 295 F.2d 822, 831 (1961). The court has been unable to obtain from this record any reasonable basis of computation for Continental's claim 7A. *See Roberts v. United States,* 174 Ct.Cl. 940, 946, 357 F.2d 938, 943 (1966). The record, in this case, provides no basis for a determination of what costs the December 3, 1974, change order and the March 4, 1975, revision compensated Continental for and what costs Continental was not compensated for. Moreover, the record provides no basis for determining what additional expenses are allocable to the earth dam work which are compensable and what expenses are allocable to the concrete dam work and the drainhole work which have been deemed not compensable. The court simply does not have a reasonable basis of computation on

---

**29.** The court has used defendant's percentages for the applicable add-ons of job overhead and home office overhead, for reasons set forth in Part IV, *infra.* The parties stipulated to the percentages for profit, taxes, and bonding expenses.

this record to fashion a damage award for Continental on claim 7A.

Finally, Continental itemized two elements of the claim which it included in its total cost claim and also submitted them as separate claims in this case, *i.e.,* claim 7B (Grout Underrun) and Claim 7C (Drill Bit Costs). Continental's counsel at oral argument conceded that Continental probably could have, and perhaps should have, separated and itemized its 7A claim, as well. Accordingly, Continental has not provided the court with any persuasive justification for its failure to present direct proof of the additional costs resulting from the extra drilling and grouting work it performed under claim 7A. *See Boyajian v. United States,* 191 Ct.Cl. 233, 240, 251, 254, 423 F.2d 1231 (1970). Without such justification, plaintiff, under the circumstances of this case, is not entitled to recover any of its claimed expenses under claim 7A. *See Joseph Pickard's Sons Co. v. United States,* 209 Ct.Cl. 643, 652, 532 F.2d 739, 744 (1976).

For reasons discussed above, plaintiff is entitled to recover $74,860 under claim 7A; Continental is entitled to no recovery under claim 7A.

*Claim 7B—Grout Underrun*

Continental seeks $80,015 as a result of revenues lost because the dam foundation required less grout than the contract estimated. In addition, plaintiff seeks $67,079 because of this grout underrun. As a result, the total amount sought under claim 7B is $147,094. Claim 7B was excepted from the July 7, 1976, release in the amount of $129,963. As indicated in Part II A, *supra,* recovery on claim 7B cannot, in any event, exceed the amount set forth as an exception in the release.

*Facts*

There are few facts in dispute on claim 7B. BOR, in the contract, estimated that 21,250 cubic feet (c.f.) of grout would be required for contract performance. This grout footage is equivalent of 21,250 bags of sand and cement since 1 c.f. of grout equals 1 bag of sand and cement. There is also no dispute about the fact that Continental pumped 5,247 bags (or 5,247 c.f.) of grout into the Nambe Falls Dam foundation during contract performance, a shortfall of 16,003 bags, or 16,003 c.f., of grout.

Under the contract, the revenue which plaintiff received for pressure grouting the foundation depended upon the number of bags of grout which were pumped into the foundation. Accordingly, Continental's bid was based on the reasonable expectation that it would perform the pressure grouting work at a certain price per bag of grout and that it could reasonably calculate total contract revenues for pressure grouting work by multiplying its price per bag by BOR's estimate of the total amount of grout needed. Continental's bid for this item was only for the work of pumping the grout into the foundation; the actual cost of supplying the grout was a separate bid item which was not part of Continental's bid, since the grout was furnished by plaintiff. Continental's bid for performing the pressure grouting work was $5 per bag. Based upon the estimate given in the bid documents, *i.e.,* 21,250 c.f. of grout, it expected to receive $106,250 (21,250 bags × $5) for performance of the pressure grouting work. Continental, however, only used 5,247 bags of grout, or stated another way, it only pumped 5,247 c.f. of grout. Consequently, Continental maintains it received $80,015 less than it expected to receive for pressure grouting work under the contract. Continental contends that it incurred the same costs for its pressure grouting work despite the fact that it pumped less grout into the dam foundation. In other words, Continental contends that its costs for pressure grouting were fixed no matter how much grout it pumped, and thus it lost anticipated revenues because of the erroneous estimate set forth in the contract.

Plaintiff provided support services consisting of compressed air, electricity, and water supplies as well as labor for Continental's pressure grouting operation. Plaintiff, like Continental, was compensated for its pressure grouting expenses on the basis of the number of bags of grout

pumped into the foundation. As a result of the grout underrun, plaintiff incurred unabsorbed costs of $67,079, an amount which both plaintiff and defendant agree accurately reflects plaintiff's unabsorbed costs.

Defendant, however, does not agree with Continental's figure of $80,015 as representing the amount which Continental lost because of the grout underrun. Specifically, defendant contends that as a result of Continental's having to pump 5,247 c.f. of grout, instead of the contract estimate of 21,250 c.f., an underrun of 16,003 c.f. of grout, Continental saved $45,500 in direct costs. Since, under defendant's argument, Continental saved $45,500 in direct costs, defendant contends the most that Continental is entitled to recover is $34,515 ($80,015 – $45,500). This amount of $34,515 is, defendant argues, the maximum amount of fixed costs for the pressure grouting operation which Continental could have incurred as a result of the grout underrun.

Defendant further reduces the above unabsorbed fixed expenses of both plaintiff ($67,079) and Continental ($34,515) by 20 percent to account for the amount of grout variation which, defendant contends, could reasonably be expected to occur on an average pressure grouting operation. Accordingly, defendant maintains that plaintiff's basic cost figure should be $53,663 ($67,079 × 20 percent), and Continental's basic cost figure should be $27,412 ($34,515 × 20 percent). There is no support in the record for defendant's 20 percent reduction figure. The record does indicate that such estimates can vary by as much as 15 percent at times. Defendant does not point to nor rely on any variation in quantity clause in the contract.

The court finds that defendant's reductions of these claims because of grout variation expectancy and because of direct costs saved are too severe. Defendant developed its direct cost figures for Continental's expenses by applying known Continental fixed cost markups for other work items, and, by applying these markups to Continental's claim for grout underrun.

The flaw in defendant's approach is the fact that the pressure grouting operation had a higher percentage of fixed costs associated with it than other Continental work operations on the Nambe Falls project. According to the testimony of Continental's president and general manager, Continental's pressure grouting operation contained no variable cost factors, but rather Continental's expenses for its pressure grouting work, remained somewhat constant throughout the operation regardless of the amount of grout which Continental had to pump into the foundation.

While the court does not completely accept Continental's assertions regarding the total constancy of its fixed costs for grouting, the record does support a finding that Continental's grouting operation contained a higher percentage of fixed costs than its other construction operations on the Nambe Falls project. One primary reason for this higher fixed cost percentage was that the pressure grouting operation had a minimum labor crew which was underutilized, despite its minimal size, because of the grout underrun. As a result, the amount of grout pumped into the foundation could have been substantially increased without a corresponding increase in labor costs. In addition, Continental's equipment required for this job was essentially the same regardless of the amount of grout actually pumped into the foundation. It is reasonable to conclude, however, that although Continental's fixed costs were higher for pressure grouting work, this work did not consist entirely of fixed costs. The court determines that reason, logic and the totality of the record support a finding that there was some labor and equipment cost savings from the grout underrun because less grout pumped would have resulted in less time spent grouting a particular grout hole.

Defendant maintains that Continental's variable direct costs for the pressure grouting work were 56 percent of its pressure grouting costs. Although defendant does not explicitly state that the variable costs in the pressure grouting operation were 56

percent of the amount bid for this work, it utilizes this percentage figure since it reduces Continental's $80,015 claim by $45,500 to allow for variable costs saved ($45,500 divided by $80,015 = 56%). The court finds, however, that 25 percent is a more appropriate figure since it allows for some savings in variable costs while recognizing the high amount of fixed costs involved in pressure grouting work. As a result of this finding that Continental's grout claim consisted of 25 percent variable costs, the court determines that Continental saved $20,004 in direct costs as a result of the grout underrun.

In the court's view, this 25 percent figure is a reasonable reflection of the fact that pressure grouting work contained a higher percentage of fixed direct costs than other work items performed by Continental, but that Continental had some direct cost savings in its pressure grouting operation as a result of the grout underrun. Since Continental was not able to present its original bid workpapers, to document its claim that the pressure grouting work involved no variable direct expenses, the court was left on its own to reconcile defendant's contentions with Continental's assertions. The court concedes that this 25 percent figure lacks precise support in the record. However, it reflects the court's view of the matter based on its scrutiny of the record and its effort to resolve the conflict between the parties on the matter.

The court concludes that plaintiff's and Continental's 7B claims should not be further reduced to reflect a 20 percent grout variance as sought by defendant. Although, as Continental's president stated, the amount of grout used on any pressure grouting operation can be as much as 15 percent higher or lower than the original estimate, defendant makes too much of this statement.[30] Defendant's use of any percentage variance figure to reduce these claims fails to account properly for the fact that this variance can be either greater than the estimated amount or less than the estimated amount. The court concludes that because of the magnitude of the variance, no reduction in either plaintiff's or Continental's additional pressure grouting expenses is warranted on this record, because an average grout variation. There is no evidence in the record that either party expected a variance of the magnitude experienced in this case. The contract estimate was not reasonably accurate. Under such circumstances, a variation reduction not provided by contract or supported by persuasive testimony is not justified. Accordingly, Continental's claim of $80,015 is to be reduced by 25 percent to account for Continental's savings in direct costs resulting from the grout underrun. As a result, Continental's claim is reduced to $60,011 ($80,015 × 25 percent). Plaintiff's claim of $67,079 is not to be reduced as the parties agree that it accurately reflects plaintiff's unabsorbed costs which resulted from the grout underrun.

## Discussion

 Since defendant ostensibly concedes liability for the grout underrun, claim 7B involves only the issue of determination of the damages which resulted from the grout underrun. Defendant's concession of liability is appropriate. At issue here was the viability of an estimate BOR placed in the contract for bidding purposes. The plaintiff was entitled to, and did, rely on this estimate in preparing its bid. Continental, as subcontractor, did the same. Since both acted reasonably, they were entitled to rely on this estimate. *See Womack v. United States*, 182 Ct.Cl. 399, 412, 389 F.2d 793, 801 (1968). There is a warranty of reasonable accuracy of estimates

---

**30.** Defendant, in fact, reduced both plaintiff's and Continental's claim by 20 percent, not 15 percent. There is no support in the record for defendant's 20 percent variance reduction figure. Defendant does not rely on or point to any variation in quantity clause in the contract. *See Womack v. United States*, 182 Ct.Cl. 399, 413,

389 F.2d 793, 801 (1968). Moreover, there is little reason to assume, as defendant does, that the variation either way will be only in the direction favored by defendant. There is no basis in this record to favor defendant in this regard. *See Arthur Venneri Co.*, DOT CAB No. 67–30, 70–2 BCA ¶ 8480, p. 39,423 (1970).

such as was set forth in the contract at issue. That warranty was violated here and a constructive change in the contract is justified entitling plaintiff and Continental to equitable adjustments. No contract provision is cited which would override the applicability of this warranty to the facts at hand. *See Cedar Lumber, Inc. v. United States*, 5 Cl.Ct. 539 at 545–48 (1984) (Merow, J.)

The court, for reasons discussed above, finds that plaintiff is entitled to recover $67,079 under claim 7B and Continental is entitled to recover $60,011 under claim 7B. The total recovery allowed under claim 7B is $127,090.

### 7C—Excess Bid Costs

Continental seeks $79,995 as an equitable adjustment under the differing site conditions clause for additional drill bit and reamer[31] costs caused by caving conditions during drilling operations. Plaintiff also seeks $27,758 for additional markup costs on Continental's claim. Thus, under claim 7C the total recovery sought is $107,753. Plaintiff excepted this claim from the July 7, 1976, release in the amount of $99,564. For reasons set forth previously, recovery on claim 7C is limited, in any event, to the amount set forth in the release. See Part IIA, *supra*. Defendant's position on claim 7C is that neither Continental nor plaintiff are entitled to recover on claim 7C.

### Facts

It is undisputed that Continental spent $140,819 on bits and reamers for drilling operations on the Nambe Falls Dam contract. Continental contends that it anticipated bit and reamer costs of $60,824 when it submitted its bid for the drilling work. According to these figures, Continental spent $79,995 more on bits and reamers than it anticipated in its bid submission. Continental blames the increased costs it incurred in this regard on the caving conditions it encountered in performing drilling work on the dam foundation. Since Continental did not retain its bid workpapers, Continental cannot document the bit and reamer costs it anticipated when it submitted its bid. Defendant focuses on this lack of documentation, and further asserts that Continental should have anticipated higher bit and reamer costs in its bid than $60,824, given the geological foundation, as revealed by the prebid documents, that existed at the worksite. Defendant further contends that there was no differing site condition because the prebid materials available to Continental indicated caving conditions in the earth dam area and, in addition, that plaintiff's failure to file its claim within the notice requirement period of the Differing Site Conditions clause should preclude court consideration of this claim.

The first factual issue in dispute relative to claim 7C is the cause of Continental's excess bit cost. Continental contends that the ground conditions were different than those set forth in the bid materials. As discussed in claim 7A, however, the court has concluded that the prebid contract materials accurately reflected the conditions encountered by Continental. In the earth dam area, the contract materials showed a tesuque formation which evidenced caving during test drillings. In the concrete dam area, contract materials showed stable granite conditions. These were, in fact, the ground conditions which Continental encountered in its drilling operations in the earth dam area and in the concrete dam area.

The court concludes that the cause of almost all Continental's excessive drill bit wear relative to grout hole drilling in the earth dam area was Continental's inability to drill using the perforated casing method which BOR ordered to be used in its December 3, 1974, directive. Prior to this directive, Continental had only drilled grout

---

**31.** A reamer is essentially part of the bit assembly since it is a diamond hole sizer which goes behind the bit to make sure that the hole maintains its proper size if the bit wears down.

References to increased bit cost in the above discussion encompass both the cost of bits and the cost of reamers.

holes for a short period, albeit unsuccessfully. The vast majority of the grout hole drilling took place after the December 3, 1974, directive. The record clearly indicates Continental's drilling difficulties in using the perforated casing method. The ground material around the perforated casing was not adequately consolidated by the grout, and thus ground material was able to work its way into the casing perforations and block Continental's drill bits. This loose ground material which infiltrated the perforated casing caused excessive wear on Continental's drill bits and resulted in the bits having a shorter life expectancy than Continental had reasonably anticipated when it submitted its bid.

The cause of Continental's greater than anticipated drill bit wear in its other drilling operations, i.e., the drainage holes in the earth dam and the drainage and grout holes in the concrete dam, was not the result of any change order or a ground condition unforeseeable or different from that shown on the contract bid documents. The cause of the drill bit wear beyond Continental's expectations in these other drilling operations listed above was most probably Continental's failure to correctly analyze the drill bit life expectancy relative to the ground conditions in which these other drilling operations took place. The court determines that Continental, not defendant, is responsible for the greater than anticipated drill bit wear which occurred in all drilling operations other than the grout hole drilling in the earth dam.

The parties did not provide the court with a breakdown of the drill bit costs incurred in each of the different areas of the dam, i.e., concrete dam area and earth dam area. Nor did the parties provide the court with a breakdown of drill bit costs by types of drilling operations, i.e., drainage hole drilling or grout hole drilling. Because of the court's determination that BOR should be responsible only for that portion of additional drill bit wear which resulted from grout hole drilling in the earth dam area, it is necessary to determine what portion of Continental's claim for excess bit costs is allocable to this work.

Based upon its review of the record, the court concludes that Continental incurred 50 percent of its additional drill bit costs during earth dam grout hole drilling. The court comes to this conclusion based upon the fact that much of Continental's drilling difficulty on the Nambe Falls Dam project took place during the period when Continental was working in the earth dam area. In arriving at this 50 percent figure the court also took into account Continental's assertions concerning the amount of difficulty it incurred in drilling drainage holes and grout holes in the concrete dam as well as drainage hole drilling in the earth dam. After consideration of all the evidence, the court finds that 50 percent of plaintiff's excess drill bit costs were reasonably allocable to the grout hole drilling operation in the earth dam. It is recognized that Continental did perform some drilling work from October 11–18, 1974, before the perforated casing order was issued. The record would not permit one to segregate out these costs. This was a short period of drilling and to the extent that some drill bit costs were incurred that should be compensated for, the court believes that the 50 percent allocation reached herein is broad enough to encompass these costs.

The other major factual issue to be decided by the court under claim 7C is the reasonableness of Continental's anticipated bit life expectancy upon which its claim is based. Continental contends that when it submitted its bid on the Nambe Falls Dam contract, Continental anticipated an overage bit life of 60 feet per grout hole and 40 feet per drainage hole for a total average bit life of 50 feet. Defendant disputes the reasonableness of Continental's anticipated bit life expectancy and asserts Continental should have estimated an average life expectancy of 25 feet per bit. Defendant's estimate is based upon the ground conditions which the prebid material showed existed on the Nambe Falls Dam project and expert testimony analyzing the effect of the ground conditions depicted in these prebid materials on drill bit life expectancy.

Essentially, defendant's contention is that Continental's drill bit estimate was not reasonable, given the ground conditions which the prebid materials showed existed on the project.

The court finds that Continental's anticipated drill bit life expectancy was reasonable for the grout hole drilling work in the earth dam, but was unreasonable for all the other drilling operations in the dam. Continental's estimate was based upon the expectation that the ground material drilled would be consolidated and solidified. Continental could not have foreseen the problems which the perforated casing method would produce in terms of allowing loose material to penetrate the casing and thus tear up the drill bits. All the other ground conditions encountered in both grout hole and drainage hole drilling should have been expected by Continental from the prebid materials.

The court accepts Continental's estimate of average drill bit life expectancy only as it relates to earth dam grout drilling. The court finds Continental's estimate more persuasive than defendant's estimate for several reasons. First, as Continental's president and general manager testified, under BOR's estimate for drill bit life expectancy, Continental would have expended more in bit costs alone in its drilling operation than BOR's estimate for drilling all the holes, which estimate included all drilling costs, i.e., labor, equipment costs, drill bits, overhead, etc. Consequently, as is evident, defendant's estimate of drill bit life is inconsistent with BOR's prebid estimate of drilling expenses and is vastly understated.

As for drill bit life expectancy in drilling operations that involved work other than the grout hole drilling in the earth dam, the court determines that neither of the parties' estimates reasonably reflect the average bit life expectancy. Continental's esti-

mate is deemed too high and defendant's estimate is deemed too low. In view of the court's determination that BOR is responsible for only excessive drill bit wear for the earth dam grout hole drilling, it is, however, unnecessary for the court to determine what the correct average drill bit life should be for drilling operations which did not involve earth dam grout hole work.

Finally, with respect to plaintiff's claim in claim 7C for add-ons to Continental's claim for profit, home office overhead, job overhead, taxes, and bond expenses, the court finds that plaintiff incurred no additional expenses as a result of any excessive drill bit wear which Continental incurred. Claim 7C involves a claim by Continental for having to furnish additional bits relative to drilling work. It is difficult to appreciate how additional drill bits furnished by Continental would have caused plaintiff any expenses, administrative or otherwise. Since plaintiff provided no persuasive evidence that such additional drill bit costs to Continental increased plaintiff's expenses, the court necessarily concludes that plaintiff incurred no additional expenses which would provide the basis for allowing plaintiff any recovery under claim 7C.

On or about April 30, 1976, plaintiff submitted to the contracting officer on behalf of itself and Continental a claim for increased bit costs due to differing site conditions. This claim, *inter alia*, was denied on July 5, 1979, by the contracting officer on the basis of plaintiff's lack of timely notice of claim as required by the Differing Site Conditions clause of the contract. The entire work for drilling and grouting was completed on February 16, 1976.

*Discussion*

Continental bases its bit cost claim on the Differing Site Condition clause of the contract.[32] Continental argues that the unsta-

---

**32.** The contract contained the Standard Differing Site Conditions claim included in many government contracts. This clause stated in pertinent part:

"4. DIFFERING SITE CONDITIONS

(a) The Contractor shall promptly, and before such conditions are disturbed, notify the Contracting Officer in writing of: (1) Subsurface or

latent physical conditions at the site differing materially from those indicated in this contract, or (2) unknown physical conditions at the site, of an unusual nature, differing materially from those ordinarily encountered and generally recognized as inhering in work of the character provided for in this contract. * * *

ble nature of caving conditions in the earth dam and concrete dam foundation areas constituted differing site conditions within the meaning of the above-mentioned clause. Defendant maintains that the contract materials available to bidders accurately reflected the conditions which Continental encountered in both the earth dam area and the concrete dam area. Consequently, defendant argues there were no differing site conditions within the meaning of the clause in question. In any event, defendant argues, Continental's calculation of drill bit costs is based upon an unrealistic estimate of average drill bit life expectancy and therefore should be rejected.

■■■■ To recover under the Differing Site Conditions clause, Continental must demonstrate that the conditions it encountered were materially different from those disclosed in the contract materials. *Foster Constr. C.A. v. United States,* 193 Ct.Cl. 587, 597, 603, 435 F.2d 873, 878 (1970). An analysis of the record demonstrates that Continental has failed to make such a showing. In the earth dam area, the contract documents available to bidders accurately described the ground conditions which Continental actually encountered. In fact, these materials showed that BOR experienced caving during its test drillings in the earth dam area and that it was necessary to use casing to control the caving. Moreover, in the concrete dam area, the contract materials showed granitic conditions and these granitic conditions were exactly what Continental, in fact, encountered. There were no differing site conditions present in these circumstances. Therefore, it is concluded that Continental's reliance on the Differing Site Conditions clause to recover on claim 7C is misplaced.

■■■ Continental can, however, recover its excess bit costs incurred during grout hole drilling in the earth dam area under the changes clause of the contract. Conti-

nental's drilling in the earth dam tesuque formation was adversely affected by BOR's directive to change to a perforated casing method of drilling. As the facts discussed above clearly demonstrate, the BOR directed change to perforated casing resulted in excessive wear on the bits Continental is entitled to recover the additional drill bit costs it incurred above its prebid estimate as a result of the earth dam grout hole drilling work, because almost all the grout hole drilling in the earth dam area occurred after the December 3, 1974, directive on perforated casing. Moreover, to the extent that it incurred excessive drill bit wear when using the solid casing method, Continental can also recover for this excess wear since the work was performed pursuant to the March 20, 1975, revised change order by BOR. The court has determined that 50 percent of Continental's excessive drill bit cost is attributable to the earth dam grout drilling operation. Continental is, therefore, entitled to recover 50 percent of its drill bit claim under the changes clause of the contract. It is recognized that Continental, however, is not entitled to recover any of its excessive drill bit costs which are attributable to drainage hole drilling in the earth dam or any of its drilling in the concrete dam, either drainhole drilling or grout hole drilling because this work was not performed pursuant to BOR change order and was not otherwise caused by BOR action.

Defendant in its Requested Findings and in its Objections to Plaintiff's Requested Findings presents an objection to the timeliness of claim 7C under the notice requirements of the Differing Site Conditions clause. Defendant maintains that it was prejudiced by this lack of timely notice. Although plaintiff's timely notice argument was directed to the Differing Site Conditions clause, the court assumes that defendant has the same objection to claim 7C

(b) No claim of the Contractor under this clause shall be allowed unless the Contractor

has given the notice required in (a) above; * *."

under the changes clause,[33] but did not raise it because claim 7C, as presented by plaintiff, was based upon the Differing Site Conditions clause.

■ In any event, the failure of plaintiff to submit this claim within the 30-day period allowed by Changes clause does not bar this claim. This court's predecessor, the United States Court of Claims, has held that "notice provisions in contract-adjustment clauses [should] not be applied too technically and illiberaly where the Government is quite aware of the operative facts." *Hoel-Steffen Constr. Co. v. United States,* 197 Ct.Cl. 561, 573, 456 F.2d 760, 768 (1972); *see Copco Steel & Engineering Co. v. United States,* 169 Ct.Cl. 601, 616, 341 F.2d 590, 598 (1965). Here, BOR clearly knew the operative facts concerning Continental's difficulties with the perforated casing method of drilling. Indeed, in March 1975, defendant revised its directive ordering drilling with perforated casing because of discussions with plaintiff and Continental concerning the problems with that method. Moreover, the court is not persuaded that BOR was prejudiced in any way by the failure of plaintiff to submit this claim within the notice period, but rather the court is persuaded that BOR was aware of Continental's drilling difficulties during the grout hole drilling in the earth dam.

■ Plaintiff, on the other hand, is not entitled to any recovery for this claim. Although plaintiff asserts a claim for add-ons to Continental's claim for home office overhead, job overhead, profit, taxes and hand expenses, these add-ons do not properly belong in this claim. The drill bits were supplied by Continental and it was Continental which had to bear the full expense of excessive bit wear. Plaintiff suffered no damages or costs in terms of administrative expenses or otherwise as a result of Continental's excessive drill bit expenses. Therefore, plaintiff is not entitled to recover its add-ons for this claim.

For the reasons stated above, Continental is entitled to recover $39,998 ($79,995 × ½) under claim 7C. Plaintiff is not entitled to any recovery under claim 7C.

## IV.

In calculating plaintiff's costs for the claims discussed above, plaintiff and defendant disagree on several cost accounting items which affect the determination of plaintiff's direct costs and its delay costs. In addition, the parties also disagree on the critical path on the Nambe Falls Dam project and this disagreement has a direct effect on the amount of delay damages plaintiff can recover. As to the critical path generally, *see* n. 5, *supra.*

During the period August 16, 1982, to mid-December 1982, the FBI conducted an audit of plaintiff's damage claims presented in this case. During this same period, the FBI also conducted an audit of Continental's claims in this case. In the course of performing its audit, the FBI discovered that certain of plaintiff's accounting records were missing. The missing accounting records were the following: plaintiff's depreciation records, most of plaintiff's cash receipts, the summary sheets of monthly cash disbursements through July 1975, and subsidiary work-in-progress ledgers for some of plaintiff's various construction projects. The absence of these records made it more difficult for the FBI to audit plaintiff's claims. During the FBI's audit of Continental's claims, the FBI also discovered that Continental was missing records. Specifically, Continental had destroyed its bid workpapers and thus the FBI was not able to verify certain of Continental's expenses included in its claims.

As a result of its audit the FBI made certain corrections and adjustments to items contained in plaintiff's claim. Plaintiff accepted the validity of many of the FBI corrections and adjustments. The court generally found the FBI's damage calculations more accurate and reliable

---

**33.** The changes clause provides that within 30 days after receipt of a written change order, the contractor must submit a written statement of his claim to the contracting officer.

than plaintiff's calculations. There were five major areas of disagreement between plaintiff and defendant which impacted on the damage calculations of the parties. These areas of disagreement were: the critical path through the project, the fair market value of certain construction equipment, the ownership and operating cost of certain construction equipment, plant write-off, and extended schedule costs. It should also be noted that the parties agree on the applicable percentages for taxes, profit, and bonding expenses. The parties also both agree that plaintiff should receive an allowance for home office overhead and job overhead, but disagree on the applicable percentages. *See generally Luria Bros. & Co. v. United States,* 177 Ct.Cl. 676, 369 F.2d 701 (1967).

## A. *The Critical Path*

 In order to calculate delay damages, it is necessary to determine which work items on the Nambe Falls Dam project were on the critical path and the time period that these work items remained on the critical path. The reason that the determination of the critical path is crucial to the calculation of delay damages is that only construction work on the critical path had an impact upon the time in which the project was completed. If work on the critical path was delayed, then the eventual completion date of the project was delayed. Delay involving work not on the critical path generally had no impact on the eventual completion date of the project.

The parties agree on the critical path for the Nambe Falls Dam project until June 24, 1975. After June 24, 1975, plaintiff's and defendant's views on the critical path differ. Plaintiff contends that for the period June 24, 1975, to September 12, 1975, the arch dam concrete placement operation remained on the critical path. On September 12, 1975, plaintiff contends that the critical path shifted to drainage hole work on the dam until February 27, 1976. On February 27, 1976, plaintiff contends that the critical path then shifted to electrical work on the project until April 13, 1976, the date on which the project was substantially completed.

Defendant, on the other hand, maintains that the critical path on the Nambe Falls Dam project was as follows: From January 1975 to June 24, 1975, the arch dam concrete placement was on the critical path. On June 24, 1975, defendant maintains that the arch dam concrete placement operation did not remain on the critical path, but instead the critical path shifted to the earth dam embankment work where it remained until December 12, 1975. On December 12, 1975, according to defendant's version, the critical path shifted to work on the access house, the concrete structure which was attached to the top of the thrust block. On January 13, 1976, defendant contends that the critical path shifted to the electrical work in the access house until the substantial completion of the project on April 13, 1976. Thus, from June 24, 1975, when plaintiff contends the critical path left the arch dam concrete placement operation until February 27, 1976, when both parties' critical path converge on the electrical work for the project, plaintiff and defendant disagree on the critical path.

At the core of this dispute over the critical path is the parties' differing contentions concerning the access house and the electrical work which had to be completed inside the access house before the project could be completed. Thus, the dispute between the parties on the critical path can be separated into two parts: the construction of the access house and the installation of the electrical work inside the access house. Plaintiff does not dispute that some of the electrical work was on the critical path toward the end of the project. What plaintiff disputes is defendant's assertion that the electrical work scheduled to be performed at the end of the project had to wait until the completion of the access house. Plaintiff also disputes defendant's contention that the access house could not be built until after earth embankment work was substantially completed.

It is crucial to plaintiff's view of the critical path that the electrical work sched-

uled at the end of the project not be dependent upon the completion of the access house. Further, if plaintiff is wrong and the electrical work was indeed dependent upon completion of the access house, it is then crucial to plaintiff's view of the critical path that the access house was able to be constructed without the earth dam embankment having to be substantially completed and that plaintiff show that the access house was, in fact, built prior to the substantial completion of the earth dam work. For if defendant is correct in its assertions on the access house and the electrical work, then defendant's view of the critical path is also correct.

First, as regards the electrical work scheduled for the end of the project, the court is persuaded that the electrical work which was to be installed toward the end of the project was dependent upon the completion of the access house. The court comes to this conclusion because the record discloses that much of this electrical work involved the installation of electrical panels and electrical circuits, located inside the access house and thus the access house had to be completed before this electrical work could be installed. In fact, plaintiff in its work schedule, updated on October 4, 1974, planned the electrical work in the access house (including the installation of the control cabinet and power distribution board) to be performed after the construction of the access house. Moreover, on this October 4, 1974, schedule, plaintiff planned that the electrical work would take 3 months to perform. This October 4, 1974, schedule supports defendant's contention that the electrical work scheduled at the end of the project could only begin after the completion of the access house and that this work involved a substantial amount of time. Plaintiff's position on the access house electrical work simply is not supported by the record.

As for the issue of the dependency of the access house on the earth dam embankment work, the court is persuaded that the access house could only be constructed after a substantial amount of the earth dam embankment work was completed. Plain-

tiff's original work schedule and its October 4, 1974, updated schedule did not list the access house as a separate construction item. In fact, the record shows that plaintiff originally planned to pour the access house during its thrust block concrete placement operation since the access house was attached to the top of the thrust block. The record also shows, however, that plaintiff discovered that it could not pour the access house as part of the thrust block concrete placement operation.

The reason plaintiff could not pour the access house during its thrust block concrete operation was that only the back of the access house was directly attached to the thrust block. The bottom of the access house was designed to sit on a concrete slab which, in turn, was designed to sit on specially compacted soil. This compacted soil was part of the top of the earth dam embankment. There was simply no feasible method by which plaintiff could compact this soil under the access house if the access house was built before the earth dam embankment was built up to the point at which the compacted soil was to be placed.

The record shows that, in fact, plaintiff encountered this difficulty with the access house and the need to have the earth dam embankment work substantially completed before the access house could be built during the thrust block concrete placement operation. Indeed, one of plaintiff's supervisor's on the project testified at his deposition, which was in evidence, that plaintiff during its thrust block concrete placement operation discovered that the access house could only be built after much of the earth dam embankment work was done and that plaintiff had to wait to build the access house until the earth dam embankment work was substantially completed.

Finally, the court is also persuaded of the validity of defendant's view of the critical path as opposed to plaintiff's view because the court found the testimony of defendant's expert who prepared the critical path to be both logical and convincing.

**730**

The court was impressed with the thoroughness of his presentation of defendant's critical path. In addition, his presentation of the critical path was, in the court's view, in concert both with the events on the Nambe Falls Dam project as they actually occurred during construction and with the method which plaintiff, itself, had scheduled the construction work at the outset of the project.

For the reasons discussed above, the court determines that on June 24, 1975, the critical path switched to work in the earth embankment dam.[34] The earth embankment dam work remained on the critical path until December 12, 1975. On December 12, 1975, the court finds the critical path shifted to work on the access house and that the access house work remained on the critical path until January 13, 1976. On January 13, 1976, the court finds that the critical path shifted to the electrical work in the access house and that this electrical work remained on the critical path until April 13, 1976, the date the project was substantially completed. Accordingly, these critical path periods provide the court with the foundation necessary to reach delay damage conclusions. *See* Part IV B, subpart 4, *infra*.

### B. *Accounting Matters*

#### 1. *Fair Market Value Determinations*

There are four areas of disagreement between the parties on accounting matters: fair market value of construction equipment, equipment ownership and operating costs, plant write-off, and extended schedule costs. All these items have an impact on plaintiff's damages and the amounts properly attributable to individual claims.

The first area of disagreement between the parties is on the fair market value of certain equipment used on the Nambe Falls Dam project. The importance of a determination of fair market value lies in the fact that it is the basis for computing plaintiff's ownership and operating expenses under paragraph 1.3.8 of the contract. Specifically, the parties disagree over the fair market value of 6 items of plaintiff's equipment: the batch plant, a service truck and 4 air compressors. Of these 6 items, the batch plant is the most important of the 6 disputed items because valuation of the batch plant has the greatest impact on the equipment ownership and operating costs.

Plaintiff placed a fair market value of $290,000 on the batch plant. The basis for this valuation figure was an appraisal performed in July 1975. This July 1975 appraisal of the batch plant was performed by an appraiser hired by plaintiff. Defendant, based upon its audit of plaintiff's claims, contends the batch plant had fair market value of $95,000.

The batch plant began working on the Nambe Falls Dam project in October 1974. Paragraph 1.3.8 of the contract states: "The cost to be used for establishing equipment allowance rates shall be the fair market value at the time it commences work on the project." The court determines that the fair market value of the batch plant was $95,000 in October 1974, when plaintiff began utilizing said plant on the Nambe Falls Dam project.

The court's determination of the fair market value in this regard is supported by several facts. First, plaintiff's acquisition cost of the batch plant provides one indication of fair market value. Plaintiff assembled the batch plant from the components of two other batch plants. In procuring these various components plaintiff spent no more than $91,000. In July 1974, plaintiff sold the batch plant to G.M.S. Leasing, the company controlled by G.M. Shupe from which plaintiff leased much of its equipment, for $95,000. In addition, in November 1974, in connection with an internal audit performed by plaintiff's auditors, plaintiff submitted a schedule to its auditors on which plaintiff listed the equipment

---

**34.** A delay in the drilling of grout holes in the cut-off trench caused this shift in the critical path. The grout hole delay resulted in the earth dam embankment work being the item on the work schedule which had the longest time to completion on June 24, 1975. The record discloses that this grout hole delay was not the responsibility of BOR.

value of the batch plant as $95,000. Finally, on September 24, 1974, plaintiff sent BOR a letter in connection with its request for a progress payment for preparatory work. In this letter plaintiff stated: "To exemplify the value of the preparatory work done we are attaching the following exhibits:" Included in this list of exhibits was the equipment item "Johnson Batch Plant" with an amount of $95,000 listed beside it.

The court's determination of the fair market value of the batch plant was made after due consideration of plaintiff's contentions. First, the court found plaintiff's expert's appraisal to be unpersuasive, especially in light of all the factors mentioned above. Even though no appraisal expert testified for defendant concerning batch plant fair market value, the court is not compelled to accept plaintiff's expert's valuation. As the Court of Claims stated: "Even uncontradicted opinion testimony is not conclusive if it is intrinsically nonpersuasive." *Sternberger v. United States,* 185 Ct.Cl. 528, 535–536, 401 F.2d 1012, 1016 (1968). Second, although plaintiff makes much of the fact that the batch plant was sold at the end of the job for $175,000, in an effort to counteract defendant's $95,000 figure, the court does not find that this sale price provides an accurate indication of the fair market value of the equipment at the time it began operating on the job which, under the contract, is the time at which fair market value must be established. Moreover, this $175,000 price would have included improvements to the batch plant components during the course of mobilizing the plant. The FBI audit of plaintiff's records indicates some $65,000 worth of work done on the batch plant components during its mobilization on this job. This $65,000 worth of work has been included as a direct cost to the project and thus are included as a component in the individual claims. Finally, the record fails to explain satisfactorily the fact that plaintiff sold the batch plant for $175,000 at the end of the job, yet it claims a fair market value of $290,000 for said plant at the beginning of the job.

The court has also accepted defendant's fair market value determinations for the other items of equipment in dispute. The court is persuaded that the service truck had a fair market value of $333 as contended by defendant given its age, the inconsistency of plaintiff's various valuation figures for the truck, and the amount of depreciation which plaintiff had taken on the truck at the start of the project. The court also accepts defendant's fair market value of the three air compressors in dispute since defendant's valuation of $400 for each compressor is consistent with the book value of the compressors and the depreciation previously taken by plaintiff on these compressors.

Finally, the court has not allowed any fair market value for the Sullair compressor which plaintiff claimed had a $50,000 fair market value. The FBI, during the course of its audit, discovered that this piece of equipment was not on the Nambe Falls Dam project, but instead was being used on one of plaintiff's construction projects in Canada. Plaintiff was unable to present any convincing evidence in terms of work records or otherwise which established that, in fact, the Sullair compressor was used at any time on the Nambe Falls Dam project. Therefore, the court concludes that the Sullair compressor had no fair market value for the purposes of cost determinations relative to the Nambe Falls Dam project.

For the reasons given above, the court has determined that the batch plant had a fair market value of $95,000 when it began operation on the job. In addition, the court has concluded that the other equipment pieces in dispute had the fair market values described in the preceding paragraphs.

## 2. *Equipment Ownership And Operating Rates*

Equipment ownership and operating rates affect the calculation of both direct costs and delay damages. The calculation of equipment ownership and operating rates involves two factors: the equipment's fair market value and the formula which is to be applied to that fair market value.

The issue of fair market value has already been discussed and determined, *supra.* The issue of the correct formula to be applied to fair market value figure of each piece of equipment remains to be resolved.

The ownership cost for a piece of equipment is calculated by first determining the fair market value of the piece of equipment. Then, a percentage figure for depreciation, overhaul, taxes, and insurance is determined and this percentage figure is applied against the fair market value to obtain a yearly ownership cost. This yearly ownership cost is further broken down by dividing by the number of months of usage per year to determine a monthly ownership cost. The primary difference between the parties in calculating ownership cost, besides the fair market value difference discussed previously, is the figure for monthly usage per year.[35]

Plaintiff used the figures for months per year usage which are contained in the "Equipment Ownership Expense" schedule of the Associated General Contractor's of America, Inc. (AGC schedule). This AGC schedule lists, among other things, the average number of months usage per year for specific pieces of equipment. For the batch plant, plaintiff uses a figure of 7 months per year usage obtained from the AGC schedule. Defendant, on the other hand, uses a figure of 12 months per year usage because that was the number of months per year which the batch plant was actually used on the Nambe Falls Dam project.

■ The contract provides in paragraph 1.3.8(b) that the figure for the average months of use per year is to be obtained from the AGC schedule but "modified as necessary to reflect experience at the individual project area." Defendant has modified the AGC schedule rate to reflect the actual use of the equipment on the Nambe Falls Dam project. Therefore, the court

accepts defendant's monthly usage figures as both in conformance with the contract provisions concerning equipment and as an accurate reflection of the actual use, or experience, of this equipment on the Nambe Falls Dam project. Accordingly, the court rejects plaintiff's use of the AGC schedule figures for average months of use per year because it contains no modification for the actual amount of use, or experience, on the Nambe Falls Dam project.

The allowance of a modification of the AGC schedule here does not conflict with case law precedent. In *Nolan Bros., Inc. v. United States,* 194 Ct.Cl. 1, 437 F.2d 1371 (1971), the Court of Claims held that the language of a Defense Department procurement regulation at issue in that case created a presumption of use of AGC rates. The court in *Nolan* recognized, however, that even though the regulation at issue in that case created a presumption of use of AGC rates, in certain circumstances, the actual costs of the contractor could be used in some circumstances. *See Nolan Bros., Inc. v. United States, supra,* 194 Ct.Cl. at 17, 437 F.2d at 1379. In an earlier case, *Bennett v. United States,* 178 Ct.Cl. 61, 67, 371 F.2d 859, 862 (1967), the Court of Claims also recognized that the AGC rate schedule could be disregarded if there was a substantial reason for doing so. In the case at bar, the contract specifically provided that the AGC schedule was to be modified to reflect actual use, or expense, on the project. Therefore, unlike *Nolan* there was no mandate by regulation that the AGC schedule be used. In fact, the contract language provides a clear directive to modify as necessary the AGC schedule to reflect experience under the contract. Both the *Nolan* and *Bennett* holdings, under the circumstances of this case, are in harmony with the conclusions reached herein.

**35.** There is also a slight difference between the parties in the yearly percentage for depreciation, overhaul, taxes, and insurance. Plaintiff uses a figure of 44 percent while defendant uses a 40.5 percent figure. The 3.5 percent difference results from plaintiff's inclusion of storage and incidentals in its 44 percent figure. Since storage and incidentals are included in the home office and job overhead figures, plaintiff's figure contains expenses included elsewhere. Therefore, the court accepts defendant's 40.5 percent figure to avoid duplication of expenses.

Having concluded that the batch plant had a use per year of 12 months, this 12-month figure, in the formula for determining ownership expenses, yields a cost of $3,377 per month or $16.23 per hour.[36] The court has also accepted defendant's cost per hour for the other pieces of equipment in dispute.[37]

The parties also disagree on the formula to use in computing plaintiff's operating costs for plaintiff's equipment on the Nambe Falls Dam project. Again, the most important piece of equipment on which the parties disagree is the batch plant. Plaintiff uses a $104.40 operating cost per hour figure while defendant uses a $30.50 per hour operating cost figure.

 The formula used by plaintiff to compute equipment operating expense is duplicative because overhaul expense, a subcost item of operating expense, is contained in both plaintiff's equipment ownership costs and in plaintiff's equipment operating costs. Defendant's method of computing equipment operating costs avoids this duplication of equipment overhaul expense. Defendant in computing operating expense for the batch plant divided the batch plant into its component parts and determined repair and lubrication costs for each component part. The court, therefore, is persuaded that defendant's computations of equipment operating expense are more reliable then plaintiff's computations

and provide a reasonable basis for the calculation for plaintiff's cost of operating the concrete batch plant. In addition, the court is also persuaded that defendant's computations of the operating expense for all plaintiff's construction equipment, in addition to the concrete batch plant, on the Nambe Falls Dam project are reasonable and reliable.

 Accordingly, the court finds that the operating cost of the batch plant was $30.50 per hour and that defendant's cost per hour figures for the other equipment used by plaintiff on the Nambe Falls Dam project are also deemed reasonable and reliable. Defendant uses a total equipment cost of $2,227 per day while plaintiff uses a figure of $4,054 per day; both of these figures include the cost of batch plant operation. The primary reason for the difference between the two daily equipment expense figures is the use of different equipment ownership and operating costs. Based upon the discussion above, the court accepts defendant's figure of $2,227 per day as a reasonable and reliable amount.

### 3. Plant Write-off

Plant write-off is essentially the expense plaintiff incurred in leasing equipment for the Nambe Falls Dam project. Plant write-off is important because it is an element in the computation of home office overhead and job overhead which, in turn, is included

36. The formula is as follows: fair market value × percentage for depreciation, overhaul, etc. divided by number of months used per year = ownership cost. The ownership cost per day is obtained by dividing the ownership cost per month by the number of hours per month ($3,377 divided by 208 hours). Both parties use the same figure of 208 hours per month.

37. Of the 5 items of equipment in dispute, defendant allowed ownership expenses for only 1 item, an air compressor. Four of the other items (3 air compressors and the service truck) were fully depreciated. 41 C.F.R. § 1–15.205–9(g) (1974), which is applicable to this contract, does not allow depreciation costs if a piece of equipment has been fully depreciated unless there has been an advance agreement between the parties. Here, there was no evidence of an advance agreement between the parties; therefore, defendant properly allowed no deprecia-

tion expense for the 4 items in question. To the extent that ownership expense includes items other than depreciation, the above-mentioned regulation does not prevent those costs. The relative value of these costs are most probably minimal, and, in any event, were not broken out by the parties for these specific items so as to enable the court to make concrete determinations for these items of equipment. However, in view of the small fair market value of the equipment involved and the fact that depreciation is in fact the greatest ownership expense, the court finds that, under these circumstances, defendant's ownership cost for the 4 above-mentioned items was reasonable on this record. The fifth item, the Sullair compressor, also was properly not assigned an ownership cost because there is no record of its use on the Nambe Falls Dam project.

in the computation of plaintiff's damages. Plaintiff contends that its plant write-off costs were $959,428 and defendant argues that plaintiff's plant write-off costs were $441,732.

The main reason for the difference between the parties on plant write-off involves the leasing rates which plaintiff paid to rent the equipment used on the Nambe Falls Dam project. Plaintiff leased its equipment from two different companies both of which were set up by G.M. Shupe and both of which did business almost exclusively with plaintiff. When plaintiff began the Nambe Falls Dam project, plaintiff's president and majority stockholder, G.M. Shupe formed another corporation G.M.S. Leasing Company, Inc. (G.M.S. Leasing). G.M. Shupe was also president of and sole stockholder in G.M.S. Leasing. G.M.S. Leasing acquired virtually all of the equipment used by plaintiff on the Nambe Falls Dam project and leased this equipment to plaintiff for use on the project. It was stipulated at trial that G.M.S. Leasing and plaintiff were companies under the common control of G.M. Shupe.

After plaintiff encountered financial difficulties in 1975, it was necessary for plaintiff to have G.M.S. Leasing sell its construction equipment to satisfy plaintiff's creditors. In order to avoid having to lease the necessary construction equipment from an unaffiliated third party, G.M. Shupe decided to enter into a joint venture with a man who was a subcontractor on several of plaintiff's construction projects, Herbert A. Sigety (H.A.S.). For the purposes of setting up this joint venture, G.M. Shupe created a new corporation, G.M.S. Company, Inc. (G.M.S. Co.). This company was to receive a 70 percent share of the profits of the joint venture (HAS/GMS Co.). G.M. Shupe was president and Chairman of the Board of G.M.S. Co., although he was not a stockholder. Of the 100,000 shares of stock issued by G.M.S. Co., 40,000 shares were owned by two of plaintiff's vice presidents in the amount of 20,000 shares each.

In addition, 51,000 shares were owned by a man who was at one time the son-in-law of G.M. Shupe's wife.

Furthermore, G.M. Shupe had a 5-year employment contract with G.M.S. Co. which required G.M. Shupe to be paid not less than $50,000 per year, and allowed termination of the employment contract only for such egregious acts as "fraud, misappropriation, embezzlement, or the like * * *." The record clearly discloses that G.M. Shupe controlled and operated G.M.S. Co.

The HAS/GMS Co. joint venture bought the equipment of plaintiff and G.M.S. Leasing when the equipment used on the Nambe Falls Dam project was sold to satisfy plaintiff's creditors. The HAS/GMS Co. joint venture was structured so that G.M.S. Co. received 70 percent of the profits from the joint benture while 30 percent went to H.A.S.[38]

■ Defendant reduced plaintiff's plant write-off amount to account for the fact that both G.M.S. Leasing and HAS/GMS Co. leased the construction equipment at rates in excess of those allowed for a corporation under common control with the corporation to which the equipment was leased. Consequently, defendant disallowed $82,422 in HAS/GMS Co. lease charges and $413,429 in G.M.S. Leasing equipment rental charges.

The basis for defendant's reduction of the leasing rates charged by G.M.S. Leasing and HAS/GMS Co. for purposes of plant write-off is to be found in 41 C.F.R. § 1–15.205–34 (1974) of the federal procurement regulations, which provides in pertinent part:

(g) Charges in the nature of rent between any division, subsidiary, or organization under a common control are allowable to the extent such charges do not exceed the normal costs of ownership, such as depreciation, taxes, insurance, and maintenance (excluding interest or other unallowable costs pursuant to this Part 1–15): *Provided,* That no part of

---

**38.** It is unclear from the record how much capital Herbert Sigety provided the HAS/GMS

Co. joint venture relative to the equipment purchases.

such costs shall duplicate any other allowed costs.

Under paragraph 1.3.7 of the contract, plaintiff's costs must conform to 41 C.F.R. § 1–15.205–34 to be allowed as expenses under an equitable adjustment.[39] Defendant contends that both G.M.S. Leasing and HAS/GMS Co. were an "affiliate of the contractor under common control" within the meaning of 41 C.F.R. § 1–15.205–34 (1974). The reduction by defendant in the lease rates of G.M.S. Leasing and HAS/GMS Co. were made to ensure that these lease rates did not exceed the allowable leasing costs as provided by 41 C.F.R. § 1–15.205–34 (1974).

There is no real issue concerning the common control of G.M.S. Leasing and plaintiff by G.M. Shupe since plaintiff's counsel stipulated at trial that the two companies were under G.M. Shupe's common control and the record clearly supports a determination of such common control. Despite plaintiff's assertions to the contrary, it is also clear from the record that HAS/GMS Co. and plaintiff were also under the common control. The record supports a finding that G.M.S. Co., in fact, controlled the HAS/GMS Co. joint venture because G.M. Shupe, president of and chairman of the board of G.M.S. Co., controlled and operated the HAS/GMS Co. joint venture. A further indication of control is the fact that G.M.S. Co. received 70 percent of the profits of the HAS/GMS Co. joint venture. Since G.M. Shupe controlled plaintiff as well as G.M.S. Co., it is clear that the HAS/GMS Co. joint venture and plaintiff were under the common control

within the meaning of 41 C.F.R. § 1–15.-205–34 (1974).

Accordingly, the court determines that defendant's reduction in HAS/GMS Co. leasing rates by $82,422 and in G.M.S. Leasing rental rates by $413,929 was a proper and necessary correction to bring these leasing rates into compliance with 41 C.F.R. § 1–15.205–34, *supra*. In addition, these reductions were proper and necessary because the record shows that the lease charges by both G.M.S. Leasing and HAS/GMS Co. exceeded the reasonable rental rates for the equipment. In fact, the record shows that for certain equipment, the lease charges paid by plaintiff increased significantly when plaintiff switched its leasing of the equipment from an unaffiliated third party to G.M.S. Leasing. The record shows a similar substantial increase in rental rates for certain equipment when plaintiff switched its leasing from an unaffiliated third party to HAS/GMS Co. The court also finds that defendant's other reduction of plaintiff's total plant write-off in the amount of $21,-345 was reasonable. This $21,345 reduction eliminates duplication in certain of plaintiff's costs.[40]

The court determines, for reasons stated above, that plaintiff's plant write-off amount is to be reduced by $517,696 ($413,-929 + $82,422 + $21,345). Accordingly, the proper amount for plaintiff's total plant write-off is $441,732 ($959,428 – $517,696).

This reduction in plaintiff's plant write-off costs affected the computation of home office overhead and job overhead. As a result of the reduction in plant write-off,

**39.** Paragraph 1.3.7 states, in pertinent part: "Allowable costs in price adjustments shall be made in accordance with the cost principles stated in Part 1–15 of the Federal Procurement Regulations (41 CFR 1–15) except that equipment ownership and operation expense shall be computed in accordance with the paragraph included in these specifications entitled 'Equipment Ownership and Operation Expense.' Where the amount of the adjustment is not agreed upon in advance, the contractor shall keep sufficient records and data to establish the cost of the work in accordance with the requirements of 41 CFR Part 1–15."

Since there was no agreement in advance between the parties on allowable rental costs, plaintiff's leasing arrangements with G.M.S. Leasing and H.A.S./G.M.S. Co. must conform to 41 C.F.R. Part 1–15.

**40.** Defendant actually reduced plaintiff's total plant write-off by $33,601 to avoid cost duplication. However, defendant also allowed plaintiff a $12,256 credit for additional taxes on G.M.S. Leasing equipment. The net result is a reduction of $21,345.

plaintiff's total direct project costs were $5,825,093, not $6,342,789 as contended by plaintiff. Plaintiff used $6,342,789 for total direct payment costs, instead of the correct figure of $5,825,093 in its calculation of home office overhead. However, a decrease in plant write-off expenses results in an increase in the home office overhead. Since plaintiff used the larger figure of $6,342,789 in its home office overhead calculations, its calculations understated its home office overhead percentage which plaintiff calculated as 8.5 percent. In addition, plaintiff's calculations for home office overhead contained other errors. On the other hand, the court finds that defendant's formula for computing home office overhead is reasonable and more persuasive than plaintiff's computations. Defendant calculates plaintiff's home office overhead percentage as 12.6 percent and the court determines that 12.6 percent is a reasonable figure for home office overhead.[41] Also in light of the court's determination on plant write-off, the court accepts defendant's figure of 10.5 percent, as contrasted with plaintiff's 8 percent, as a correct calculation of plaintiff's job overhead rate.

### 4. Extended Schedule Job Cost

▮ Plaintiff claims $8,903 per day in delay costs for each day the project was delayed by BOR[42]. Defendant uses a figure of $6,817 per day to compensate plaintiff for delay costs.[43]

The difference between defendant's and plaintiff's per day delay cost figures is mostly a function of the parties use of different equipment ownership and operating costs. Both equipment ownership expense and equipment operating expense have a direct effect on the per day delay cost. Since the court has accepted defendant's equipment ownership and operating cost figures, the court also accepts defendant's figure for cost of delay per day.[44] Accordingly, the court finds that plaintiff incurred additional expenses in the amount of $6,817 for each day the completion of the project was delayed by BOR actions.

### Summary Statement

In concluding this discussion of damages, it should be emphasized that as a general rule the court found defendant's method of computing the costs incurred by plaintiff to be both fair and reasonable. In fact, as was mentioned earlier, plaintiff accepted many adjustments and corrections which the FBI made in plaintiff's computations. Plaintiff's damage submissions were simply not as persuasive as were the defendant's damage submissions. Indeed, the court suspects that plaintiff's damage submissions most probably reflected plaintiff's desire that the court adopt a generalized view of damages and render a jury verdict

---

**41.** Although the fact that the court held defendant responsible for more delay days than defendant conceded (21 instead of 16) could have slightly lowered the home office overhead and job overhead percentages, the reduction in these percentages would have been so slight, (less than 0.2%) that the court deemed it more realistic and practical simply to use defendant's figure instead of the court trying to juggle the figure to reach what might be deemed speculative, unrealistic or unnecessary meddling.

**42.** Plaintiff originally sought $9,020 per day but reduced the amount to $8,903 at post-trial oral argument to allow for certain adjustments and corrections.

**43.** Both the $8,903 per day figure and the $6,817 per day figure are for the period of high overhead when the batch plant was on the project. The parties have stipulated to a reduction of the

cost per day figure to $573 per day for any period of delay after the batch plant was dismantled. Only plaintiff's claim 6 involved a work which took place during this low overhead period. In any event there were no delay days in the court's determination of delay damages which required this reduction.

**44.** Another factor which contributes to a lesser degree to the differences between the parties in determining cost of delay, is the parties' different computations of home office overhead cost per day. Defendant uses a figure of $1,469 per day while plaintiff uses a figure of $1,548 per day. The difference in the figures stems from the parties' differing computations of plant write-off. The court has accepted defendant's figures for plant write-off. Accordingly, it follows that defendant's figure of $1,469 is deemed more reasonable and is therefore accepted by the court.

award to plaintiff. In its final brief to the court, plaintiff suggested that this case may be one which lends itself to a jury verdict. Its damage submissions and calculations seemed to be prepared with this in mind and it caused considerable problems for defendant and the court in trying to correlate damages with the separate and independent claims asserted by plaintiff and its subcontractor.

 In arriving at its damage award figures, the court has acted in accord with the proposition that where the fact of damage has been established, precision in calculating the amount is not required. *See Capital Electric Co. v. United States,* 729 F.2d 743, 746 (Fed.Cir.1984). The court, however, also was governed by the proposition that leniency as to the actual mechanics of computation does not relieve a contractor of its basic and essential burden of establishing the fundamental facts of liability, causation and resultant damage. It was plaintiff's obligation in this case to prove with reasonable certainty the damages and delay which resulted from BOR's actions and to provide a reasonably correct approximation of the damages which arose therefrom. *See Wunderlich Contracting Co. v. United States,* 173 Ct.Cl. 180, 199, 351 F.2d 956, 968 (1965); *Willems Indus., Inc. v. United States, supra,* 155 Ct.Cl. at 377, 295 F.2d at 831. Under the difficult circumstances of this litigation, the court took a balanced approach relative to the above proposition in order to arrive at what it considered a fair award based upon the record in this case.

In reaching damage conclusions in its discussions of the various claims presented by plaintiff, the court has utilized the calculations, along with others not disputed by the parties, set forth above in determining the amount plaintiff is entitled to recover as an equitable adjustment. It is the court's determination that plaintiff, relative to the claims it has asserted herein, is entitled to recover, as an equitable adjust-

ment, on its own behalf, the sum of $677,-169, and on behalf of its subcontractor, Continental, the sum of $100,009.

## V.

### *Interest Claim*

Plaintiff also seeks to recover $139,167 which is the amount plaintiff's Surety, Travelers Indemnity Co. (Travelers), paid, as guarantor, in interest charges to Washington Trust Bank of Spokane, Washington (WTB) to help finance the completion of the Nambe Falls Dam project.[45] Defendant contends that plaintiff is not entitled to recover this interest which plaintiff's surety paid to WTB.

### *Facts*

In the early summer of 1975, plaintiff was in financial difficulty. As a result, plaintiff's surety, Travelers, helped set up a financial arrangement in July 1975 which allowed plaintiff to complete the Nambe Falls Dam contract. Only one facet of the financial arrangements between Travelers, WTB and plaintiff need be discussed for purposes of ruling on the interest claim presented by plaintiff.

Under this financing arrangement, a special trust account was set up to finance the completion of the Nambe Falls Dam project. WTB, *inter alia,* agreed to loan plaintiff $700,000 to assist in the completion of the project. Travelers guaranteed the payment of this $700,000 loan and also agreed to pay the interest on this loan directly to the bank. The loan was a demand loan and, therefore, callable by WTB at any time.

In November 1975, WTB requested Travelers to pay back the $700,000 loan which Travelers had guaranteed. Travelers, however, asked WTB to postpone the repayment of the $700,000 loan and WTB acceded to this request. There is no evidence in the record as to what reason Travelers gave WTB in support of its request. Fur-

---

45. Plaintiff includes this $139,167 interest claim as a line item in its total cost and quantum meruit claims. It does not include it as a specif-

ic claim in its individual equitable adjustment claims.

ther, the proposed findings of fact submitted by the parties were most sketchy on this interest issue. Travelers, it was testified, requested the loan repayment postponement because Travelers believed that BOR and plaintiff would imminently settle plaintiff's outstanding claims against BOR. Ostensibly, from any such settlement proceeds, plaintiff would repay the WTB $700,-000 loan which Travelers had guaranteed. There is no contention by plaintiff that Travelers did not have the financial resources to pay the loan back in November 1975, and it is certainly reasonable to assume that a surety such as Travelers had the financial ability to repay this $700,000 loan in November 1975 and at any time thereafter. Instead of repaying the loan, however, Travelers made a business decision to postpone paying the principal of the loan to WTB and to simply continue making interest payments relative thereto. Travelers eventually paid WTB in full for the $700,000 loan in March 1978.

Travelers paid a total of $139,595 to WTB for interest on the $700,000 loan. These interest payments stretched from September 1975 to March 1978. Thus, Travelers continued making interest payments after April 13, 1976, the date BOR accepted the Nambe Falls Dam project as substantially complete. Under its indemnity agreement with Travelers, plaintiff was responsible for all costs Travelers incurred as a result of having to perform on its bond with plaintiff; consequently, plaintiff was liable to Travelers for the interest paid by Travelers to WTB on the $700,000 loan.

### Discussion

■ As a general rule, interest on a claim against the United States is not recoverable absent an express provision to the contrary in a relevant statute or contract. 28 U.S.C. § 2516(a) (1976); *Brookfield Constr. Co. v. United States*, 228 Ct.Cl. 551, 559, 661 F.2d 159, 165 (1981); *First National City Bank v. United States*, 212 Ct.Cl. 357, 371, 548 F.2d 928, 937 (1977) (*en banc*). Plaintiff does not seek interest on the loan under a specific statutory provision or under a specific contract provision authorizing the payment of interest. Instead, plaintiff relies on the case of *Bell v. United States*, 186 Ct.Cl. 189, 205–206, 404 F.2d 975, 984 (1968) which held that interest, in certain circumstances, could be recovered as part of an equitable adjustment claim. To come within the holding of *Bell v. United States, supra*, plaintiff must show a direct relationship between the loan for which the interest expense is claimed and the additional work for which plaintiff received an equitable adjustment. In short, plaintiff must show that the additional work for which the equitable adjustment is sought directly caused the loan for which the interest expense is claimed. *Dravo Corp. v. United States*, 219 Ct.Cl. 416, 424–427, 594 F.2d 842, 846, 847 (1979); *Bell v. United States, supra; see S.S. Silberblatt, Inc. v. United States*, 3 Cl.Ct. 644 (1983).

■ Plaintiff has not demonstrated, nor indeed did it make any attempt to show, that additional BOR directed work for which it sought an equitable adjustment resulted in the $700,000 loan from WTB. Indeed, as the discussion of plaintiff's individual claims demonstrates BOR was responsible for only a moderate amount of additional work on the Nambe Falls Dam project. There is no persuasive evidence in the record that plaintiff's financial difficulties and the necessity of relying on Travelers to finance the completion of the project were the result of additional work directed by BOR. Consequently, under the holding of *Bell v. United States, supra*, plaintiff cannot recover the interest payments on the $700,000 loan as an equitable adjustment. Further, plaintiff cannot recover a portion of these interest payments simply because the court has found that BOR directed some additional work for which plaintiff is entitled to receive an equitable adjustment. Plaintiff has not made the requisite showing that the additional BOR directed work for which it herein receives an equitable adjustment necessitated any portion of the $700,000 loan. Absent such a showing that a portion of the loan was required because of the additional BOR

directed work for which plaintiff received an equitable adjustment, plaintiff cannot recover any part of the interest payments made for the $700,000 loan. *See Framlau Corp. v. United States,* 215 Ct.Cl. 185, 198, 568 F.2d 687, 694 (1977).

■■■■ Furthermore, by refusing to pay the principal loan amount when requested to do so by WTB, Travelers failed to take proper action to limit interest expense. In effect, plaintiff's claim for interest seeks to transfer to defendant responsibility for Travelers' decision to postpone repayment of the $700,000 loan principal. Travelers, however, made the decision not to repay the principal of the loan based upon its expectation that there would be a quick resolution of plaintiff's claims involving the Nambe Falls Dam project. Given the complexity of plaintiff's claims and plaintiff's vague manner of presenting these claims, Travelers should not have reasonably expected these claims to be resolved quickly. By failing to repay the $700,000 WTB loan within a reasonable time after WTB's request for repayment, Travelers greatly increased the amount of interest it paid on the loan. Since repayment when WTB's first requested repayment would have stopped any further interest expense, Travelers, by not repaying the loan, failed to limit expenses that were avoidable. Plaintiff cannot recover those costs which could have been avoided. *See Dittmore-Freimuth Corp. v. United States,* 182 Ct.Cl. 507, 531, 390 F.2d 664, 679 (1968). Accordingly, even if plaintiff had shown the causal relationship required by *Bell v. United States, supra,* it would not be entitled to recover all of the interest paid by Travelers on the WTB $700,000 loan. Plaintiff could only recover for those interest payment which were made before WTB requested payment on the loan.[46]

■■■ One final point should be made relative to plaintiff's interest claim. Although not argued by defendant, it is the court's view that plaintiff's claim for interest is barred by the release it executed on July 7, 1976. *See* Part IIA, *supra.* The interest claim which plaintiff now asserts was not listed as an exception in said release and thus plaintiff is precluded from any recovery on said claim. Since this interest claim is presented as part of an equitable adjustment claim, it certainly was the type of claim that should have been excepted from the release if plaintiff intended to seek future recovery thereon from the contracting officer or the court.

For reasons set forth above, the court concludes that plaintiff is not entitled to recover on its claim for interest expenses of $139,167, which item is part of plaintiff's claim for recovery under either its modified total cost theory or its quantum meruit theory. *See* Part IIB of this opinion, *supra.*

## VI.

### *Defendant's Counterclaim*

In its answer to plaintiff's petition (now designated "complaint" under RUSCC 7) defendant included a counterclaim for $78,-922.75. Defendant reduced this $78,922.75 amount to $19,907 in its post-trial submission. Plaintiff stipulated that defendant is entitled to a credit of $8,588 on its counterclaim.

The basis for defendant's counterclaim is the contention that plaintiff was over paid by BOR for excavation on the right abutment.[47] Defendant contends that the reason for this overpayment was the fact that BOR paid plaintiff at the contract price for

---

46. Travelers, in the court's view, had a reasonable time to repay the loan after WTB requested repayment in November 1975. Although the court has not attempted to fix a specific date on this reasonable time period, it is certainly clear that Travelers should have repaid the loan by April 1976, the month in which BOR accepted the Nambe Falls Dam project as substantially complete.

47. Defendant's original counterclaim of $78,-922.75 contained an amount of $16,171 for overpayment on the earth dam excavation. Defendant has apparently dropped this item of its counterclaim. In any event, there is no support in the record for this earth dam portion of the counterclaim.

all excavation beyond the contract design line. Since plaintiff was responsible for some of this overexcavation as a result of the setbacks for its drills beyond this line, defendant claims that plaintiff was improperly paid for all excavation resulting from said drill setbacks. Defendant did not, however, propose any findings of fact which specifically delineated the basis for its counterclaim. Nor did defendant reveal in its post-trial submissions how it arrived at its $19,907 figure, or how many cubic feet of excavated material it contended plaintiff was responsible for on the right abutment. Indeed, defendant reduced its $78,922.75 counterclaim figure, set forth in its pleading, to $19,907 without any explanation. Defendant merely included its $19,907 counterclaim amount as a line item in its calculations without direct support or explanation.

Defendant must carry the burden of proof on its counterclaim. *International Harvester Co. v. United States,* 169 Ct.Cl. 821, 847, 342 F.2d 432, 446, 447 (1965); *Albright v. United States,* 161 Ct.Cl. 356, 363 (1953). In sustaining its burden, defendant must provide the court with a sufficient basis for determining the damages it seeks so that the court's determination will be more than sheer speculation. *Willems Industries, Inc. v. United States, supra,* 155 Ct.Cl. at 377, 295 F.2d at 831; *Winn-Senter Constr. Co. v. United States, supra,* 110 Ct.Cl. at 63. Defendant has failed to carry its burden in this regard. Defendant has not provided the court with a basis for determining how many cubic yards of excavated material on the right abutment resulted from plaintiff's drill setbacks and it has not provided the court with a method of determining a damage amount absent such cubic yard figures. Instead, defendant has simply presented the court with a figure for damages without adequate support.

The court has determined that plaintiff did setback its drills 1½ feet on the right abutment. However, without a method of determining how this 1½ foot setback translates into cubic feet of excavated material, the court is unable to attach a dollar amount to this fact of a 1½ foot setback. Since plaintiff stipulated that defendant is entitled to a credit of $8,588 as a result of plaintiff's drill setbacks, the court accepts this figure, and it is amply supported by the record, as the amount to which defendant is entitled to recover on its counterclaim in view of the fact that defendant has failed to provide a sufficient basis on which a reasonable computation of damages can be made.

For reasons discussed above, defendant is entitled to recover $8,588 on its counterclaim.

## VII.

Based upon the facts found and the reasons discussed above, and upon consideration of the entire record, the court determines that plaintiff is entitled to recover $677,169 on its own behalf and $100,009 on behalf of its subcontractor, Continental. Thus, plaintiff is entitled to a total judgment of $777,178. The court further determines that defendant is entitled to recover $8,588 on its counterclaim. IT IS THEREFORE ORDERED that a judgment of $768,590 ($777,178–$8,588) be entered for plaintiff, plus interest thereon as provided by the Contract Disputes Act, 41 U.S.C. § 611 (1982).